IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| D'AMICO DRY d.a.c., | ) | |
| f/k/a d'Amico Dry Limited | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. CV-18-284 |
| | ) | IN ADMIRALTY |
| NIKKA FINANCE, INC., | ) | |
| as owner of the M/V SEA GLASS II, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT

Plaintiff, D'AMICO DRY D.A.C. f/k/a/ D'AMICO DRY LIMITED ("Plaintiff" or "d'Amico Dry"), by and through its attorneys, Maynard, Cooper & Gale and Tisdale Law Offices, LLC (*pro hac vice* pending) as and for its Verified Complaint against the Defendant, NIKKA FINANCE, INC ("Nikka"), alleges as follows:

## INTRODUCTION/STATEMENT OF CASE

As discussed more fully herein, this action arises out of the breach of a Forward Freight Agreement ("FFA") entered into between the plaintiff and Primera Maritime (Hellas) Limited a/k/a Primera Maritime Limited ("Primera") dated September 2, 2008. Primera defaulted on its obligations and in accordance with the terms of the FFA, on June 9, 2009, d'Amico Dry obtained an unappealable final judgment of the English High Court in the amount of $1,766,278.54. Post- judgment interest and future legal fees incurred in the enforcement of the judgment were also awarded to d'Amico Dry as part of the English judgment.

On September 11, 2009, d'Amico Dry commenced an action against Primera in the United States District Court for the Southern District of New York (Koeltl, J.)("New York

Action") numbered 09-CV-7840 (JGK), to enforce the foreign judgment. On December 23, 2009, d'Amico Dry filed an Amended Complaint in the New York action, adding numerous single-purpose vessel owning corporations and stock holding companies controlled by the same people controlling Primera; Nicholas Coronis, his son Paul Coronis, and their family, as alter egos of Primera.  Included as a defendant there was the defendant herein, Nikka Finance Inc., ("Nikka") the registered owners of the M/V SEAGLASS II, a bulk carrier which is now or very soon to be within the district.

Despite numerous motions to dismiss, an appeal to the United States Court of Appeals for the Second Circuit, extensive document discovery and numerous depositions on all issues, the recognition of the foreign judgment and the alter ego causes of action, including the alter ego claim against Nikka, were tried before Judge Koeltl in May, 2016.  Nikka and the other defendants moved for entry of judgment at the close of the plaintiff's case and at the conclusion of the trial, both of which were denied.  Post-trial findings of fact and conclusions of law, including post-trial memoranda were filed by the parties. In a decision dated August 13, 2016, Judge Koeltl dismissed Plaintiff's Amended Complaint on the ground that the court did not have subject matter jurisdiction, holding that the subject FFA was not a maritime contract. d'Amico Dry then filed its *second* appeal in the case.

On March 29, 2018, the Second Circuit Court of Appeals reversed the district court's decision and held that the d'Amico/Primera FFA was a maritime contract, remanding the case to Judge Koeltl for a decision on, among other things, the alter ego causes of action.  Most recently, the alter-ego defendants raised the potential of a lack of personal jurisdiction defense as against them, based upon what they contend is a change in the law after the United States Supreme Court decision in *Daimler A.G. v. Bauman,* 571 U.S. 117 (2014).  The alter ego defendants assert that

this change in the law allows them to raise personal jurisdiction as a defense at this stage of the proceedings. Plaintiff asserts that that defense has been waived, if it applies at all. Judge Koeltl has ordered that the parties simultaneously submit amended Post Trial Findings of Fact, Conclusions of Law, and Memoranda of Law on or before July 13, 2018 and reply pleadings on or before July 27, 2018.

Rule B of the *Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions* ("Supplemental Rules") requires that the claimant have a maritime claim against the defendants. Here, the Second Circuit Court of Appeals has determined that maritime subject matter jurisdiction exists as to this claim. Rule B also requires that the defendant not be found in the District. As the accompanying affidavit of Thomas S. Rue establishes, the defendant cannot be found within the district. Finally, Rule B requires that the defendant have property within the district. The defendant's vessel, the M/V SEAGLASS II is now, or is very soon to be in the jurisdiction of this Honorable Court.

The within Rule B attachment is intended to provide indisputable personal jurisdiction over the defendant and security for d'Amico Dry's maritime claim pending in New York. If the New York Court determines that no personal jurisdiction exists over the defendant, then the plaintiff respectfully prays that this Court hear and determine that Nikka is the alter ego of Primera and thereby liable to d'Amico for its judgment against Primera which today has a value of $3,758,580.22, plus any further interest and counsel fees that accrue.

## JURISDICTION AND VENUE

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the *Federal Rules of Civil Procedure* and 28 U.S.C. § 1333, because it arises out of a breach of a maritime contract, as will be set forth more fully herein.

2.      Venue is proper in this District because there is, or will be during the pendency of this action, property of or due and owing to the Defendant within or moving through this District in the form of the M/V SEA GLASS II, as will be more fully discussed herein.

## THE PARTIES

3.      d'Amico Dry was at all material times a dry bulk vessel owning and operating company incorporated in Ireland. Stipulated Fact ¶ 1.[1]

4.      Primera Maritime (Hellas) Limited ("Primera") was, at all material times, a Liberian corporation engaged in the business of ship management with its registered address at 80 Broad Street, Monrovia, Liberia.  (**Ex. 1** at ¶ 2.)

5.      Nikka Finance, Inc. ("Nikka") was, at all material times, incorporated in The Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. (*Id.* at ¶ 10.)

6.      Bulknav, Inc. ("Bulknav") was, at all material times, a Marshall Islands corporation with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. (*Id.* at ¶ 15.)

7.      Bulknav was, at all material times, a holding company holding for all of the shares of among other companies, Nikka. (*Id.* at ¶ 16.)

8.      Primebulk Shipmanagement, Ltd. ("Primebulk") was, at all material times, a ship-management company incorporated in The Marshall Islands with its registered address of Trust

---

[1] "Stipulated Fact" refers to the Stipulations of Fact appended to the Pretrial Order dated February 8, 2016, submitted in the case of d'Amico Dry Limited v. Primera Maritime (Hellas) Limited, Docket No. 09-cv-7840 (JGK) now pending in the United States District Court for the Southern District of New York before the Honorable United States District Judge John G. Koeltl. The Stipulated Facts filed in that action are attached hereto as **Exhibit 1**. All Exhibits referenced in this Verified Complaint will be noted as "**Ex.** ___."

Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960. (*Id.* at ¶ 17.)

      9.      The M/V SEAGLASS II is a motor vessel bearing IMO number 9498925.

      10.     At all material times, Defendant Nikka was and is the owner of the M/V SEA-GLASS II. (*Id.* at ¶ 53)

      11.     It is believed that the M/V SEAGLASS II (property of the Defendant) is or will be within or moving through this district during the pendency of the action.

      12.     It is further believed that in addition to the M/V SEAGLASS II itself, Defendant's bunkers, fuel, goods, chattels, appurtenances, equipment, effects, and other property, tangible or intangible, in excess of the amount sought to be attached belonging to, due or being transferred to, from, or for the benefit of Defendant including, but not limited to, such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit, will be moving through, or within this district during the procedure of this action.

## PRIMERA / d'AMICO DRY FFA

      13.     On September 2, 2008, Primera agreed to buy, and d'Amico Dry agreed to sell, freight futures for 45 days within the months of January, February, and March 2009 respectively. (Bench Trial Transcript[2] at p. 111 (**Ex. 2**).; **Ex. 1** at ¶¶ 32, 34.)   Paul Coronis was responsible for trading FFAs at Primera. (**Ex. 2** at p. 178.)

---

[2] **Exhibit 2** refers to the four-day Bench Trial Transcript conducted in this matter in the U.S. District Court for the Southern District of New York in May 2016.

14.     At the time it entered into this and other FFA[3] trades representing potentially tens of millions of dollars of debt for Primera, Primera had assets of approximately $132,000.  (**Exs. 3, 4, 5, 6, 7; Ex. 2** at p. 205.)

15.     Starting on or about September 8, 2008, the freight market dropped precipitously. (**Ex. 2** at p. 205.) As of October 2008, Paul Coronis believed that Primera would lose substantially on its FFA trade with d'Amico Dry, as it already had and would in many of its other FFA trades. (*Id.* at p. 207.) Paul Coronis knew as of that time that he would likely be unable to pay Primera's FFA obligations because others, especially Industrial Carriers, Inc. ("ICI"), were not paying Primera.  (*Id.* at p. 210.)

16.     As of January 30, 2009, Primera owed d'Amico Dry $795,963.20 under the FFA. (**Ex. 6.**)  Despite d'Amico Dry's due demand for payment, Primera failed to remit payment to d'Amico Dry in respect of the January 2009 contract month. This was a breach of the FFA. (**Ex. 1** at ¶ 36.)

17.     As a result of Primera's breach, d'Amico Dry became entitled to terminate the FFA. (*Id.* at ¶ 37.)

18.     d'Amico Dry terminated the FFA on or about February 23, 2009. (*Id.* at ¶ 38.)

19.     Primera's breach of the FFA resulted in d'Amico Dry's loss of $1,752,973.30 exclusive of interest, costs and attorneys' fees. (**Ex. 8.**)

20.     Pursuant to clause 15 of the FFA contract, all disputes arising thereunder were to be submitted to the English High Court with English law to apply. (*Id.* at ¶  39.)  Pursuant to

---

[3] A Forward Freight Agreement ("FFA") is a contract for the difference between a contract rate and a settlement rate. The contract rate is a rate agreed upon by the parties. The settlement rate is the market rate for freight carried by a certain type of vessel, traveling a certain route (or group of routes), during a certain time period in the future. *d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.,* 886 F.3d 216, 218–19 (2d Cir. 2018).

Clause 11 of the ISDA Master Agreement, the Defaulting Party shall be responsible for the other party's costs of collection. (**Ex. 9**, LB Dep. 088, Clause. 11.)

21.     d'Amico Dry commenced legal proceedings against Primera in the High Court of Justice Queen's Bench Division, Commercial Court under Claim No. 2009, Folio 218 in accordance with the FFA contract. (**Ex. 8**.)

22.     On June 19, 2009, the High Court of Justice, by The Honorable Mr. Justice Flaux, entered a final, un-appealable judgment against Primera in the sum of $1,766,278.54 (comprising the principal due of US $1,752,973.30, together with interest at the contractual rate accrued up to June 19, 2009). Legal costs in the amount of GBP 17,000, which converts to US $28,056.39, were also awarded. (**Ex. 1** at ¶ 41;   **Ex. 8**.) Post-judgment interest at the rate of 8% was also awarded in accordance with English law as were future legal fees incurred to collect the judgment. (**Ex. 8**.)

## NEW YORK PROCEEDINGS

23.     On September 9, 2009, Plaintiff d'Amico commenced an action against Primera in the United States District Court for the Southern District of New York (Koeltl, J.) with the filing of a verified complaint, docket number 09-CV-7840 (JGK).

24.     This action sought recognition and enforcement of the English High Court's judgment.

25.     Primera appeared through counsel and answered the complaint on October 19, 2009.

26.     On November 11, 2009, Primera made a motion to dismiss the complaint arguing (1) that an action seeking recognition and enforcement of a foreign judgment did not give rise to admiralty jurisdiction and (2) that an FFA was not a maritime contract under U.S. law.

27.     While the motion to dismiss was pending, Plaintiff d'Amico Dry sought and obtained leave of court to amend its complaint to include additional defendants believed to be the alter egos of Primera.  Defendant Nikka Finance was one of these additional parties added to the New York action.

28.     These newly named defendants appeared through counsel and joined in Primera's motion to dismiss.  In the New York action, Primera was represented first by DLA Piper (USA) and later by Squire Patton Boggs (US) LLP. Counsel for the alter-ego defendants including Nikka Finance was, and still is, Blank Rome.

29.     After taking evidence and briefing from the parties, the court (Koeltl, J.) granted the motion to dismiss the complaint on the ground that an action to recognize and enforce a foreign judgment from a non-admiralty court did not give rise to admiralty jurisdiction.  *d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.,* 2011 A.M.C. 1484, 2011 WL 1239861 (S.D.N.Y. Mar. 28, 2011).

30.     Plaintiff d'Amico Dry appealed this decision to the United States Court of Appeals for the Second Circuit.

31.     The Second Circuit reversed the District Court's decision and held that federal admiralty jurisdiction extends to actions seeking recognition and enforcement of foreign judgments which themselves adjudicated a claim that would have given rise to admiralty jurisdiction under the familiar standards of U.S. law. *d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.,* 756 F.3d 151 (2d Cir. 2014).

32.     The Court of Appeals remanded the case to the District Court for, among other things, a determination of whether an FFA is a maritime contract under U.S. law.

33.     After remand, the district court conducted a four-day bench trial in May 2016, during which it received evidence on the remaining issues in this case, including (1) whether the d'Amico-Primera FFA qualifies as a maritime contract under U.S. law and (2) the alter ego status of the named defendants, including Nikka. Nikka's counsel's motion for entry of judgment on partial findings pursuant to Federal Rule of Civil Procedure 52 at the conclusion of the trial was denied.  (**Ex. 2** at p. 384.)

34.     On August 13, 2016, the district court issued its Findings of Fact and Conclusions of Law.  *d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.,* 201 F. Supp. 3d 399, 402 (S.D.N.Y. 2016), *vacated and remanded,* 886 F.3d 216 (2d Cir. 2018).   The court dismissed the case for lack of subject matter jurisdiction in light of its conclusion that the subject FFA was not a maritime contract.

35.     Plaintiff then appealed the decision of the district court to the United States Court of Appeals for the Second Circuit for a second time.   On March 29, 2018, the Second Circuit reversed and remanded the case to the district court for further proceedings.  The Second Circuit held that the FFA was a maritime contract and remanded the action for determination of the alter ego issues. *d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.,* 886 F.3d 216 (2d Cir. 2018).

36.     On April 19, 2018, the Second Circuit issued its mandate, and the alter ego issues are now pending before the district court.

37.     Among the alter ego issues *sub judice* before the district court is whether Defendant Nikka Finance Inc., the owner of the SEAGLASS II, is an alter ego of Primera.

38.     Recently, counsel for the alter ego defendants raised the issue of lack of personal jurisdiction over all of the defendants, arguing that the issue is now ripe and that the Supreme Court of the United States' decision in *Daimler A.G. v. Bauman*, 571 U.S. 117 (2014) governs.

39.     Judge Koeltl also ordered that supplemental partial findings of facts and conclusions of law be simultaneously filed on July 13, 2018, with replies filed on July 27, 2018.

40.     At the bench trial, Plaintiff submitted evidence regarding the alter ego relationship between Defendants Nikka and Primera. Plaintiff also elicited testimony from the principal of all the Primera companies, Mr. Paul Coronis. The following paragraphs are based on the evidence obtained in discovery in the New York Action and admitted into evidence during the bench trial conducted from May 9, 2016 to May 12, 2016.

## THE CORONIS FAMILY'S CONTROL OF PRIMERA
## AND THE VESSEL OWNING COMPANIES

41.     Primera was incorporated on June 22, 1990.  (**Ex. 10** at pp. 00025 through 000044.) Nicholas Coronis was appointed President, Director, and sole shareholder of Primera when it was incorporated.  (*Id.* at pp. 000241 through 000243.)

42.     Foreign ship management companies (like Primera) wishing to do business in Greece must seek authorization and comply with Greek Law 89. (**Ex. 2** at pp. 162, 163.) Submissions under Greek Law 89 must be truthful and accurate. *Id.*

43.     Nicholas Coronis was the company representative for Primera under Greek Law 89.  (**Ex. 10** at pp. 000133, 000198.)

44.     On May 12, 1991, Nicholas Coronis, as the sole shareholder of Primera, appointed himself the sole Director, President, Vice-President, Treasurer and Secretary of Primera.  (*Id.* at pp. 000241 through 000243.)

45.     Paul Coronis joined Primera in 2002 as a trainee. He became a Director of Primera in 2004, and maintained that position until November 15, 2008. (**Ex. 2**  at pp. 171, 172; **Ex. 1** at ¶¶ 26, 27.)  Paul Coronis was responsible for the commercial and legal desk at Primera. (**Ex. 2** at pp. 172, 178.)

46.     Although incorporated in Liberia, Primera had no offices or employees there. Instead, at all material times, Primera operated out of 6 Roupel Street, 145 64, Kifissia, Athens, Greece. (*Id.* at p. 161.) The building which occupies this address (and which is used by all of the Coronis controlled entities) is owned by Paul Coronis, Jonathan Coronis and Chianna Coronis (the Coronis siblings.) (*Id.* at p. 161; **Ex. 1** at ¶¶ 30, 31.)

47.     As of the time Primera entered into the FFA with d'Amico Dry, the President, Treasurer and Secretary was Nicholas Coronis.  He was also the Managing Director.  The other Director was Paul Coronis. The shareholders consisted of Nicholas Coronis with some minor ownership by Mr. Atherinos, a silent partner, with possibly an even smaller shareholding by Mr. Grigoris.  (**Ex. 10** at p. 000129; **Ex. 2** at pp. 178-180.)

48.     At all material times, Nicholas and/or Paul Coronis controlled Primera and the other defendants.  As Director and General Manager of Primera, Nicholas Coronis controlled the day-to-day affairs of Primera and the other Coronis-family-controlled vessel owning and operating companies as a single enterprise. (**Ex. 2** at p. 172.) As discussed more fully below, later control of these enterprises was passed to Paul Coronis.

49.     In 2008, the Coronis family used Primera to insulate their ship-owning companies from liability. In 2008, the only vessels Primera managed were Coronis-controlled vessels.  (*Id.* at pp. 173-174.)  In particular, at that time Primera managed the SEAGLASS II (owned by Nikka). (**Ex. 11; Ex. 2** at p. 173.)

50.     Although he claims to have been responsible for the Primera vessel purchases and sales, Paul Coronis purchased and sold vessels only for other Coronis' controlled companies in 2008 and 2009. (**Ex. 2** at p. 179.)

51. Nikka was a Marshall Islands corporation with its registered office c/o Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro. Nikka had no offices or employees in the Marshall Islands. The company had no employees, but operated out of the Primera office at 6 Roupel Street, 145 64, Kifissia, Athens, Greece. (**Ex. 1** at ¶¶ 5, 6, 10, 12; **Ex. 12** at p. 4; **Ex. 2** at p. 158-160.)

52. In 2008 and 2009, Paul Coronis was the sole Director of Nikka. (**Ex. 2** at p. 175. **Ex. 34.)** Paul Coronis was the person who ordered the incorporation of Nikka. (*Id.* at pp. 158-160.) The shares of these companies were owned 70% by the Coronis Family, with the remaining 30% owned by "silent partners" through a holding company, Bulknav Inc. ("Bulknav"). (**Ex. 2** at pp. 174, 175.) Paul Coronis authored the Law 89 letter for Nikka. (**Ex. 10** at pp. 000213A, 000215A, 000219.)

53. Before the Primera/d'Amico FFA, and before the market crash, on or before May 21, 2008, Paul Coronis negotiated a $204 million Facilities Agreement with HSH Nordbank ("May 21, 2008, Facilities Agreement") on behalf of Nikka (and others) as "Joint and Several Borrowers." (**Ex. 2** at pp. 184-185; **Ex. 12**; **Ex. 1** at ¶ 42.). Other Coronis-controlled companies, such as Mirage, Handy, Pasha, Movida, Element, and Caldera, were also "Joint and Several Borrowers" under the May 21, 2008, Facilities Agreement. (Collectively referred to as "Joint and Several Borrowers"). (**Ex. 2** at pp. 184-187; **Ex. 12**; **Ex. 1** at ¶ 42.) At that time, the Coronis Family owned approximately 70% of each of these entities, also through Bulknav. (**Ex. 2** at p. 184.) Notice under the May 21, 2008, Facilities Agreement for the Joint and Several Borrowers was to be sent care of Primera Maritime at its Kifissia address. (**Ex. 12** at p. 80.)

54. The M.V. SEAGLASS II was constructed with "considerable funds" from the May 21, 2008, Facilities Agreement. (**Ex. 2** at p. 188). As part of the May 21, 2008, Facilities

Agreement, the existing vessels owned by the Joint and Several Borrowers, including the SEAGLASS II, were pledged as collateral for the loan, with each company guaranteeing the performance of the other. (*Id.* at p. 187; **Ex. 12** at cover page and p. 82; **Ex. 13** at cover page; **Ex. 1** at ¶ 44.) In addition, funds from the May 21, 2008, Facilities Agreement were to be used to pay for the construction of five new bulk carriers. (**Ex. 2** at p. 187.)

55.     The May 21, 2008, Facilities Agreement was guaranteed by Primera as well as Paul and Nicholas Coronis, personally. (*Id.* at p. 188; **Ex. 12**; **Ex. 1** at ¶¶ 43, 45.) There was no evidence of any independent consideration having been paid to Primera to have agreed to this guarantee. The original Facilities Agreement was signed either by Paul Coronis or an attorney he authorized on behalf of all of the Joint and Several Borrowers, including Nikka and Primera. (**Ex. 12.**)

56.     In the May 21, 2008, Facilities Agreement, the parties agreed that Primera would be the manager of the new and existing ships therein identified while the Agreement was in effect. (*Id.* at pp. 2-3.) It was also agreed the "beneficial ownership" of the Joint and Several Borrowers and Primera would not change during the pendency of the Agreement. (**Ex. 12** at p. 48; **Ex. 2** at p. 189.)

57.     Thus, as of the time Primera entered into the FFA with d'Amico Dry, and as of the time Paul Coronis concluded that Primera was in dire financial condition, Paul Coronis had ordered the incorporation of all of these Joint and Several Borrowers, including Nikka. Paul and Nicholas Coronis were the Officers and Directors of each Joint and Several Borrower. The Coronis family owned 70% of the shares of each, the rest being owned by silent partners. None of the Joint and Several Borrowers had offices or employees, etc., of their own—instead, they

were operated solely by Primera, which maintained and controlled their assets, including their bank accounts.  (**Ex. 2** at pp. 158-161, 304-305, 339.)

## PRIMERA'S DIVERSION OF ASSETS

58.    After the freight market collapsed, and parties sought to enforce FFA debt against Primera, Paul Coronis and Primera used a Three Way Netting Off agreement on or about October 6, 2009, to collect on Primera's earlier FFA trade with another company, TMT Asia. (**Ex. 2** at p. 254; **Ex. 14**.) Instead of directing payment to Primera's account, Paul Coronis diverted funds that should have been paid to Primera to other Coronis controlled entities, despite the fact that Primera was the party to the FFA.  For instance, the first payment of $203,228.58 was directed to Primrose Shipping, Ltd., a Coronis-controlled company. (**Ex. 2** at pp. 255, 256, 259;  **Exs. 5, 14, 15** at p. 9, **Ex. 16** at pp. 4-8.) The second payment of $185,000.00 was directed to Seadance Maritime, a company related to Primrose and controlled by the Coronis family. (**Exs. 15, 16**; **Ex. 2** at p. 261.)

59.    Also in 2008 and 2009, Paul Coronis directed other payments due to Primera to other Coronis-controlled companies, including JPC Investments (**Ex. 2** at p. 275; **Exs. 17, 3, 18, 4, 19**), a company controlled by Annabel Charlton (nee Annabel Coronis), Paul Coronis' mother. She is the only known director of JPC Investments. (**Ex. 2** at pp. 272, 273;  **Ex. 17** at last page, **Ex. 20** at p. 3; **Ex. 21** at p. 3.)

## THE CORONIS FAMILY CREATES PRIMEBULK
## TO AVOID JUDGMENT ENFORCEMENT

60.    In early 2009, with a collapsed freight market, and vigorous pursuit by numerous creditors and significant FFA debts, the Coronis family continued its efforts to avoid paying its debts.

61.     After defaulting on its FFA with d'Amico Dry, on January 26, 2009, Paul Coronis (despite allegedly having resigned from Primera) contacted d'Amico Dry to offer a guarantee backed by one of the vessel-owning companies managed by Primera, such as Nikka, in exchange for d'Amico Dry agreeing to payment in installments by Primera. (**Ex. 2 at** pp. 212-214; **Ex. 22**.) When d'Amico Dry did not respond to Paul Coronis' satisfaction, Paul Coronis wrote to d'Amico Dry on February 9, 2009, stating:

> I . . . understand that this is to mean that you are not interested in a commercial solution as per the terms previously put forward and *your sole interest is to pursue something aggressively and with limited or no results.*"

**Ex. 22; Ex. 2** at pp. 212, 213.) Importantly, Paul Coronis communicated with d'Amico Dry and its counsel using his Primera email address. (**Ex. 22**.)

62.     Within days of writing this "good luck getting blood from a stone" email to d'Amico Dry (on Jan. 26), Paul Coronis ordered the incorporation of Primebulk.  (**Ex. 22; Ex. 23** at p. 000011.)  Primebulk was incorporated on February 25, 2009. (**Ex. 1** at ¶ 46; **Ex. 23** at p. 000011.) Primebulk did not have any employees or offices in the Marshall Islands. It also operated out of 6 Roupel Street in Athens, Greece.  (**Ex. 2** at pp. 216-217.)

63.     Once incorporated, Primebulk took the place of Primera. As such, within days of Primebulk's incorporation, all of the employees of Primera (save one) became employees of Primebulk. (**Ex. 1** at ¶ 57; **Ex. 10** at p. 000198; **Ex. 23** at p. 000059; **Ex. 23** at p. 000085A; **Ex. 2** at p. 217.) Panagiotis Yannoutsos, who oversaw the construction of vessels for Primera, was tasked with overseeing the construction of the same vessels for Primebulk. (**Ex. 2** at p. 218.) Primebulk took over the offices and office equipment/furniture previously occupied by Primera. (**Ex. 2** at pp. 219, 220, 334.) Primebulk used the same computers previously used by Primera. (**Ex. 1** at ¶ 58.) (Paul Coronis contends that "the landlord," *i.e.*, his family, provided the

furnishings and equipment, but nothing of that sort is found in Primebulk's lease). (**Ex. 2** at pp. 222-223; **Ex. 24**.) Primebulk assumed the management of the vessels previously managed by Primera (all Coronis-controlled entities) and used the Primera books and records to prepare financial statements for each of these owning companies. (**Ex. 2** at p. 220; **Exs. 24, 25; Ex. 10** at p. 000213A.) No consideration was paid by Primebulk to Primera for these assets. (**Ex. 2** at p. 222.)

64.     Paul Coronis and Nicholas Coronis signed the letters required under Greek Law 89 to transfer the management of the SEAGLASS II (owned by Nikka) from Primera to Primebulk. (**Ex. 26** at pp. 000075, 000075A.)

65.     When it was established, Paul Coronis and Anastasia Kalogirou, his grandmother, were the 70% shareholders of Primebulk through Riverside Holdings Co. (**Ex. 1** at ¶ 48; **Ex. 2** at p. 221.) Again, the other shareholder was a "silent partner."  The only Officer and Director initially appointed was Anna Papanikolaou, one of the Coronis Family lawyers. (**Ex. 2** at p. 234.) Later in April 2010, Ms. Papanikolaou resigned and Dimitrios Vitzileos took her place. (**Ex. 26** at p. 000056; **Ex. 2** at pp. 234, 235.) Mr. Vitzileos had been an employee of Primera from 1996 through 2009. (**Ex. 2** at p. 235; **Ex. 1** at ¶ 59; **Ex. 10** at p. 000133.)

66.     In 2009, because of the freight market collapse and the huge FFA losses causing the demise of Primera and the replacement of Primera with Primebulk, Paul Coronis had to revise the May 21, 2008, Facilities Agreement. Once again, Paul Coronis negotiated the amendments on behalf of all Joint and Several Borrowers and Primebulk. (**Ex. 2** at pp. 248-250.) These negotiations led to the Second and Third Supplemental Agreements dated February and September 2009. (**Ex. 13; Ex. 28**.)

67.     The guarantee from Primera was replaced by a guarantee from Primebulk.  (**Ex. 12** at p. 5; **Ex. 13** at p. 2; **Ex. 2** at p. 251.) Primera Ocean Services and Bulknav were added as guarantors. (**Ex. 2 at** p. 251; **Ex. 13** at p. 2.) Paul Coronis and Nicholas Coronis also increased their personal guarantees. (**Ex. 2** at p. 251; **Ex. 1** at ¶ 61.) No consideration was exchanged for these guarantees.

68.     Moreover, although vessel managers approved in facilities agreements generally must have a proven track record as ship managers, Primebulk replaced Primera as the ship management company, despite having only been in operation for less than six months.  (**Exs. 12, 13, 28**; **Ex. 2** at pp. 251, 252; **Ex. 1** at p. ¶ 60.)  Primebulk managed the Coronis family bulk carriers. There was no additional consideration received by Primebulk for agreeing to replace Primera as a guarantor of the Facilities Agreement.

69.     In 2010, all vessels managed by Primebulk were delivered or financed under the May 21, 2008 Facilities Agreement, including Nikka. (**Ex. 2** at pp. 247, 248.)

70.     Primebulk was, at all material times, grossly undercapitalized for the obligations it had assumed.  (**Exs. 7, 13, 25**.)

71.     Primebulk did not have an office lease for its space at 6 Roupel Street (in Athens, Greece) from when it began operating vessels in the summer of 2009 until December 1, 2010. (**Ex. 30**; **Ex. 2** at pp. 223-224.) At that time, Primebulk only managed ships that were majority owned by the Coronis family, such as the SEAGLASS II. (**Ex. 2** at pp. 247, 248.)

72.     Just as with Primera, Paul Coronis handled the legal and commercial/chartering desk at Primebulk on a day-to-day basis, even though he claims not to have a position as an officer, director, or employee of Primebulk. (**Ex. 2** at p. 236.)

73.     In the first eight months of essentially operating Primera's business, Primebulk earned net profits of $525,703. (**Ex. 25** at p. BR00421). In 2010, its first full year of operation, Primebulk earned net profit of $969,936. (**Ex. 25** at p. BR 00421). Combined, these profits approach the sum which Primera owed d'Amico Dry: Primera essentially avoided paying D'Amico Dry by depleting its own assets, diverting them to other Coronis-controlled companies, and rebadging Primera as Primebulk.  (**Ex. 25** at pp. BR00421-BR00434.)

74.     Paul Coronis unilaterally designated himself as the Rule 30(b)(6) witness for Primebulk, Nikka, and all of the other defendants. (**Ex. 2** at p. 170.)

75.     Minutes of Primebulk's Board of Directors clearly show that fraudulent steps were taken to "backfill" the corporate records to cover the involvement of the Coronis family and try to prove adherence to corporate formalities. (*See* Ex. 2.) Mr. Coronis could not explain why the 2010, 2011, 2012, or 2013 meetings of the sole director were on "short notice."  He also could not explain why these minutes were identical to one another with the exception of the dates and signature. (*Id.* at pp. 291-296; **Ex. 27**.)

76.     Primebulk is a successor-in-interest and/or an alter-ego of the Coronis family and Primera. In complete disregard of corporate formalities, the Coronis family abused the corporate form by using Primebulk to replace the debt-laden Primera as the ship manager for the Coronis family fleet of ships. Primebulk took over Primera's remaining assets (those which had not been diverted to other Coronis-controlled companies) without consideration, but ignored Primera's liabilities. Primebulk was grossly and inadequately capitalized, in that its assets were insufficient to satisfy the obligations that it guaranteed. Primebulk intermingled funds with all of the shipowning companies, including Nikka. Primebulk's only officer and director was initially Primera's attorney, and later was Dimitrios Vitzileos, an employee of Primera. Primebulk's

employees were almost entirely employees transferred from Primera, and its controlling shares were owned by the Coronis family. Primebulk operated out of 6 Roupel Street, 145 64 Kifissia, Athens, Greece in the office space formerly occupied by Primera (and all of the "individual" shipowning companies, including Nikka). It exercised no degree of independent business discretion, but was instead controlled by Paul Coronis. Its dealings with the other Coronis family companies were less than at arm's length. Primebulk did not pay consideration for any of the business, assets, or equipment that it received from Primera, including Primera office space, furniture, computers, employees, managed ships, and shipowning company accounts and records. Primebulk was not treated as an independent profit center, in that it assumed all of Primera's work without any of Primera's debt. It replaced Primera as the corporate guarantor in the loan agreement to buy new Coronis family ships and became jointly and severally liable for the other Coronis family entities' debt. It intermingled assets with Primera and other Coronis-controlled companies.

## THE CORONIS FAMILY'S RELATIONSHIP WITH BULKNAV

77.     The shares of each of the Joint and Several Borrowers including Nikka under the May 21, 2008 Facilities Agreement were 70% owned by the Coronis Family by way of Shelly Ventures, Inc. and 30% by silent partners. (**Ex. 2** at pp. 184, 198;  **Ex. 31**.)

78.     In or about July, 2010, the shareholding of all of the Joint and Several Borrowers, including Nikka, changed.  Bulknav was incorporated in the Marshall Islands at Paul Coronis' request.  (**Ex. 2** at p. 159.) It became the holding company for all of the shares of the Joint and Several Borrowers, including Nikka. It also owns the shares of Moondance Maritime, Rocket Finance, Inc., Caldera and Adalia. (*Id.* at p. 196.)  No consideration was paid by Bulknav for these shares. (*Id.* at p. 197.)

79.     Bulknav does not maintain any offices or employees in The Marshall Islands. (*Id.* at p. 196.)

80.     Thereafter, the Coronis Family continued to own 70% of the shares of the vessel-owning companies by owning 70% of the shares of Bulknav through Shelly Ventures.  (*Id.* at pp. 197, 198; **Ex. 1** at p. ¶50.) The other shares were owned by silent partners.  (*Id.* at pp. 197, 198; **Ex. 32**.)

81.     During 2009 and 2010, Nicholas Coronis and Paul Coronis were both directors and President and Treasurer, respectively, of Bulknav. (*Id.* at p. 198.) Their lawyer, Evangelos Bairactaris, who incorporated Bulknav at Paul Coronis' request, was the only other director, and served as Secretary. (**Ex. 33**.)

82.     Despite the fact that Bulknav and all of the Joint and Several Borrowers were either Marshall Islands (like Nikka) or Malta corporations, none of them had offices or employees in their places of incorporation.  They all operated only through Primera and later Primebulk at their address in Kifissia, Athens, Greece. (**Exs. 12, 13**; **Ex. 2** at pp. 158-160.)

83.     None of these Joint and Several Borrowers (including Nikka) had employees. (**Ex. 2** at p. 160.)

84.     After the formation of Bulknav, Paul Coronis resigned from the boards of the shipowning companies. Paul Coronis stated that it was duplicative for him to be a director of the Bulknav subsidiaries, because he exercised sufficient control over them as Director of Bulknav. (*Id.* at p. 199.) Paul Coronis makes all the decisions for Bulknav.  (**Ex. 31**; **Ex. 2** at p. 200.)

85.     Bulknav did not have its own bank account. (**Ex. 2** at p. 200.)

86.     At his own discretion, Paul Coronis moved money among the Bulknav "individual" shipowning companies, including Nikka, to balance out gains and losses across all

the companies. While there is ample evidence of funds having been transferred between these companies for no apparent benefit, there is also no evidence that these funds were ever repaid or that even an inter-company account was maintained. (*Id.* at pp. 200, 201) For instance, even after the vessel SUNRAY was sold, her single-purpose owning company, Sonic, remained incorporated with a retention account and provided working capital for the other vessel owning companies. (**Ex. 32**.)

87.     Bulknav is an alter-ego of the Coronis family and Primera. Bulknav disregarded corporate formalities by operating as a shell company used by the Coronis family to add another layer of corporate protection for family members. It was inadequately capitalized. It had no bank account. While Bulknav had no funds, money was intermingled and moved among the shipowning entities it owned (like Nikka) on a regular basis at the discretion of Paul Coronis to cover shortfalls in the operation of each company. While it has never had employees, Bulknav's officers and directors overlapped with the other Coronis family companies and included Paul and Nicholas Coronis, with Paul Coronis remaining an officer and director to date. The controlling Bulknav shares have always been held by the Coronis family. All of Bulknav's shipowning companies are managed out of 6 Roupel Street, 145 64 Kifissia, Athens, Greece, where both Primera and Primebulk housed their day-to-day operations. Bulknav exercised no independent business discretion. Its Director, Paul Coronis, unilaterally designated himself as the Rule 30(b)(6) witness for Bulknav and all of the shipowning companies without seeking permission from any other person. In a less than arm's length transaction, Bulknav novated a contract for the construction of a tank vessel from another Coronis-family-operated company without consideration for the transaction. It was not treated as its own profit center. It paid no consideration to the shipowning companies for the transfer of their shares, it guaranteed the loan

agreement to purchase of new vessels for the Coronis family, and became jointly and severally liable for the debt. It intermingled the assets, including Nikka, of the Coronis family.

## PRIMERA'S "LIQUIDATION"

88.   Because of threats and action taken by Claimants in England to force Primera into involuntary insolvency in 2010, Primera commenced dissolution and later liquidation proceedings in Monrovia, Liberia. None of the alter-ego defendants, including Nikka, were parties to the Liberian Liquidation. In 2010, Liberia had no established law regarding the liquidation of corporations.  Liberia has no liquidation law even today. (**Ex. 2** at pp. 485, 486.) The Primera liquidator was H. Varney Sherman.

89.   Mr. Sherman did nothing to investigate Primera's assets. (*Id.* at pp. 463, 469, 480.)

90.   Mr. Sherman was not aware of any of Primera's pre-dissolution activities, including the transfer of assets to the Coronis-controlled companies. (*Id.* at pp. 479, 480.)   In fact, Mr. Sherman was unaware that Primera conducted any business in 2009. (*Id.* at p. 468.)

91.   Although the Primera 2008 Balance Sheet and Profit and Loss Statement showed assets of $132,862 as of December 31, 2008, Mr. Sherman made no investigation into the disposition of those assets.  These funds were not available to the creditors in the liquidation. (**Ex. 7; Ex. 2** at pp. 475, 484.)

92.   Despite being the liquidator, Mr. Sherman was unaware that Primera was a party to an English arbitration wherein it was seeking to recover approximately $23.5 million from a shipyard, Jiangsu Eastern Heavy Industry.  (**Ex. 2** at p. 483.) He did not know what, if any, action Primera had taken to recover the FFA sums due Primera from Industrial Carriers and TMT Asia. (*Id.* at p. 471.)

93.     The liquidation was dormant between 2011 and 2015. (**Ex. 33** at p. 000012; **Ex. 2** at pp. 480, 481.)

94.     For all intents and purposes, Primera's Liberian liquidation is a sham.

## COUNT ONE: ALTER EGO LIABILITY

95.     Plaintiff incorporates Paragraphs 1-94 set forth above as if set forth fully herein.

96.     Defendant Nikka was used to perpetrate a fraud upon the Plaintiff and/or was so dominated and its corporate form so disregarded that it primarily transacted the business of Primera and the Coronis family rather than its own corporate business.

97.     Plaintiff has proven a stripping of the assets of Primera by the Coronis family, motivated by a desire to render Primera judgment proof. This constitutes fraud justifying a piercing of the corporate veil.

98.     The injury caused by the Coronis domination of Primera's corporate structure and operations warrants the exercise of this Honorable Court's equitable powers to pierce Defendant Nikka's corporate veil. The diverted funds are unavailable to satisfy the adjudicated liability to the Plaintiff unless and until the veil is pierced. As made clear above, the long and tortuous history of this litigation demonstrates the bad faith of Primera, the Coronis family, and all the dominated companies.

99.     The evidence clearly establishes that Nikka was so dominated and controlled by Primera (and its successor Primebulk) and the Coronis family as to be the alter ego of Primera.

100.    The totality of the facts adduced in discovery and at trial has established that Plaintiff is entitled to pierce the corporate veil and/or have Nikka declared the alter ego of, among others, Primera.

101.    The June 9, 2009, High Court of England judgment totaled $1,766,278.54 and included pre-judgment interest and English Counsel fees. (**Exs. 8, 9.**) The judgment and the terms and conditions of the FFA provide for post-judgment interest in the amount of 8% per annum. As of June 21, 2018, post-judgment interest in the principal amount of the judgment ($1,752,973.30) totals $1,266,347.90 (9 years, 11 days = 9.03 years x 0.08 per year = 72.24 % x $1,752,973.30.) Moreover, the judgment and contract terms (**Ex. 8**) provide for the award of attorneys' fees incurred in the collection of judgment. As established, in the accompanying declaration of Thomas L. Tisdale, New York Counsel to d'Amico Dry, the Plaintiff has incurred at least $725,953.88 in attorneys' fees to date. Thus, the damages suffered by d'Amico Dry in accordance with the English judgment and the contact terms totals $3,758,580.22, a figure that increases with the necessity of engaging present counsel. In accordance with the rules of this court, Plaintiff seeks a Rule B attachment of the M/V SEAGLASS II as security for 125% of the present value of its claim, or **$4,698,225.20.**

## COUNT II: RULE B ATTACHMENT AS SECURITY FOR THE NEW YORK ACTION

102.    Plaintiff repeats and re-states each of the allegations set forth in Paragraphs 1-101 above with the same force and effect as if set forth at length herein.

103.    As established by the Affidavit of Thomas L. Tisdale filed herewith, Defendant Nikka cannot be found within this District within the meaning of Rule B of the *Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure*, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, including but not limited to the M/V SEAGLASS II, its engines, tackle, equipment, appurtenances, bunkers, etc., and other property, tangible or intangible, on board or in the district.

104.   d'Amico Dry's alter-ego case seeking a declaration that Nikka is responsible for the debts of Primera is on-going and, as previously noted, *sub judice* before the United States District Court for the Southern District of New York. The security obtained by this Rule B attachment should stand as security for that potential New York judgment.

105.   The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any property of Defendant including the M/V SEAGLASS II as well as any property held on the SEAGLASS II or by any garnishees within the District for the purpose of obtaining security for Plaintiff's maritime claim *sub judice* in the United States District Court for the Southern District of New York.

## COUNT III: RULE B ATTACHMENT AND ALTER EGO DETERMINATION

106.   Plaintiff repeats and re-states each of the allegations set forth in Paragraphs 1-105 above with the same force and effect as if set forth at length herein.

107.   In the event that the New York court determines that it lacks personal jurisdiction over Defendants pursuant to the alter-ego defendants' (including Nikka) post-trial submission, Plaintiff prays that this Court hear and determine that Nikka is the alter ego of Primera, and as such liable to Plaintiff for the English judgment. Possible dismissal by the New York court on the basis of personal jurisdiction would not be a determination on the merits, and the prayed-for Rule B attachment of Nikka's property within this District provides this Court with personal jurisdiction over Nikka. Thus, in the event of a dismissal in New York on personal jurisdiction grounds, this Court should hear the alter ego claim and declare that Nikka is liable for d'Amico's judgment against Primera.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint, failing which a default judgment be entered against them in the sum of **$4,698,225.20**.

B.     That since the Defendant cannot be found within this District, this Court issue an order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the *Supplemental Rules for Certain Admiralty and Maritime Claims*, attaching the M/V SEAGLASS II as well as any and all bunkers, fuel, appurtenances, etc. or other property, tangible or intangible, belonging to, due, or being transferred to, from, or for the benefit of Defendant, including but not limited to the M/V SEAGLASS II as well as such property as may be held, received, or transferred in Defendant's name or as may be held, received, or transferred for their benefit at, moving through, or within the possession, custody or control of the M/V SEAGLASS II or any banking/financial institutions and/or other institutions or such other garnishees to be named up to the amount of **$4,698,225.20**, and that all persons claiming any interest in the same be cited to appear and, pursuant to Supplemental Admiralty Rule B, answer the matters alleged in the Verified Complaint;

C.     That this Court recognize and confirm any judgment in Plaintiff's favor against Defendant issued from the United States District Court for the Southern District of New York and permit the enforcement of same against the attached property of Defendant;

D.     In the event the New York action is dismissed for lack of personal jurisdiction over the defendant, that this Court consider and conclude that Defendant Nikka is the alter ego of Primera, and therefore liable to Plaintiff for the English judgment, plus interest and costs

incurred in the collection of that judgment, totaling $3,758,580.22 as of the date hereof, but continuing to accrue;

        E.      That this Court award Plaintiff the attorneys' fees and costs incurred in this action, pursuant to the agreement between the parties; and

        F.      That this Court award Plaintiff such other, further, and different relief as the Court deems just, proper and equitable.

*(s)  Thomas S. Rue*
Thomas S. Rue (RUETH8241)
J. Ben Segarra (SEGAJ6478)
Attorneys for Plaintiff, d'Amico Dry d.a.c.,
  f/k/a d'Amico Dry Limited
11 North Water Street, Suite 24290
Mobile, Alabama  36602-5024
Telephone:    (251) 432-0001
Facsimile:     (251) 432-0007
E-mail:       true@maynardcooper.com
             bsegarra@maynardcooper.com

OF COUNSEL:
MAYNARD, COOPER & GALE, P.C.

## <u>ATTORNEY'S VERIFICATION</u>

I, Thomas L. Tisdale, declare upon penalty of the laws of the United States as follows:

1.      My name is Thomas L. Tisdale.

2.      I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.      I am an attorney in the firm of Tisdale Law Offices, LLC, attorneys for the Plaintiff in the New York action.

4.      I have read the foregoing Verified Complaint and know the contents thereof, and believe the same to be true and accurate to the best of my knowledge, information, and belief.

5.      The reason why this Verification is being made by the deponent, and not by Plaintiff, is that Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my belief are the statements made by, and the documents and information received from, Plaintiff and agents and/or representatives of Plaintiff.

7.      I am authorized to make this Verification on behalf of Plaintiff.

Executed on: June 22, 2018

/s *Thomas L. Tisdale*  (pro hac admission pending)
Thomas L. Tisdale (CT Juris No. 101741)