# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| d'Amico Dry d.a.c., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION No. 1:18-00284-KD-MU** |
| | ) | |
| Nikka Finance, Inc., | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This matter is before the Court on Defendant's motion to vacate the Rule B attachment related to the vessel M/V SEA GLASS II (Doc. 13), Plaintiff's Response (Doc. 21), the related June 27, 2018 Rule E(4)(f) evidentiary hearing, and both parties' supplemental briefing (Docs. 32 & 33).[1] For reasons more fully discussed below, the motion to vacate is **DENIED.**

## I.    Background[2]

The Plaintiff, d'Amico Dry d.c.a. (d'Amico),[3] previously sued Primera Maritime (Hellas) Limited (Primera) for failing to perform under a Forward Freight Agreement (FFA). The crux of the dispute between d'Amico and Defendant Nikka Finance, Inc. (Nikka)[4] is whether d'Amico can

---

[1] Rules referenced are the Supplemental Rules for Certain Admiralty or Maritime Claims.

[2] This Court takes judicial notice of the prior (and pending) federal proceedings related to this case (S.D. Tex and S.D.N.Y.). Rule 201 of the Federal Rules of Evidence permit judicial notice to be taken at any stage of a proceeding and a court may take notice of another court's docket and orders. McDowell Bey v. Vega, 588 Fed. Appx. 923, 926-927 (11th Cir. 2014); U.S. v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994); Hughes v. Lamrerti, 2009 WL 4894493, *1 n. 5 (S.D. Fla. Dec 17, 2009).

[3] A dry bulk vessel owning and operating company, incorporated in Ireland. (Doc. 1 at 4).

[4] A company incorporated in The Marshall Islands.  (Doc. 1 at 4).

collect against Nikka, under an alter ego theory, on the $1,766,278.54 foreign judgment[5] entered in favor of d'Amico and against Primera.  (Doc. 1).

For almost a decade, d'Amico has litigated a variety of issues in England, the Southern District of Texas, and the Southern District of New York, including the existence of alleged Primera "alter egos" and collection/enforcement attempts on the foreign judgment. As of August 2016, d'Amico had attached three vessels connected to the S.D.N.Y. defendants. D'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd., 201 F. Supp. 3d 399, 407 (S.D.N.Y. 2016), vacated and remanded, 886 F.3d 216 (2nd Cir. 2018). What has brought the parties to this district is the presence of the vessel, M/V SEA GLASS II, owned by Nikka, which d'Amico claims is Primera's alter ego.

A.   **Primera**

On June 22, 1990, the entity Primera was incorporated as a Liberian company. (Doc. 1-10). Primera was a ship management company that operated out of an office in Greece.  (Doc. 1-1 at 6; Doc. 1-2 at 3, 6).  Primera's employees ranged from 17-23 over the years. (Doc. 1-2 at 10; Doc. 1-10 at 23-25).  Shareholders of Primera included: Nicholas Coronis (Nicholas),[6] Eleftherios Atherinos, and Mr. Gregoris. (Doc. 1-2 at 16-17; Doc. 1-10 at 22).   Paul Coronis (Paul) was a director of Primera from 2004 to November 15, 2008, and between 2004-2008, Nicholas, was the General Manager.  (Doc. 1-1 at 5; Doc. 1-2 at 11). As General Manager, Nicholas operated Primera's daily functions and ship management issues.  (Doc. 1-2 at 11).  Primera's legal representative in Greece -- for applicable Law 89 requirements -- was also Nicholas; however, Paul handled "to a certain extent" the legal requirements of Primera and used outside counsel. (Doc. 1-2 at 10, 15; Doc. 1-10 at 24).  Paul also negotiated FFA trades -- including the one with

---

[5] Judgment issued by England's High Court of Justice.

[6] Nicholas Coronis is Paul Coronis' father.

d'Amico -- on behalf of Primera, and in 2008 oversaw Primera's commercial department to some extent (seeking new business/customers, maintaining broker/charter relationships, etc.)  Paul was also involved in sales and purchases for Primera.  (Doc. 1-2 at 11, 15, 31)).  With the downturn of the FFA market, Primera was forced into liquidation in late 2008.  (Doc. 15 at 5)

**B.**    **Nikka**

Paul or his father Nicholas incorporated Nikka.  (Doc. 13-3 at 63; Doc. 1-2 at 4-5).  Nikka is a Marshall Islands corporation.  (Doc. 1-1 at 4; Doc. 1-24).  Aside from its registered office, Nikka's office is the vessel that it owns (the M/V SEAGLASS II) -- a "floating office" where crewman (the employees) handle the daily affairs of the company.  (Doc. 1-2 at 5). Nikka's directors include Paul who, from 2008 and through October 14, 2009, was the sole director. (Doc. 1-2 at 14; Doc. 1-34 at 2).  As of October 15, 2009, Nikka had three directors, Paul and two other individuals.  (Doc. 1-34).

Nikka is 100% owned by a Marshall Islands holding company named Bulknav, Inc. (Bulknav). (Doc. 1-1 at 4).  An entity named Shelley Ventures owns 69% of Bulknav, and per Paul, that entity is "[t]he vehicle through which the Coronis family owned their shares in Bulknav." (Doc. 13-1 at 73).  Nicholas owns 11-12% of Shelley Ventures (Doc. 13-3 at 130), thus Nicholas owns an approximate 8.28% interest in Nikka via Shelley Ventures' interest in Bulknav.  Paul, according to Nikka's attorney, owns "a little bit more than Nic[h]olas." (Doc. 30 at 51 (Rule E hearing)).  As to the remaining 30+% of Bulknav, such is owned by non-Coronis family members.

Nikka owns the vessel M/V SEA GLASS II.  (Doc. 1-2 at 12; Doc. 1-11).  Nikka's "strategy, activity and goal, is the sole ownership of the vessel and profit maximization via her

operation...." (Doc. 1-24 at 3).  In 2014, Nikka had over $33 million in total assets, but after balancing against total liabilities had approximately $317,726.  (Doc. 1-24 at 4-5).

C.   **Primera Activities & Contracts**

In the beginning of 2008, Primera managed four ships via ship management contracts, including the M/V SEA GLASS II.  (Doc. 1-2 at 12-13).

On May 21, 2008 (and as amended over the years), a $204 million Facility Agreement was executed between HSH Nordbank and various "Joint and Several Borrowers" that was guaranteed by Primera and others.  (Doc. 1-1 at 7; Doc. 1-2 at 18, 20-22; Doc. 1-12; Doc. 1-28).  The borrowers were Nikka and other ship owner entities (all of which were primarily owned by Coronis family members).  (Id.) The Facility Agreement was collateralized by cash deposits made by the Borrowers and by each new ship that was built (including the M/V SEA GLASS II).  (Id.)  Paul and his father Nicholas provided personal guarantees under the Facility Agreement.  (Id.)  Primera did not manage the loans but was a guarantor.  (Doc. 1-2 at 21-22).

On July 1, 2008, Primera obtained an interest free loan from an entity named JPC Investments for $1,500,000 to be used as working capital.  (Doc. 1-17).

On September 2, 2008, d'Amico and Primera executed a Forward Freight Agreement (FFA), through which Primera agreed to buy and d'Amico agreed to sell freight futures for 15 days during January, February and March 2009 (45 days total).  (Doc. 1 at 5; Doc. 1-1 at 6; Doc. 1-2 at 2; Doc. 1-6 at 2; Doc. 1-4).  "An FFA is a contract for the difference between a contract rate and a settlement rate. The contract rate is a rate agreed upon by the parties. The settlement rate is the market rate for freight carried by a certain type of vessel, traveling a certain route (or group of routes), during a certain time period in the future. Because FFAs are not commitments to perform

shipping services, any individual or entity…can trade in FFAs. FFAs are traded over the counter…." D'Amico Dry Ltd., 886 F.3d at 218-219.

On October 10, 2008 Primera executed a Management Agreement (ship management contract) with Nikka to manage the vessel M/V SEA GLASS II (owned by Nikka). (Doc. 1 at 8; Doc. 1-11; Doc. 1-1 at 7-8). Under the Nikka-Primera ship management contract, Primera managed the accounts and records of Nikka as part of its duties. (Id.)

As of December 31, 2008, Primera's assets totaled approximately $132,000, with its profit approximately $80,000 (after balancing $1,294,695 in income and $1,213,869 in expenses). (Doc. 1 at 6; Doc. 1-2 at 32; Doc. 1-7).

Soon after Primera executed the September 2008 FFA with d'Amico, over-the-counter FFA trading diminished significantly and the freight market rate dropped precipitously. (Doc. 1 at 5; Doc. 1-2 at 31-33). Acting on Primera's behalf, Paul began trying to collect on the nonpayment of FFAs by Industrial Carriers. Realizing that collection was going to be difficult, Paul sought a worldwide freezing order and began pursuing commercial and legal relief in Greece against Industrial Carriers. (Doc. 1-2 at 33). By September or October 2008, given the issues with Industrial Carriers, Paul understood that Primera's exposure for shorting or defaulting on the d'Amico FFA was higher than anticipated: "I realized that when Industrial Carriers defaulted against Primera after the financial crisis, and that is when I initially contacted d'Amico for settlement." (Doc. 1-2 at 33-34). Paul communicated with d'Amico a number of times before the end of 2008 -- before the FFA payment was due and before settlement was due on January 22, 2009 -- as well as in 2009. (Doc. 1-2 at 34-35; Doc. 1-22). By January 30, 2009, Primera owed d'Amcio $795,963.20 under the FFA. (Doc. 1; Doc. 1-6 at 34). D'Amico demanded payment and Primera failed to remit same, breaching the FFA in January 2009. (Doc. 1-1 at 6). On February

9, 2009, d'Amico notified Paul that Primera was in default under the FFA.  (Doc. 1-2 at 35-36).  On February 23, 2009, d'Amico terminated the FFA with Primera.  (Doc. 1-1 at 6).

Because of Primera's financial decline with the collapse of the FFA market, by October 6, 2009 its Law 89 authority to operate as a ship management company in Greece had been withdrawn. (Doc. 1; Doc. 1-2 at 31-33, 55).  Thus, banks would not permit Primera to continue as an approved ship manager. (Doc. 13-3 at 128).  In 2009, Marshall Islands entity Primebulk Shipmanagement, Ltd. (Primebulk), which was incorporated on February 25, 2009, took over management of the vessel M/V SEAGLASS II, previously managed by Primera.  (Doc. 1-1 at 5, 7-8). No consideration was paid by Primebulk to Primera for the transfer of the management contracts. Primebulk also replaced Primera as the approved ship manager in the 2008 Facility Agreement.  (Doc. 1-1 at 8).

**D.    <u>D'Amico's litigation against Primera</u>**

Pursuant to Clause 15 of the d'Amico-Primera FFA contract, d'Amico commenced proceedings against Primera in the English High Court in England with English law to apply (High Court of Justice Queen's Bench Division, Commercial Court under Claim No. 2009, Folio 218). (Doc. 1-1 at 6-7; Doc. 1-8).  On June 19, 2009, d'Amico obtained a final judgment against Primera from England's High Court of Justice in the amount of $1,766,278.54 plus post-judgment interest and future legal fees (to be incurred to enforce the judgment).  (<u>Id</u>.)

In September 2009, d'Amico initiated litigation against Primera in the S.D.N.Y. (CV 09-7840 (JGK)) to enforce the foreign judgment.  (Doc. 1 at 7-10).  On December 23, 2009, d'Amico amended its complaint in that case to add Nikka as a defendant.   (<u>Id</u>.) The case was vigorously litigated in the S.D.N.Y. including years of discovery, motions to dismiss, and a May 2016 bench trial on all issues (including d'Amico's alter ego claims against numerous defendants, one of which

was Nikka).  (Id.)  The parties are *currently* litigating the existence of personal jurisdiction over the alleged alter ego defendants, with relevant briefing due on July 27, 2018.

On June 22, 2018, d'Amico initiated this admiralty action in this Court, seeking **$4,698,225.20**, by filing a Verified Complaint against Nikka with a motion for Rule B Attachment of the vessel M/V SEA GLASS II (and supporting Affidavit), as well as a motion to appoint a substitute custodian. (Docs. 1-3, 6-7).  D'Amico's Verified Complaint alleges three (3) counts against Nikka: 1) alter ego liability; 2) Rule B attachment as security for the S.D.N.Y. action; and 3) Rule B attachment and alter ego determination (in the event the S.D.N.Y. determines it lacks personal jurisdiction over Nikka).  (Doc. 1).  In support of its motion for a Rule B attachment, d'Amico asserted (including via Affidavit) that Nikka is Primera's alter ego and from that, attachment is proper because: 1) Nikka is the owner of the vessel; 2) Nikka is indebted to d'Amico in excess of $4,698,225.20 based on a foreign judgment; 3) Nikka cannot be found in this district; and 4) Nikka's assets/property, the vessel M/V SEA GLASS II, is or will be located in the district. (Docs. 3, 7).  The Rule B writ of attachment for vessel M/V SEA GLASS II issued on June 22, 2018.  (Doc. 10).  On June 23, 2018, Nikka filed a motion for an emergency Rule E(4) hearing to vacate the Rule B attachment.  (Doc. 11).  On June 25, 2018, Nikka moved to vacate the Rule B attachment.  (Doc. 13).  The Court held a Rule E evidentiary hearing on June 27, 2018.  (Doc. 18).

## II.   **Governing Law**

"In admiralty disputes, federal courts apply federal common law when analyzing corporate identity." Hawknet Ltd. v. Overseas Shipping Agencies, 2008 WL 1944817, *3 (S.D.N.Y. Apr. 29, 2008) (citation omitted).  See also Daughtry v. Jenny G. LLC, 703 Fed. Appx. 883, 886 (11th Cir. 2017) ("[t]o determine whether to disregard the corporate form in an admiralty case, we apply federal common law[]").

III.    **Burden of Proof**

Rule B (1) of the Supplemental Rules for Certain Admiralty or Maritime Claims provides,

in relevant part, as follows:

> **(1) When Available; Complaint, Affidavit, Judicial Authorization, and Process.** In an
> in personam action:
>
> **(a)** If a defendant is not found within the district when a verified complaint praying for
> attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may
> contain a prayer for process to attach the defendant's tangible or intangible personal
> property--up to the amount sued for--in the hands of garnishees named in the process.
>
> **(b)** The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit
> stating that, to the affiant's knowledge, or on information and belief, the defendant cannot
> be found within the district. The court must review the complaint and affidavit and, if the
> conditions of this Rule B appear to exist, enter an order so stating and authorizing process
> of attachment and garnishment. The clerk may issue supplemental process enforcing the
> court's order upon application without further court order.

Fed. R. Civ. P. Supp. Rule B(1)(a)-(b).

For a valid Rule B writ of attachment, the plaintiff must establish four requirements: 1) the

plaintiff has a valid prima facie maritime claim against the defendant; 2) the defendant cannot be

found within the district where the action is commenced; 3) property belonging to the defendant

is present, or soon will be present, within the district; and 4) there is no statutory or general

maritime law proscription to the attachment. Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,

460 F.3d 434, 445 (2nd Cir. 2006) *overruled on other grounds by* The Shipping Corp. of India Ltd.

v. Jaldhi Overseas Pte Ltd., 585 F.3d 58 (2nd Cir. 2009). See generally World Fuel Servs. Europe,

Ltd. v. Thoresen Shipping Singapore Private Ltd., 155 F.Supp.3d 1226, 1231-1232 (S.D. Ala.

2015) (citing British Marine PLC v. Aavanti Shipping & Chartering LTD., 2014 WL 2475485, *7

(E.D.N.Y. Jun. 3, 2014)).

Additionally, according to Rule E of the Supplemental Rules for Certain Admiralty or

Maritime Claims, "[w]henever property is…attached, any person claiming an interest" in the

property may challenge the attachment at a prompt hearing "at which the plaintiff shall be required to show why the…attachment should not be vacated…." Fed.R.Civ.P. Supp. E(4)(f). The purpose of the hearing is not to decide the ultimate issue, "but only to make a preliminary determination whether there were reasonable grounds" for issuing the attachment.  <u>Salazar v. Atlantic Sun</u>, 881 F.2d 73, 79-80 (3rd Cir. 1989).  The Rule E(4)(f) hearing gives the defendant (or other person with an interest in the property) a right to a prompt post-seizure hearing at which he can attack the complaint, the attachment, the security demanded, or any other alleged deficiency.  <u>Barna Conshipping, S.L. v. 1,800 Metric Tons, more or less, of Abandoned Steel</u>, 2009 WL 1203923, *3 and n. 6 (S.D. Ala. Apr. 29, 2009).  The court is given great latitude to fashion any relief appropriate in the circumstances.  *Committee Notes*, 103 F.R.D. 319, 355 (1985).

If a plaintiff "fails to sustain his burden of showing that he has satisfied the requirements of Rule B and E," the attachment must be vacated. <u>Aqua Stoli</u>, 460 F.3d at 445.  Indeed, under Rule E(4)(f) the plaintiff carries the burden of showing why an attachment should not be vacated. In the typical case, e.g., in which there has been no discovery, plaintiff shoulders a probable cause burden for the propriety of the attachment.  <u>Id.</u> Rule E(4)(f) permits the Court to look beyond the verified complaint, consider evidentiary submissions by the parties and to hold a hearing. <u>White Rosebay Shipping S.A. v. HNA Grp. Co. Ltd.</u>, 2013 WL 441014, *3 (S.D. Tex. Feb. 5, 2013) (citations omitted).

This, however, is not the typical Rule B attachment case.  D'Amico's Verified Complaint and Rule B attachment comes after almost a decade of litigation among many parties, including litigation over the existence of a variety of "alter egos."  And the parties have already engaged in years of discovery.

As stated, the first requirement for a proper Rule B attachment is the existence of a valid prima facie maritime claim *against the defendant*.  The defendant in this case is Nikka.  D'Amico has no maritime claim against Nikka.  D'Amico only has a maritime claim against Primera.  Primera is not a defendant in this case.  To satisfy the first requirement, d'Amico must legally place Nikka in the shoes of Primera—as its alter ego—to establish a valid prima facie maritime claim against Nikka.  In short, if Nikka is not the alter ego of Primera, there is no valid prima facie maritime claim before the Court to support the Rule B attachment. See, e.g., Glory Wealth Shipping Pte, Ltd. v. Industrial Carriers, Inc., 590 F.Supp.2d 562, 564 (S.D.N.Y. 2008); Pink Goose (Cayman) Ltd. v. Sunway Traders LLC, 2008 WL 4619880, *2 (S.D.N.Y. 2008).

There is not unanimous agreement among federal courts regarding the proper standard for determining whether a plaintiff has a valid maritime claim to avoid vacatur of a Rule B attachment. Budisukma Permai SDN BHD v. N.M.K. Products & Agencies Lanka (Private) Ltd., 606 F. Supp. 2d 391, 398-399 (S.D.N.Y. 2009). Courts vary between the application of the prima facie/probable cause standard, the heightened "reasonable grounds or fair probability", and the higher preponderance of the evidence standard.  See, e.g., Budisukma Permai, 606 F. Supp. 2d at 398-399 (discussing both and applying the lower prima facie standard); Classic Maritime Inc. v. Limbungan Makmur SDN BHD, 646 F. Supp. 2d 364, 367 (S.D.N.Y. 2009) (discussing the heightened pleading standard of Supplemental Rule E(2)(a) and that a plaintiff need "demonstrate that 'reasonable grounds' exist for the attachment[]"); Olendorff Carriers GMBH & Co., Grand China Shipping (Hong Kong) Co., Ltd., 2013 WL 3937450, *2 (S.D. Tex. Jul. 30, 2013 (preponderance of the evidence)). Cf. PDS Gaming Corp. v. M/V Ocean Jewel of St. Petersburg, 2007 WL 2988798 (11th Cir. Oct. 5, 2007) ("while the district court articulated the correct standard which must be met to determine whether an arresting party is entitled to a warrant of arrest, it in

fact improperly turned the Supplemental Rule E(4)(f) hearing into a mini-trial and posed a much higher burden….than is authorized…we must vacate the district court's order and remand this case for the district court to apply the correct legal standard.").  It appears that more often than not, those federal courts applying the lower prima facie probable cause standard have done so in cases where there has been no discovery, and those applying the higher standard of reasonable grounds or preponderance of the evidence have already engaged in several Rule E hearings and alter ego discovery.

As this Court has taken judicial notice of the prior (and pending) federal proceedings related to this case, such includes the discovery conducted therein.[7]  Thus, the court questions whether to avoid vacatur of the Rule B attachment, d'Amico should demonstrate by a preponderance of the evidence that Nikka is Primera's alter ego. See, Hawknet Ltd., 2009 WL 1309854 at *2 ("the Court held an initial hearing, pursuant to Rule E(4)(f) in order to establish whether the plaintiff had made a prima facie showing...Now that a Rule E(4)(f) hearing has been held and discovery has taken place, the Court believes that a standard of proof higher than simply proving a prima facie case should be required of plaintiff….we find that plaintiff must show, by a preponderance of the evidence, that TOM Shipping is an alter-ego of MOS in order to maintain its attachment….").  However, the Court finds that the better course, per Eleventh Circuit guidance (PDS Gaming Corp., 2007 WL 2988798), is to apply the lower (probable cause) burden to determine whether vacatur of d'Amico's Rule B attachment is merited at this point in the proceedings in *this* Court. Additionally, while the parties have litigated (and engaged in discovery) for almost a decade, from the Court's review of the record it appears that the lion's share of such litigation and discovery were related to entities *other than Nikka*.

---

[7] See *supra* note 2.

## IV.    Alter Ego

Concerning the four requirements for a proper writ of attachment, the parties do not dispute that Nikka cannot be found within the district where the action is commenced, Nikka's property (the vessel M/V SEA GLASS II) is present in the district, and that there is no statutory or general maritime law proscription to the attachment.   As such, the singular issue before the Court is whether d'Amico has demonstrated that it has a valid maritime claim *against Nikka* -- i.e., that Nikka is Primera's alter ego.

'[A] corporate entity is liable for the acts of a separate, related entity only under *extraordinary* circumstances…" Vitol, S.A. v. Primerose Shipping Co., Ltd., 708 F.3d 527, 541 (4th Cir. 2013) (emphasis added). "The conclusion to disregard the corporate entity may not, however, rest on a single factor…but must involve a number of such factors; in addition, it must present an element of injustice or fundamental unfairness." DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 687 (4th Cir. 1976).  It is only in those "extraordinary cases" where courts find alter ego and then "pierce the corporate veil and disregard the corporate entity[.]" Vitol, 708 F.3d at 544.    As explained in LIG Ins. Co. Ltd. v. Inter-Florida Container Transport, Inc., 2013 WL 4516104, *6 (S.D. Fla. Aug. 23, 2013), aff'd, 564 Fed. Appx. 495 (11th Cir. 2014) (footnote omitted):

> ….To pierce the corporate veil, "the individual must have used the corporate entity to perpetrate a fraud or have so dominated and disregarded the corporate entity's corporate form that the corporate entity primarily transacted the individual's personal business rather than its own corporate business." *Lobegeiger v. Celebrity Cruises, Inc.*, 2011 WL 3703329 at *15 (S.D.Fla. Aug.23, 2011) (Altonaga, J.). Reaching the "alter egos" of corporations is especially valuable "where the separate identity of two corporations should be disregarded where one corporation becomes the conduit of another" or "where the near identity of two corporations should be disregarded in order to prevent manifest injustice to third parties." *Talen's Landing Inc. v. M/V Venture II,* 656 F.2d 1157, 1160 (5th Cir.1981)[]….

As guided by federal common law, the Court applies the factors set forth by the Eleventh Circuit in United Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co., 855 F.2d 1499, 1505-1507 (11th Cir. 1988) in its analysis of dominion and control.  The factors include whether:

> (1) the parent and the subsidiary have common stock ownership;
> (2) the parent and the subsidiary have common directors or officers;
> (3) the parent and the subsidiary have common business departments;
> (4) the parent and the subsidiary file consolidated financial statements and tax returns;
> (5) the parent finances the subsidiary;
> (6) the parent caused the incorporation of the subsidiary;
> (7) the subsidiary operates with grossly inadequate capital;
> (8) the parent pays the salaries and other expenses of the subsidiary;
> (9) the subsidiary receives no business except that given to it by the parent;
> (10) the parent uses the subsidiary's property as its own;
> (11) the daily operations of the two corporations are not kept separate; and
> (12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

D'Amico states, and Nikka does not dispute, that the relevant time period for analyzing dominion and control is between September 2, 2008, when d'Amico and Primera entered into the FFA and at the latest June 19, 2009 when the English Judgment was entered.  Accordingly, the following analysis focuses on this time period.

**A.    <u>Fraud</u>**

The Coronis family, according to d'Amico, used Nikka "to perpetuate a fraud", "and/or was so dominated and its corporate form so disregarded that it primarily transacted the business of Primera and the Coronis family rather than its own corporate business."  (Doc. 1 at ¶ 96). Specifically, per the Verified Complaint, d'Amico's fraud claim is rooted in the alleged diversion of assets by Primera.  One such diversion is related to an October 6, 2009 Three Way Netting Off Agreement through which d'Amico claims Paul diverted funds, that should have been paid to Primera, to other companies. The second alleged diversion occurred when in 2008 and 2009 Paul directed other monies due to Primera to be paid to other entities, including JPC Investments.  (Doc.

1 at 14).  However there has been no evidence that either of these alleged diversion schemes benefited Nikka or that monies were diverted directly or indirectly to Nikka.

Also, d'Amico argues that Primebulk was created as a fraud by Primera, solely to avoid enforcement of the foreign judgment. While there is some evidence to support this allegation, there is no evidence implicating Nikka in this alleged scheme.

### B.    Dominion and Control

Mindful that an alter ego analysis rests upon a fact-intensive analysis, subject to the contours of individual situations, the Court considers the 12-factor test outlined in United Steelworkers. Rather than determining the final issue, instead, the Court makes a "preliminary determination whether there were reasonable grounds" for issuing the attachment.  Salazar, 881 F.2d at 79-80.

### 1.    Common stock ownership

With regard to Primera, d'Amico alleges in the complaint and Nikka does not dispute that "[t]he shareholders [of Primera] consisted of Nicholas Coronis with some minor ownership by Mr. Atherinos, a silent partner, with possibly an even smaller shareholding by Mr. Grigoris." (Doc. 1 at ¶ 47).[8] See also Doc. 1-2 at 16; Doc. 1-10; Doc. 30 at 49 (Rule E hearing).

Concerning Nikka, Nikka is 100% owned by Bulknav. (Doc. 1-1 at 4 ). Shelley Ventures owns 69% of Bulknav, and per Paul Coronis, that entity is "[t]he vehicle through which the Coronis family owned their shares in Bulknav." (Doc. 13-1 at 73).  Nicholas owns 11-12% of Shelley Ventures (Doc. 13-3 at 130), thus Nicholas owns an approximate 8.28% interest in Nikka.  Paul, according to Nikka's attorney, owns "a little bit more than Nic[h]olas." (Doc. 30 at 51 (Rule E

---

[8] In briefing, d'Amico asserts that the records show only Nicholas as a shareholder.  (Doc. 33 at 31).

hearing)).  The remaining 30+% of Bulknav is not owned by Coronis family members.  The remaining owners are not without authority, but "the majority of them were not involved with shipping as their primary type of business." (Doc. 13-3 at 67).

Accordingly, the only common stock ownership between Primera and Nikka is a less than 9% interest held by Nicholas Coronis.  This factor weighs against finding Nikka to be an alter ego of Primera.

### 2.      Common directors or officers

Evidence of intertwined common or overlapping officers, without more, is insufficient to find alter ego liability.  See, e.g., Gibralter Sav. b. LDBrinkman Corp., 860 F.2d 1275, 1287 (5th Cir. 1988) (footnote omitted) ("[m]any wholly-owned subsidiaries and closely-held corporations are not factually distinct from their owners. Many are in fact controlled and operated in close concert with the interests of the owners, and do not have a distinct factual existence: separate employees, offices, or properties; consolidated financial reporting and tax returns; and the like. Such conduct is perfectly natural and proper and provides no basis for ignoring legal independence.[ ]…The problem arises when such a corporation is not treated as legally distinct; when, in other words, the owners neglect to maintain the formal independence of the corporation as required by law[]").  See also Austral Asia PTE, Ltd. v. SE Shipping Lines Pte., Ltd., 2012 WL 2567149, *2 (E.D. La. Jul. 2, 2012) ("as this Court has previously emphasized, some overlap of ownership, officers, directors, and other personnel, is not unusual in this [maritime] industry…without more, the Court finds such commonalities to be of little import[]").

As to Primera, d'Amico alleges, and Nikka does not dispute, that Paul was a director from 2004-2008 and that Nicholas served as General Manager, Director, President, Treasurer and

Secretary of Primera. (Doc. 1-10 at 22). At a November 21, 2008 Primera meeting, the shareholders accepted Nicholas' resignation of those positions. (Doc. 1-10 at 22).

As to Nikka, d'Amico asserts, and Nikka does not dispute, that Paul was its sole Director during the relevant time period. Thus Paul served as a director for both Primera and Nikka during the relevant timeframe. On October 10, 2008, Nikka and Primera executed a management agreement, (Doc. 1-11 at 2), which provided for ship management services.

This factor weighs in favor of a finding that Nikka is an alter ego of Primera, as it appears Paul was managing both entities during the relevant time period. Such an arrangement would make it difficult, if not impossible, for the management contract between Primera and Nikka to be considered an arms length transaction.

### 3.    Common business departments/common offices

D'Amico asserts that Nikka was run by Paul out of Primera's office. Nikka argues that it did not operate out of Primera's office, but instead used the vessels as "floating office[s.]" (Doc. 13-3 at 64). As noted above, Nikka executed a management agreement with Primera as early as October 10, 2008. Thus, the fact that Primera managed Nikka's affairs from Primera's office does not support d'Amico's alter ego theory.

### 4.    Consolidated financial statements and tax returns

D'Amico does not contend that Nikka and Primera have consolidated financial statements and tax returns. Regardless, there has been no evidence of same submitted to the Court. This factor does not support a finding that Nikka is an alter ego of Primera.

### 5.    One finances the other

The fifth factor is whether Primera financed Nikka. There is evidence that Primera, and later Primebulk, guaranteed bank loans to Nikka for the construction of the M/V SEA GLASS II.

(Doc. 1-13 at 5). D'Amico argues "without Primera . . . guarantees, the SEA GLASS II would never have been delivered."  The Court in <u>Flame S.A. v. M/V LYNX</u>, 2010 WL 11571118, *11 (E.D. Tex. Aug. 6, 2010) discounted Primera's guarantee of a vessel as evidence of financing:

> These facts suggest that, while Primera might have had to pay off on its guarantee, that did not become necessary. There is no evidence that Primera advanced funds to Camela to finance the purchase of the Lynx or its ongoing operations. There is no indication that Primera made any of the payments on the HSH Nordbank loan. The court finds that this factor does not weigh in favor of an alter ego finding.

Here, too, d'Amico does not suggest that Primera became obligated to pay any of Nikka's debt related to the M/V SEA GLASS II vessel.

Next, d'Amico argues that the court should consider the fact that amongst the ship owner entities, which were part of a collective $204 million contract (the May 2008 Facility Agreement), transfers of money took place between the profitable ships and the non-profitable ships. However, even if true, there is no evidence that any assets of Primera were used to prop up any ship owner entity, much less Nikka.  Nor is there evidence that Nikka or Primera was subsidized in any of these transfers of money.

This factor does not weigh in favor of finding Nikka to be an alter ego of Primera.

**6.    <u>One caused the incorporation of the other</u>**

Articles of incorporation establish that Nikka was incorporated before 2008.  Paul, while serving as both a Primera and Nikka director, may have caused Nikka's incorporation. (Doc. 13-3 at 63).  This factor highlights the dual role of Paul as to Nikka and Primera, but otherwise does not advance the alter ego theory.

**7.    <u>One operates with grossly inadequate capital</u>**

The seventh factor turns upon whether Primera and/or Nikka operated with inadequate capital. "Undercapitalization is often critical in alter ego analysis." <u>Bridas S.A.P.I.C. v.</u>

Government of Turkmenistan, 447 F.3d 411, 420 (5th Cir. 2006). See also Gardemal v. Westin Hotel Co., 186 F.3d 588, 594 (5th Cir. 1999) ("undercapitalization is a critical factor in our alter-ego analysis…"); Wm. Passalacqua Builders, Inc. v. Resnick Dev. S., Inc., 933 F.2d 131, 142 (2nd Cir. 1991) ("the degree of capitalization . . . is clearly relevant to the piercing inquiry…"); Classic Maritime Inc. v. Limbungan Makmur SDN BHD, 646 F. Supp. 2d 364, 371 (S.D.N.Y. 2009) ("Evidence of substantial undercapitalization . . . is significant because it can be evidence of a company's lack of independent substance.") (Koeltl, J.).

Primera had assets of $132,000 at the time it executed the FFA with d'Amico. (Doc. 1-2 at 32).  D'Amico claims the FFA represented "potentially tens of millions of dollars of debt…." (Doc. 21 at 17). If true that Primera's obligations exceeded tens of millions while holding assets totaling $132,000, it would appear that Primera was vastly undercapitalized.

This factor would appear to weigh in favor of piercing Primera's corporate veil.  But it is not clear to the undersigned how it supports a finding that Nikka was an alter ego of Primera.  This is because there is no evidence that Nikka was either the cause of the undercapitalization or benefited from Primera's undercapitalization.

### 8.   One pays the salaries and other expenses of the other

The parties dispute whether Nikka has employees.  D'Amico claims Nikka does not employ anyone, (Doc. 1 at 12 ¶ 51), while Nikka claims it employed the crew on the vessel. (Doc. 32 at 11). There was no evidence submitted to directly support either contention. However, the focus is more properly on who paid the expenses and salaries of the employees.

The management agreement between Nikka and Primera called for Primera, as the ship management company, to "procure and/or terminate the services of…Master, Mariners, Officers, Engineers….and other necessary persons as the Manager may think proper and negotiate and pay

their fees and/or wages[.]" (Doc. 1-11 at 2 ¶ 2(2)).  There is no evidence indicating whether Nikka reimbursed Primera the expenses of operating the M/V SEAGLASS or salaries of its crew.   Due to the lack of evidence, this factor has no weight.

### 9.   One receives no business except that given to it by the other

The ninth factor focuses on the source of business for each entity. Nikka states, and d'Amico does not dispute, that Nikka's business proceeds are derived solely from companies that rent M/V SEA GLASS II.   D'Amico states that the management of Coronis controlled vessels (including Nikka) was Primera's only business.   Assuming this to be the case, this shows Primera's dependence on the Coronis controlled vessels (including the M/V SEAGLASS II) for its existence. This factor slightly supports d'Amico's theory of alter ego.

### 10.   One uses the other's property as its own

The tenth factor turns upon whether Primera or Nikka used the other entity's property as its own. D'Amico states that Primera and Nikka frequently used the other's assets without consideration.  (Doc. 21 at 17).  D'Amico proceeds to discuss how Primera transferred its on-going business to another company, Primebulk, but it does not allege this money or business was transferred to Nikka.   D'Amico compares these companies -- which appear to be Nikka's equivalent -- to pockets. (Doc. 21 at 19 ("All of the property of all of these companies were used by Nikka and Paul Coronis as the personal property of the Coronis family, like 16 pockets in the same pair of pants[]"). Notwithstanding the illustration, d'Amico does not explain how Nikka, specifically, was used as a pocket.  D'Amico does not allege Primera shifted property or money or assets to Nikka, but instead alleges "Primera's assets were shifted to various Coronis controlled entities sheltering Primera from these liabilities…." (Doc. 21 at 19). However, these other Coronis-controlled companies are not party to this Rule B attachment.

D'Amico also points to Paul's email, sent as the FFA default was impending, in which he offered a guarantee from a vessel owning company managed by Primera. (Doc. 33 at 37 (citing Doc. 1-22 at 2)). While not specific to Nikka, d'Amico contends Paul's offer to guarantee a vessel owning company is indicia of control of the vessel-owning company, and use of the property as an extension of Primera's own.  This is evidence that Paul exercised considerable power, acting on Primera's behalf, to negotiate and use one of the Primera-managed vessels as a bargaining chip. This fact provides some evidence of Primera's willingness and ability to use Nikka's property if needed.   Thus the factor weighs in favor of d'Amico's alter ego theory.

**11.    Daily operations of the two corporations are not kept separate**

The eleventh factor addresses the daily aspects of Primera and Nikka. D'Amico alleges "[t]he Joint and Several Borrowers…[including Nikka Finance] were operated solely by Primera, which maintained and controlled their assets, including their bank accounts." (Doc. 1 at ¶ 57.) D'Amico also argues "the decision-making authority for Primera . . . and Nikka . . . resided with Nicholas and Paul Coronis." (Doc. 21 at 19).  Nikka responds that it had a separate bank account and that the management of the accounts was part of the management agreement with Primera.

The court considers this to be an important factor.  Yet, no documentary evidence supports either party's argument regarding the control of the finances or how the daily operations were handled.  The evidence suggests, as discussed *supra*, that Paul was the person who primarily controlled the operations of Primera and Nikka and that he was intimately involved in trying to solve Primera's financial problems.   To the extent this factor can be weighed, it weighs slightly in favor of d'Amico's alter ego theory.

**12.    One does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings**

The parties disagree, as with other factors, about the object of this analysis. <u>Compare</u> Doc. 13 at 29 (" . . . Nikka Finance observed all corporate formalities . . . .") <u>with</u> Doc. 21 at 20 ("Primera produced no corporate books or records and there was no evidence to prove its adherence to corporate formalities.").

Nikka directs attention to itself. Nikka states it observed corporate formalities by documenting its incorporation, filing Law 89 documentation, filing separate tax returns, documenting its election of directors, and taking minutes of its board of director meetings. (Doc. 21-1 at 4 (Ex. 35)).  At the evidentiary hearing, Nikka's counsel directed the Court to Bulknav's Board Minutes, (Doc. 21-1 at 30), as evidence of adherence to corporate formalities. Three individuals, Nicholas Coronis, Paul Coronis, and Evangelos Bairactaris signed the February 23, 2009 Board Minutes. (Doc. 21-1 at 30). Other Bulknav Board Minutes were also introduced into evidence. <u>See</u> <u>e.g.</u>, Doc. 21-1 at 24 (February 9, 2015), Doc. 21-1 at 26 (February 11, 2013), and Doc. 21-1 at 29 (May 19, 2010). Bulknav owns Nikka.

No evidence has been submitted regarding Primera's adherence to corporate form. D'Amico faults Primera for its lack of evidence that it observed corporate formalities: "Because of its lack of document production, no evidence is available to Plaintiff or the Court to discern whether or not Primera . . . or Nikka observed their legal requirements." (Doc. 33 at 40).

This factor cannot be analyzed at this stage of the litigation due to a lack of evidence.

## C.   <u>Conclusion</u>

To overcome a motion to vacate a Rule B attachment, among other requirements, d'Amico must demonstrate a valid prima facie admiralty claim against Nikka. <u>Aqua Stoli</u>, 460 F.3d at 445. In other words, it "must prove that the attachment was, and is, supported by '"probable cause."'" <u>Barna Conshipping</u>, 2009 WL 1203923 at *3 (quoting <u>Salazar</u>, 881 F.2d at 79). The Court

concludes d'Amico has established a prima facie case based primarily on the control asserted by Paul Coronis over Primera and Nikka.   The court has also considered the lack of evidence at this stage to make a determination as to whether d'Amico's other allegations are supported by fact. Although there has been extensive discovery, it does not appear that the focus has been on Nikka's relationship with Primera.

Accordingly, Nikka's motion to vacate the Rule B attachment (Doc. 13) is **DENIED**.

## V.    Sanctions/Damages etc.

Nikka moves for costs, expenses, sanctions, $100,000 in damages, and "reputational harm" damages against d'Amico due to its "wrongful attachment and failure to disclose critical information" to the Court, as well as for leave to file a motion "amplifying" this request, arguing that d'Amico intentional mischaracterized trial testimony from the S.D.N.Y.  Nikka contends that d'Amico "knew the same allegations used in two previous Rule B actions failed to meet the prima facie alter ego burden. Plaintiff failed to disclose…that it was twice denied the remedy it seeks here."  (Doc. 13 at 30-31).   Nikka's requests are due to be denied in their entirety.

As explained in Industrial Maritime Carriers, LLC v. Dantzler, Inc., 611 Fed. Appx. 600, 603 (11th Cir. 2015):

> "It is an established principle of maritime law that one who suffers a wrongful attachment may recover damages from the party who obtained the attachment, provided he prove that such party acted in bad faith." *Furness Withy (Chartering), Inc., Panama v. World Energy Sys. Assocs., Inc.,* 854 F.2d 410, 411 (11th Cir.1988) ("*Furness II*"); *Frontera Fruit Co., Inc. v. Dowling,* 91 F.2d 293, 294 (5th Cir.1937) ("these awards are necessarily based on findings of bad faith, malice, or such negligence as would constitute bad faith....")1; 2 *Admiralty & Mar. Law* § 21−5 (5th ed.) ("A plaintiff may be liable for damages for wrongful arrest or attachment and detention of a vessel only upon a showing of bad faith, malice or gross negligence.").....

Mere negligence will not suffice; instead, a party must show the attachment arose from malice, bad faith, or reckless disregard of the other party's legal rights. Coastal Barge Corp. v. M/V Mar. Prosperity, 901 F. Supp. 325, 328 (M.D. Fla.1994).

The facts of this case differ significantly from those in which damages for a wrongful attachment have been awarded (e.g., information was withheld, a party knowingly arrested or rearrested a vessel knowing it had no right to do so, etc.). Industrial Maritime Carriers, 611 Fed. Appx. at 604-606 (comparing and discussing different cases). Indeed, Nikka has failed to submit sufficient evidence of bad faith, malice or gross negligence.  The record reveals that the prior Rule B attachments in other federal courts were related to other companies, *not Nikka*, but companies named Camela Navigation and Pasha Finance.  This renders Nikka's contentions -- rooted in an alleged misrepresentation and/or failure by d'Amico to disclose to the Court about the results of those prior attachments -- irrelevant. Additionally, Nikka has submitted no evidence supporting its claim of having incurred $100,000 in damages.  There is thus no basis -- on the grounds articulated by Nikka -- for an award of sanctions or damages.  Further, Nikka has provided no facts or evidence in support of, or even case law regarding, its "reputational harm" damages claim.  As such, there is nothing before the Court to support this request.   Finally, Nikka's request to amplify its motion for sanctions/damages is rendered moot by the above rulings. Nikka's motion for sanctions and/or damages (and related relief) is **DENIED.**

**DONE** and **ORDERED** this the **5th** day of **July 2018**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**