IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

D'AMICO DRY d.a.c.,                    :
f/k/a D'AMICO DRY LIMITED,

     Plaintiff,                      :

v.                                     :        Case No. 1:18-00284-KD-MU

NIKKA FINANCE, INC., as Owner of :             IN ADMIRALTY
the M/V SEAGLASS II,

     Defendant.                      :

## PLAINTIFF'S PARTIAL OPPOSITION TO DEFENDANT'S MOTION TO APPROVE SUBSTITUTE SECURITY

d'Amico Dry d.a.c, formerly known as d'Amico Dry Ltd. ("Plaintiff"), submits this Memorandum of Law in Partial Opposition to the Motion to Approve Substitute Security filed by Defendant Nikka Finance, Inc.'s ("Nikka") as Owner of the M/V SEAGLASS II (Doc. 47). Specifically, throughout these proceedings, Plaintiff has been fully prepared, in accordance with the Federal Supplemental Admiralty Rules and the Local Rules of this Court, to accept a bond or other security approved by the Court in place of M/V SEAGLASS II—in the principal amount of Plaintiff's fairly-stated claim plus 25 percent thereof, totaling $4,698,225.20.

## PRELIMINARY STATEMENT

If Nikka's Motion to Approve Substitute Security (Doc. 47) were read in a vacuum, the reader would never know that Nikka had filed a Motion to Vacate the attachment of the M/V SEAGLASS II, much less that its motion was denied. The reader would also never know that this Court found that Plaintiff had established a

*prima facie* claim that Nikka is the alter ego of Primera Maritime (Hellas) Ltd. ("Primera"). (Doc. 40 at pp. 12, 21-22.) Through this somewhat wishful amnesia, Nikka argues that it did not enter the FFA with Plaintiff, puzzlingly stating: "D'Amico has not established [that] Nikka is the alter ego of Primera and, thus, to the extent Nikka is required to post security in order to obtain the release of its [v]essel, the substitute security amount should be no more than the [j]udgment amount of $1,766,278.54." (Doc. 47 at p. 4.)

This argument, in addition to treating this Court's order denying Nikka's Motion to Vacate as if never rendered, is imbued with logic which escapes Plaintiff's present powers of observation. Even in the alternate universe in which the Court had not found a prima facie case of an alter ego relationship betwixt it and Primera, Nikka's argument would still fail: either Nikka has nothing to do with Primera, in which case Nikka would not be in the business of posting *any* security for the SEAGLASS II, or Nikka is, as Plaintiff here believes, the (or one of the) alter ego(s) of Primera, and the *full amount* of Plaintiff's claim, plus 25 percent thereof, is the proper amount of the bond or letter of undertaking which Nikka must now produce in the vessel's stead. Its Motion to Vacate having been denied, Nikka now seeks a bizarre "hybrid" approach wherein it tacitly recognizes that it must post security for the M/V SEAGLASS II or have it remain under attachment, but then attempts to reduce the *amount* of that required security based on a "flip flop" of that tacit recognition.

In short, Nikka's motion is meritless. In accordance with Supplemental Admiralty Rule E(5), if the parties cannot come to a prior agreement, "the court shall fix the principal sum of the bond." *Id.* The principal sum shall be "sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs." *Id.* Thereafter, "the bond or stipulation shall be conditioned for the payment of the principal sum and interest thereon at 6% per annum." Based upon the law applicable to the English judgment which Plaintiff seeks to enforce, Plaintiff's claim is fairly stated to be $3,758,580.22 as of the date of filing the Complaint (June 22, 2018). In accordance with the Local Rules of this Court, security in the amount of $4,698,225.20 should be ordered. Further, the form of the security (which Nikka fails to specify) must be a bond or other security approved by the Court pursuant to Supplemental Rule E—such as a letter of undertaking.

Next, despite the fact that the negotiations concerning potential substitute security were exchanged between counsel on a "without prejudice" basis, Nikka has deemed it appropriate to discuss some of the terms of those negotiations in its motion. Nikka fails to say that it has never elaborated on the basis for the offers it made (even though its first offer was less than the nine-year-old English judgment) and has never elaborated, even in its instant motion, why it incorrectly believes that English law does not apply to the English judgment (itself still to be confirmed by an American admiralty court).

The inconsistencies in Nikka's positions concerning the value of the M/V SEAGLASS II are alarming. At this Court's June 27, 2018, evidentiary hearing, it

was Nikka's position that the value of the vessel was $6.5 million, but that no equity remained in the vessel. (Doc. 34-1 at p. 48 (Tr. 47).) Despite raising the possible futility of the attachment because the vessel's value is less than the mortgage,[1] Nikka now offers to post $2.5M as substitute security, an amount which is insufficient to secure Plaintiff's claim, but which is substantially greater than the *nil* equity Nikka was asserting. In establishing the amount of substitute security to be posted by Nikka in order to lift the attachment of the vessel, Plaintiff respectfully asserts that one should not be distracted by any figure other than the present day value of the Plaintiff's claim, a figure well below Nikka's stated value for the vessel.

In making its discretionary determination, Plaintiff prays that this Court be mindful of the larger picture here, in which Plaintiff has been unable to enforce its English judgment because of the actions of Primera and its alter egos, and the instant quest for civil justice has spanned nearly a decade. (*See* Doc. 1 at pp. 1-10.) For the first time since Plaintiff commenced the New York action in 2009, Nikka and her alter egos have challenged the *subject matter jurisdiction* in the United States District Court for Southern District of New York just this year. This sub-contest was not fully and finally resolved until the United States Court of Appeals for the Second Circuit issued its decision on March 29, 2018, holding that the Primera/d'Amico FFA was indeed a maritime contract bestowing upon the Southern

---

[1] This contention is a non-issue at this stage, as the "value" for Rule B/E purposes is the market value of the *res* without considering any mortgages thereon. (*See* Doc. 33 at pp. 21-22.)

District of New York with its requisite admiralty jurisdiction. *See d'Amico Dry Limited v. Primera Maritime (Hellas) Limited*, 886 F.3d 216, 228 (2d Cir. 2018).

At the eleventh hour, the alter ego Defendants, including Nikka, have raised the issue of personal jurisdiction in the New York action, further obstructing Plaintiff from realizing the fruits of its hard-fought English Judgment by domesticating it stateside. The increase in damages which Nikka and Primera will suffer as a result of the accrual of interest at the English rate of 8% per annum rather than the U.S. post-judgment rate is a problem of Primera and its alter egos' own making. In the words of John Fitzgerald Kennedy, "[t]hings do not happen. Things are made to happen." Here, *Nikka* made this thing happen, and it should not profit by its own inequity. Nikka is hoisted by its own petard.

## POINT I

### THE SUBSTANTIVE LAW OF ENGLAND GOVERNS THE VALUE OF THE PLAINTIFF'S CLAIM AGAINST NIKKA

Without authority, Nikka claims that Rule E is procedural and that U.S. law therefore applies. However, Plaintiff's judgment against Primera was entered on June 19, 2009 in the High Court of Justice, Queens Bench Division, Commercial Court of England, (Doc. 26-8 at pp. 2-4), because English law and English High Court jurisdiction were the law and forum chosen by Primera and Plaintiff in the FFA. (*See* Doc. 26-3 at p. 6 (parties choosing to be governed by English law and to be subject to the jurisdiction of the High Court of Justice in London).) In so doing, Nikka mis-cites the law and, in particular, the holding of *Blue Whale Corp. v. Grand China Shipping Development Co., Ltd.*, 722 F.3d 488 (2d Cir. 2013). In that

matter, the United States Court of Appeals for the Second Circuit held: "Admiralty law provides the remedies; substantive law defines the right to the remedy." *Id.* at 495. "Assessing the *prima facie* validity of a claim is a substantive inquiry that should be governed by the relevant substantive law." *Id.* The Court further held that, though foreign law inquiries may be more difficult, this does not mean that the foreign law inquiry is automatically more rigorous. *Id.*

While Rule B and Rule E supply the procedure by which a valid *prime facie* admiralty claim can give rise to a writ of maritime attachment, the existence of a valid *prima facie* claim turns on substantive law. Where the substantive law underlying the claim is foreign, it is that foreign law that applies. *See, e.g.*, *Al Fatah Intern. Nav. Co. Ltd. v. Shivsu Canadian Clear Waters Technology (P) Ltd.,* 649 F. Supp. 2d 295, 300 (S.D.N.Y 2009); *Sonito Shipping Co. Ltd. v. Sun United Mar. Ltd.*, 478 F. Supp. 2d 532, 536 (S.D.N.Y 2007).

Thus, the determinations of (1) the interest rate to be charged and (2) the entitlement to legal fees are *substantive* and as such, governed by English law and not by U.S. post-judgment interest rules or the American Rule.

## POINT II

### THE  ENGLISH POST-JUDGMENT INTEREST RATE APPLIES UNTIL THE ENGLISH JUDGMENT IS MADE A JUDGMENT OF THE U.S. DISTRICT COURT

Nikka again cites no authority for the proposition that U.S. post-judgment interest should apply to an English judgment which has not been confirmed, and Plaintiff could locate no such authority in its own research.

The United States Court of Appeals for the Tenth Circuit in *Society of Lloyd's v. Reinhart*, 402 F.3d 982 (2005) held that "U.S. post-judgment rate should apply as of the date of the entry of the [foreign] judgment in the U.S. district court." *Id.* at 1005. In so holding, the Tenth Circuit determined that the U.S. federal post-judgment interest rate did not apply to the English court's judgment, but rather only to the district court's judgment. *Id.* As part of its remand instructions, the Tenth Circuit instructed the district court to divide the post-judgment interest rates into two periods: The English post-judgment rate was to be applied from the time the English judgment was rendered until it was confirmed as U.S. district court judgment, and the U.S. federal post-judgment rate was to apply from the district court's confirmation of the English judgment until it was paid. *See id.*

Recently, the United States Court of Appeals for the Third Circuit affirmed a decision of the lower court enforcing an English court judgment where English interest was awarded until it was recognized as a domestic judgment. *Louis Dreyfus Commodities Suisse, SA v. Financial Software Systems, Inc.*, 703 F. App'x 79, 85 (3d Cir. 2017). The Third Circuit further concluded that the foreign post-judgment interest automatically accrues until the U.S. judgment is entered. The judgment creditor need not seek the foreign interest in the foreign forum. *Id.* at 84.

Other decisions are in accord. *See Anyang Xinyi Electric Glass Co., Ltd. v. B&F Int'l (USA),* No. 15-00862, 2015 WL 12859716, at *5 (C.D. Cal. Nov. 24, 2015) (enforcing Chinese post-judgment interest rate of 6.4% until the entry of the district court's order confirming the judgment); *Dynamic Cassette Int'l Ltd. v. Mike Lopez &*

*Assocs., Inc.*, 923 F. Supp. 8, 12-13 (E.D.N.Y. 1996) (interest at the English law rate applied to the principal due under an English judgment owed to the Plaintiff under a default judgment). Most recently, a federal court determined that the foreign post-judgment interest rate of eight percent was correct, reasoning that it "is consistent with the prevailing view that [a] foreign judgment…bears interest according to the law of the place where it was rendered." *Soc'y of Lloyd's v. Anderson*, No. 3-03-MC-112-D, 2004 WL 1243220, at *1 (N.D. Tex. June 4, 2004), *report and recommendation adopted*, No. 3:03-MC-112-D, 2004 WL 1490072 (N.D. Tex. July 1, 2004) (internal quotations omitted). The Court concluded by noting that not applying the eight percent interest rate would "only partially enforce the English judgment, thus undermining this court's determination that the judgment is entitled to comity." *Id.*

In accordance with English law, the Judgment Act 1838 provides that every judgment debt shall carry interest at the rate of 8% per annum. As the Declaration of William Marshall declares, interest at the rate of 8% per annum runs on judgments of the English High Court until such time as they are satisfied. The rate of 8% has been in existence since before 2009 though today. (*See* Declaration of William Marshall, attached hereto as Exhibit 1.) In accordance with English law, the law governing the damages awardable to Plaintiff and thus the principal amount of the security to be provided in accordance with Rule E, interest has been properly calculated by Plaintiff to total $1,266,347.90 as of June 22, 2018.

## POINT III

### THE  ENGLISH JUDGMENT AND FFA CONTRACT ENTITLE PLAINTIFF TO ITS ATTORNEYS' FEES

The English Judgment provides for the awarding of counsel fees incurred in collecting the Judgment. Nikka entirely ignores the terms of the English Judgment as well as the underlying contract, Primera's breach of which gives rise to the Judgment. The American Rule does not apply when the contract which is the subject of the action provides for the awarding of legal fees. *See, e.g.*, *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975) (citing *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717 (1967)).

In paragraph two of the judgment, the Honourable Mr. Justice Flaux held:

> "It is declared that the Defendant remains obliged to honour its obligations under s. 11 Master Agreement and will, on demand, indemnify and hold harmless the Claimant for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by the Claimant by reason of the enforcement and protection of its rights under this Agreement, including, but not limited to, costs of collection. It is ordered that, on demand by the Claimant, the Defendant must so indemnify it within five London business days." Thus, in accordance with the English Judgment, Primera and thus Nikka are liable to Plaintiff for the "costs of collection."

(Ex. 26-8 at p. 2.) As the accompanying Declaration of William Marshall attests, costs of collection include the attorneys' fees incurred by Plaintiff in pursuit of Primera and its alter egos in the New York action as well as Plaintiff's attachment efforts in Texas and in this Court.[2] (*See* Marshall Declaration (Exhibit 1) at ¶¶ 8-9.)

---

[2] The amount of legal fees Plaintiff requests as part of its verified claim does *not* include, however, some GBP 155,000 in legal fees incurred by *other* lawyers for

As the Affidavit of Thomas L. Tisdale attests, attorneys' fees in the amount of $725,953.88 were incurred by Tisdale Law Offices, LLC in the New York action. (*See* Affidavit of Thomas L. Tisdale, attached hereto as Exhibit 2, at ¶ 6.) The fees charged for partners during the course of that case range between $290 and $345 per hour. (*Id.* at ¶ 7.) Associate rates ranged between $160 and $240 per hour. (*Id.*) For nearly two years, an associate's time was charged at the paralegal rate of $125. (*Id.*) During the course of the New York action, there were no less than four Motions to Dismiss the Complaint in various forms, an interim appeal to the United States Court of Appeals for the Second Circuit, the production of thousands of documents, at least five days of depositions, a four-day bench trial and a subsequent appeal to the United States Court of Appeals for the Second Circuit. (*Id.* at ¶ 3.) As the Affidavit attests, the work involved was reasonable based upon the various motions filed by the Defendants and their defensive posture. (*Id.* at ¶ 5.) The rates charged are commensurate with lawyers of similar experience in the field of maritime law. (*Id.* at ¶ 7.)

Thus, the security provided should include security for Plaintiff's legal fees which are at least $725,953.88 incurred to date.[3]

---

Plaintiff (outside Tisdale Law Offices) in the English action, or by other lawyers in the Beaumont forum. (*See* Tisdale Declaration (Exhibit 2).)

[3] To the extent that this Court is concerned with the spectre of Plaintiff asking Nikka for security for *estimated* attorneys' fees—with the concomitant implication that Plaintiff is including *future* or *inchoate* attorneys' fees in its $4,698,225.20 figure—Plaintiff takes this opportunity to emphasize that the attorneys' fee portion of this amount is for work *already performed* as of the filing of the Verified Complaint.

## POINT IV

## THE FORM OF SECURITY NECESSARY
## IS EITHER A BOND OR SUBSTITUTE
## SECURITY IN A FORM ACCEPTABLE TO THE COURT

Supplemental Admiralty Rule E(5) requires that the substitute security be either a bond or other security "to be approved by the court or the clerk." According to the Rules of this Court, only certain sureties may issue *in rem* bonds responsive to a vessel arrest or attachment such as exists here. While Nikka's motion to approve substitute security is silent on the issue, only these forms of security can be approved by the Court. Plaintiff would be willing to consider other forms of security, specifically a letter of undertaking, but none was specifically proposed in Nikka's motion.

## CONCLUSION

Based upon the foregoing, Plaintiff prays that the Court deny in part the Defendant's Motion to Approve Substitute Security, that the Defendant be ordered to provide security in the form of a bond or other surety approved by the Court in the amount of $4,698,255.20, representing 125 percent of Plaintiff's principal claim, and for all other such further relief the Court may deem proper.

/s/ *Thomas S. Rue*
Thomas S. Rue (RUETH8241)
J. Ben Segarra (SEGAJ6478)
Attorneys for Plaintiff, d'Amico Dry d.a.c.,
  f/k/a d'Amico Dry Limited
11 North Water Street, Suite 24290
Mobile, Alabama  36602
(t):     (251) 432-0001
(f):     (251) 432-0007
(e):     true@maynardcooper.com
          bsegarra@maynardcooper.com

OF COUNSEL:
MAYNARD, COOPER & GALE, P.C.

/s/ *Thomas L. Tisdale*
Thomas L. Tisdale (Pro Hac Vice)
Attorney for Plaintiff, d/Amico Dry d.a.c.,
  f/k/a d'Amico Dry Limited
60 East 42nd Street, Suite 1638
New York, New York 10165
Telephone:   (212) 354-0025
Facsimile:   (212) 869-0067
E-mail:      ttisdale@tisdale-law.com

OF COUNSEL:
TISDALE LAW OFFICES, LLC

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 12th day of July, 2018, filed the foregoing pleading with the Clerk of the Court via the CM/ECF Filing System which will automatically forward an electronic copy of same to all counsel of record.


_/s/ J. Ben Segarra_