**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| d'AMICO DRY d.a.c., f/k/a d'Amico Dry Limited, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | | CA 18-0284-KD-MU |
| | : | **IN ADMIRALTY** |
| NIKKA FINANCE, INC., as owner of the M/V SEA GLASS II, | : | |
| | | |
| Defendant. | | |

## ORDER

This cause is before the undersigned on Plaintiff's renewed motion to compel (Doc. 129) and Defendant's response in opposition (Doc. 136). This order **DENYING** Plaintiff's motion to compel is entered pursuant to 28 U.S.C. § 636(b)(1)(A) and General Local Rule 72(a)(2)(S).

## FACTUAL BACKGROUND

As set forth in the undersigned's order denying Nikka's motion for protective order (*see* Doc. 140), this admiralty action has been pending in this Court since June 22, 2018, based upon d'Amico's verified complaint against Defendant Nikka and the within Rule B attachment of the M/V SEA GLASS II (*compare* Doc. 1 *with* Doc. 76), the vessel being arrested in the jurisdiction of this Court that same day (*see* Doc. 10). And, as has been previously recognized by this Court, "[t]he crux of the dispute between d'Amico and Defendant Nikka . . . is whether d'Amico can collect against Nikka, under

an alter ego theory, on the $1,766,278.54 foreign judgment entered in favor of d'Amico

and against Primera [Maritime (Hellas) Limited]." (Doc. 40, at 1-2 (footnotes omitted)).[1]

> On June 22, 1990, the entity Primera was incorporated as a Liberian company. Primera was a ship management company that operated out of an office in Greece. . . . Shareholders of Primera included: Nicholas Coronis (Nicholas), Eleftherios Atherinos, and Mr. Gregoris. Paul Coronis (Paul) was a director of Primera from 2004 to November 15, 2008, and between 2004-2008, Nicholas[] was the General Manager. As General Manager, Nicholas operated Primera's daily functions and ship management issues. Primera's legal representative in Greece–for applicable Law 89 requirements—was also Nicholas; however, Paul handled "to a certain extent" the legal requirements of Primera and used outside counsel. Paul also negotiated FAA trades—including the one with d'Amico—on behalf of Primera, and in 2008 oversaw Primera's commercial department to some extent (seeking new business/customers, maintaining broker/charter relationships, etc.)[.] Paul was also involved in sales and purchases for Primera. With the downturn of the FFA market, Primera was forced into liquidation in late 2008.

> .    .    .

> Paul or his father Nicholas incorporated Nikka. Nikka is a Marshall Islands corporation. Aside from its registered office, Nikka's office is the vessel that it owns (the M/V SEAGLASS II)—a "floating office" where

---

[1]    As a bit of additional background, d'Amico previously sued Primera for breach of a September 2, 2008 Forward Freight Agreement ("FFA") and, on June 9, 2009, Plaintiff obtained a final judgment issued by England's High Court of Justice in the amount of $1,766,278.54. (*Compare id. with* Doc. 1, at 1 & Doc. 76, at 1.) Thereafter, on September 11, 2009, d'Amico sued Primera in the Southern District of New York to enforce the foreign judgment (*see, e.g.,* Doc. 76, at 2), an action which remains pending today after numerous proceedings, including two appeals. (*See id.*)

> The within Rule B attachment is intended to provide indisputable personal jurisdiction over the defendant and security for d'Amico Dry's maritime claim pending in New York. If the New York Court determines that no personal jurisdiction exists over the defendant, then the plaintiff respectfully prays that this Court hear and determine that Nikka is the alter ego of Primera and thereby liable to d'Amico for its judgment against Primera which today has a value of $3,758.580.22, plus any further interest and counsel fees that accrue.

(*Id.* at 3.)

crewm[e]n (the employees) handle the daily affairs of the company.[2] Nikka's directors include Paul who, from 2008 and through October 14, 2009, was the sole director. As of October 15, 2009, Nikka had three directors, Paul and two other individuals.

Nikka is 100% owned by a Marshall Islands holding company named Bulknav, Inc. (Bulknav). An entity named Shelley Ventures owns 69% of Bulknav, and[,] per Paul, that entity is "[t]he vehicle through which the Coronis family owned their shares in Bulknav." Nicholas owns 11-12% of Shelley Ventures, thus Nicholas owns an approximate 8.28% interest in Nikka via Shelley Ventures' interest in Bulknav. Paul, according to Nikka's attorney, owns "a little bit more than Nic[h]olas." As to the remaining 30+% of Bulknav, such is owned by non-Coronis family members.

(*Id.* at 2-3 (internal cites omitted; footnote added and footnote omitted)).

The Court entered its Expedited Rule 16(b) Scheduling Order on July 6, 2018 (Doc. 46) and, given the expedited nature of that Order, the parties were advised that responses to written discovery were due "within twenty (20) days of service." (*Id.* at 3; *compare id. with* Doc. 107, at 3 (same)). In addition, the Expedited Scheduling Order instructs that, in the event motion practice is necessary, "[a]ny such motion shall quote in full (1) each interrogatory, request for admission or request for production to which the motion is addressed . . ., and (2) the response or the objection and grounds therefor, if any, as stated by the opposing party." (Doc. 46, at 6.)

As with Paul Coronis's deposition, the undersigned has conducted several informal discovery conferences related to d'Amico's requests for production of documents propounded to Nikka. (*See generally* Docs. 89, 93, 107 & 128). Indeed, the undersigned struck d'Amico's August 15, 2018 emergent motion to compel Nikka to produce the documents requested in Plaintiff's First Set of Requests for Production

---

[2]    (*See also* Doc. 40, at 3-4 ("Nikka's 'strategy, activity and goal, is the sole ownership of the vessel and profit maximization via her operation . . . .'")).

served on Nikka (Doc. 89 (order striking emergent motion to compel at Document 87))[3] but also construed the motion as "Plaintiff's unconventional request . . . for an informal conference with the undersigned in accordance with the contents of Paragraph 11(b) of the Scheduling Order[.]" (*Id.*) After an informal conference conducted on August 20, 2018, the undersigned entered an Order on August 21, 2018, which reads, in relevant measure, as follows:

> During the informal conference on August 20, 2018, the Court also discussed issues related to d'Amico's first set of requests for production of documents served on Nikka. The undersigned simply memorializes the direction given to the parties in regard to the propounded production requests and any outstanding issues regarding those discovery requests. In particular, the undersigned finds that the appropriate date range for discovery in this matter is January 1, 2008 through December 31, 2011, with the exception that Nikka should produce a copy of the vessel building contract for the M/V SEA GLASS II regardless of when the contract was executed. ***This Court will not now or later deem Nikka to have waived its right to object to the propounded requests for production***; however, the undersigned will require Nikka to search its warehouse (or storage facility) in Greece for additional records responsive to d'Amico's requests for production for the period January 1, 2008 through December 31, 2011. This is additional search if to be conducted so that a supplemental response to d'Amico's propounded requests can be tendered not later than **August 31, 2018.**

(Doc. 93, at 5-6 (footnote omitted; some emphasis supplied)).

Nikka did make a supplemental response to Plaintiff's First Set of Requests for Production of Documents as ordered by the Court (*see* Doc. 107); however, because d'Amico voiced numerous issues with Nikka's supplemental response, and requested leave to pose up to five additional requests for production of documents as part of its

---

[3]     D'Amico's first set of requests for production of documents was served upon Nikka on July 12, 2018. (*See* Doc. 129, Exhibit 3, Affidavit of Thomas L. Tisdale, at ¶ 1.) Nikka admits it did not serve its responses within 20 days but, instead, served its responses within 28 days of service, on August 8, 2018 (*compare* Doc. 129, at 2 *with* Doc. 136, at 13).

motion to amend the Court's expedited scheduling order (*see id.* at 4), in an Order dated September 7, 2018, the undersigned set forth certain principles to guide Nikka both in responding to d'Amico's additional requests for production of documents[4] and "in making its ***final*** supplementation to its supplemental response to d'Amico's first request for production of documents, same being due not later than **September 21, 2018.**" (Doc. 107, at 4 & 4 n.4 (some emphasis supplied)).

> First, the date range for discovery in this matter is **January 1, 2008** through **December 31, 2011.** Second, the sole triable issue for the November 26, 2018 bench trial is whether Nikka is the alter ego of Primera. Third, the discovery that need be produced in this case for the relevant time period is responsive information within the control of the responding party, including information the responding party can obtain on demand, for instance, from its bank, accountant, or affiliated corporations. *See, e.g., ANZ Advanced Technologies, LLC v. Bush Hog, LLC,* 2011 WL 814663, *9 (S.D. Ala. Jan. 26, 2011) ("[A] corporate party may be required to produce documents within the possession, custody, or control of a sister corporation or other corporate affiliate. For purposes of Fed.R.Civ.P. 34, 'control' can exist even if the documents are physically located with a corporate party's affiliate. . . . "'[C]ontrol over a corporate affiliate's documents is not equivalent to 'piercing the corporate veil.' . . . Rather, 'control' has been 'construed broadly by the courts' to include not just a legal right, but also a 'practical ability to obtain the materials' on demand. . . . The 'specific form of the corporate relative does not matter,' rather, practical considerations such as 'common relationships' and shared ownership or management dictate whether a party can be held responsible for production of its affiliate's materials."). Finally, what this Court is looking for is Nikka's financial (and other) records, whether "group" records or not.[5]

---

[4]     d'Amico's second set of requests for production of documents was served upon Nikka on September 7, 2018 (Doc. 129, Exhibit 3, Tisdale aff., at ¶ 1.) Nikka's response to Plaintiff's second set of requests for production was electronically served some eighteen (18) days later on September 25, 2018. (Doc. 136, Exhibit A.)

[5]     "For instance the undersigned agrees with Plaintiff that the following "Nikka" information generated during the aforementioned date range is relevant, responsive and proportional in this case (and to the sole issue to be tried) and should be produced by Nikka if not already produced (or, otherwise, Nikka should explain in its affidavit why the information cannot be produced) even if Nikka has to demand the information from one of its affiliated corporations: (1) payments to employees of Nikka; (2) invoices and payments to Primera and Primebulk for ship-management services; (3) Nikka's bylaws, shareholder minutes, and share (Continued)

As regards Nikka's supplemental response that is due on September 21, 2018, the undersigned directed the Defendant that its response is to be accompanied by an affidavit from a single source about the steps taken to uncover responsive and relevant documents/information, the fruits of those efforts, and, if applicable, why certain responsive information is unavailable.

(Doc. 107, at 4-6.)

On September 28, 2018, Nikka filed its notice/response to the undersigned's September 7, 2018 Order. (Doc. 120; *compare id. with* Doc. 107.)[6] In particular, Nikka attached to that response the Declaration of Paul Coronis "catalog[ing] the efforts undertaken and otherwise provides information as directed by the Magistrate's Order." (*Id.* at 1.) Coronis's Declaration reads, in relevant measure, as follows:

2.      I provide this Declaration to identify the steps taken by Nikka to respond to d'Amico's Requests for the Production of Documents.

3.      d'Amico requested documents from Nikka for the first time in August 2015 in the New York Action.

4.      I directed my personal assistant at the time, who in turn directed several employees of Primebulk Shipmanagement, the managers of the SEA GLASS II, to search Nikka's records for documents responsive to d'Amico's requests. I understand that no less than two searches for the responsive documents were made.

---

certificates; (4) loans to/from Nikka, including any inter-company loans; (5) Nikka's tax returns; (6) P&I/Hull policies for 2008, 2009 and part of 2010; (7) written communications with Primera and Primebulk regarding the SEA GLASS II; (8) records relied on by Nikka regarding ownership of Primera; (9) records establishing the ownership of Nikka; (10) any communications with HSH Nordbank to allow Primera and Primebulk to be the managers of SEAGLASS II; and (11) the July 10, 2007 MOA for Nikka's purchase of the SEAGLASS II, with addenda. By highlighting these items, the undersigned does not mean to suggest that these are all the relevant documents that must be produced or for which an explanation must be given for the inability to produce same; rather, this information is highlighted because the undersigned did not specifically address these items during the informal conference on September 6, 2018." (Doc. 107, at 5 n.5.)

[6]      That response, obviously, was untimely by seven (7) days.

5.     Most of Nikka's responsive documents were located. Some documents were with the manager and some, given the age of the requested documents, were in storage. The requested records that were not located in storage were presumed discarded due to their age.

6.     Nikka's responsive documents were produced in the New York Action as part of a production that included over 5,000 corporate records including, but not limited to, annual board minute reports, charterparties, insurance policies, tax filings, financial accounts and bank records.

.     .     .

8.     Notwithstanding the prior exhaustive search for records in the New York Action, Nikka, in this action, made significant efforts to search for records requested by d'Amico, including: (i) conducting a further search for records in storage; (ii) contacting the law firm that represented Nikka in the purchase of the SEA GLASS II; (iii) contacting banks; and, (iv) contacting the P&I Club the SEA GLASS II was entered with in 2008 and 2009.

9.     After conducting a further search for records, as noted in paragraph 8, Nikka was able to locate the shipbuilding contract and technical specification for the SEA GLASS II, the commercial invoice addressed to Nikka for the purchase of the SEA GLASS II, a copy of the Bill of Sale issued to Nikka for the purchase of the SEA GLASS II, evidence of payment for the purchase of the Vessel, and copies of canceled bearer stock certificates No. 1 through 5 for Nikka Finance for the period prior to September 2008. A majority of the documents requested in this action were previously produced in the New York Action. ***No other documents requested by d'Amico, other than the ones identified in paragraph 9, could be located.***

10.     The Managing Director of the law firm who represented Nikka in the purchase and drafting of documents for the SEA GLASS II provided a Declaration stating the law firm could not "locate any of the above documents relating to Nikka's purchase of the SEA GLASS II since the transaction concluded nearly ten years ago. It is the Firm's policy not to retain documents for more than five years, which exceeds the requirements imposed by Greek law applicable to retention of documents by Greek law firms."[7] . . .

---

[7]     Evangelos Bairactaris, Esquire, of the law firm Bairactaris & Partners in Piraeus, Greece, supplied the Declaration attached to Coronis's declaration and therein makes clear that he was requested by Nikka to locate any documents that would be responsive to d'Amico's first (Continued)

11.    HSH Nordbank, the bank that provided financing for the purchase of the SEA GLASS II, also provided a letter which confirmed that the bank did not receive audited financial statements for Nikka.[8] . . .

12.    The P&I Club has not responded to the request for copies of the 2008 and 2009 entries.

(Doc. 120, Declaration of Paul Coronis (footnotes and emphasis added)).

Although the undersigned learned of d'Amico's continued dissatisfaction with Nikka's document production and with the adequacy of Mr. Coronis's declaration on October 2 and 3, 2018, the final informal conference on these related issues did not occur until the afternoon of October 5, 2018, the discovery completion deadline. (*See* Doc. 128.) The Order generated in the wake of that informal conference reads, in relevant measure, as follows:

Turning to any remaining issues d'Amico has related to Nikka's responses to its First and Second Requests for Production of Documents, as well as the content of Mr. Coronis' September 27, 2018 declaration  . . ., the only guidance the Court can give to the parties is that now is the time for d'Amico to file a written motion to compel. To this end, the undersigned specifically informed the parties that any motion to compel filed by d'Amico prior to the close of business on October 9, 2018 will be **DEEMED** timely under the modified scheduling order entered on September 7, 2018 (*see* Doc. 107).[9] Before filing the motion to compel,

---

two requests for production set forth in its second set of requests for production. (*See* Doc. 120, Exhibit B to Paul Coronis declar.) However, Mr. Bairactaris located no such documents because "Nikka's purchase of the SEA GLASS II . . . concluded nearly ten years ago[,]" and his Firm only retains documents for five years. (*Id.* at ¶ 4.)

[8]    The letter from HSH Nordbank reads, as follows: "Nikka Finance Inc. is a client of our Bank on a depository, operational and lending basis since 2008. The cooperation has been conducted to our entire satisfaction. During the period we have not received and do not retain independent audited Financial Statements for Nikka Finance Inc." (Doc. 120, Exhibit C to Coronis declar.)

[9]    "This finding carries with it the implicit determination by the undersigned that good cause exists for allowing d'Amico to file its motion to compel four days *after* the discovery completion date of October 5, 2018." (Doc. 128, at 2 n.1).

> however, d'Amico should consider (particularly regarding the contents of Mr. Coronis' declaration) whether it can obtain the information it seeks during the course of Mr. Coronis' deposition.

(Doc. 128, at 2).

d'Amico filed its renewed motion to compel on October 9, 2018 (Doc. 129). In its motion, d'Amico expressly incorporates by reference the affidavit of Thomas L. Tisdale (Doc. 129, at 1) and requests that this Court order Nikka to produce the documents requested in its first and second sets of requests for production, and produce a more detailed affidavit of Paul Coronis (*id.*) based upon: (1) Nikka's waiver of its objections to d'Amico's requests for production (*id.* at 6-8); (2) Nikka's pattern of dilatory conduct, including its attempt to enforce an arbitrary timeline limiting its discovery obligations (*id.* at 8-9) and its fatuous relevancy objections interposed by Nikka (*id.* at 9-11); and (3) Nikka cannot be heard to claim that it does not have custody and control over certain documents (*id.* at 11-13). Given that the motion to compel incorporates Mr. Tisdale's affidavit by reference, the undersigned sets forth portions of the affidavit directed to the proceedings in Mobile. (*See* Doc. 129, Exhibit 3, Tisdale aff., at 6-14).

> 14.    In conformity with the Court's Scheduling Order, d'Amico served its First RFP on Nikka on July 12, 2018. (Exhibit D). Instead of responding in accordance with the Court's Scheduling Order within 20 days of service, Nikka did not respond to Plaintiff's request until August 8, 2018. (Exhibit E). Relying on its misinterpretation of this Court's Order denying Nikka's Motion to Vacate Attachment . . ., Nikka objected to every request on the basis that "discovery is limited to the time period September 2, 2008 to June 19, 2009." Nikka boldly argued that some documents such as the "shipbuilding contract for the M/V SEAGLASS II" were "irrelevant and would not lead to discoverable information on the issues before this Court," and in response to requests concerning the payment of charter hire, Nikka responded "the payment of charter hire is irrelevant to the issue of whether Primera had dominion and control over Nikka." (Exhibit E, RFP Nos. 1, 13).

15.    Rather than producing documents anew, Nikka identified a series of documents which it produced in the New York Action as allegedly responsive to the First RFP. Nikka referred to a total of 500 pages of documentation. Of these documents, 153 pages represent the financing agreement (which d'Amico appended to its Complaint in support of its Writ of Attachment of the SEAGLASS II) as well as 161 pages of insurance policies most of which post-date the operative period. In total, Nikka referred d'Amico to a total of 184 pages of non-banking, non-insurance documentation in response to a total of 30 separate requests in the First RFP. (Exhibit E).

16.    At the request of d'Amico, and armed with a detailed list of Nikka's discovery shortcomings (Exhibit F), an informal conference was held on August 20, 2018. On August 21, 2018, . . . an Order [was issued] . . . .

17.    On August 31, 2018, Nikka served its Amended Responses to d'Amico['s] First RFP. (Exhibit G). Of the 1,227 pages of documentation provided, approximately 700 pages represent the specifications for the construction of the M/V SEAGLASS II, and an additional 64 pages represent the contract between the shipyard and the vessel purchaser, JBU Loggers, Ptd. Ltd. [At that time, the undersigned learned that the Coronis' interests purchased the shipbuilding contract for the M/V SEAGLASS II from JBU Loggers while the vessel was under construction]. Other than those documents, Nikka produced no additional documents but instead renumbered their previous production from the New York Action and re-served it.

.    .    .

19.    At the September 6, 2018 conference, the undersigned outlined those documents which d'Amico believes were not produced . . . . A list of the documents which were not produced was provided to the Court and all counsel. (Exhibit I). The Court was advised of the bases upon which we believed these documents existed such as citations to the Nikka Facility Agreement, the Nikka/Primebulk Management Agreement and other documents produced either in this or the New York Action. We further advised the Court where we believed these documents were in the hands of HSH Nordbank, the lead lender on the Facility Agreement, Nikka's outside auditors, Nikka's lawyers, Nikka's insurers, and other sources.

20.    [The Court entered an Order on September 7, 2018]

.    .    .

22.     Despite having been granted ten days to supplement its Response to the First RFP and twenty days to respond to its Second RFP, it was not until September 25, 2018 that Nikka provided only a response to Plaintiff's Second RFP. Exhibit K). In it, Nikka objected to the requests as impermissibly broad, unreasonably burdensome and outside the scope of reasonable discovery contemplated by Rule 26. Along with its objections, Nikka produced a single document, the Bill of Sale for the vessel dated October 14, 2008 (despite having been specifically requested to produce a copy of the Memorandum of Agreement which preceded the purchase of the vessel and numerous other documents). Subsequently, Nikka produced four canceled Share Certificates when the shares were transferred to Bulknav, Inc. in 2008. Other than the foregoing, Nikka has produced nothing further.

23.     In addition, Nikka provided a letter from the Piraeus branch of HSH Nordbank . . . . This unsworn letter "carves close to the bone" and is somewhat disingenuous where it states "we have not received and do not retain independent audited financial statements for Nikka Finance, Inc." The Facility Agreement is dated May 21, 2008. The first audited financial statement would not have been prepared until after the conclusion of the 2008 financial year by which time Bulknav, Inc. was incorporated and all of the shares of Nikka transferred to Bulknav. It is therefore probable that financial statements from Bulknav as well as "Group" financial statements of Bulknav, Primera and Primebulk were provided to HSH Nordbank, but not specifically from Nikka.

24.     Additionally, Nikka included a Declaration of Evangelos Bairactaris. . . . This statement [related to the declarant's checking of the firm's archives] makes no reference to Mr. Bairactaris being asked for any other documents, especially documents called for in the First RFP. Mr. Bairactaris' office was involved for the Borrowers including Nikka in the negotiation of the Facilities Agreement and would in normal custom and practice have received copies of the documents which were exchanged during those negotiations including copies of the Memorandum of Agreement for the purchase of the vessel, financial statements, etc., which are specifically referred to in the Facilities Agreement.

25.     Neither the Affidavit of Mr. Coronis which Nikka was ordered to provide nor the letter from the Piraeus branch of HSH Nordbank or Mr. Bairactaris' Declaration address the details of Nikka's search for the documents requested in the First and Second RFP. No documents were requested from the bank. Mr. Bairactaris was not asked for any documents relating to the Facilities Agreement which remains in effect today. No inquiries were made of any outside auditing firms which performed the tasks required for the loans, nor is there any explanation as

to why the operational and commercial documents relating to the M/V SEAGLASS II are not available in the archives of Primebulk.

.          .          .

26.    As noted above, the undersigned has a strong belief that the documents sought in the First and Second RFPs which have not been produced, existed and still exist within the custody and control of Nikka. The support therefor can be found in the documents produced by Nikka or those produced in the New York Action. I address some of those documents below:

A.    The Facilities Agreement.    The May 21, 2008 Facility Agreement was entered into by, among others, Nikka as a "Borrower" and guaranteed by Primera (which is identified as the "Corporate Guarantor" and included in the definition of "Security Party."). . . . The Agreement required Nikka to provide HSH Nordbank's Hamburg home office with Certificates of Incorporation and constitutional documents of each Borrower and Security Party, resolutions of shareholders and directors of each Borrower and Security Party authorizing the execution of the financing documents, Powers of Attorney executed on behalf of the Borrower and Security Party, copies of each MOA and Shipbuilding Contract signed or issued by the Borrowers, all documents required in connection with the opening and operating of each earnings account, retention account, equity account, swap account and debt service reserve account, and evidence that a minimum balance of $500,000 per existing ship is standing to the credit to the debt service reserve account or other account or accounts in the name of the Borrowers. . . . Evidence that no less than 80% of the issued shares and/or voting rights attached to the issued shares of each Borrower are directly or indirectly owned by persons acceptable to the documentary agent in its sole discretion must be provided. [] As a general undertaking, the Borrowers, including Nikka, and the Corporate Guarantor, Primera, agreed to provide audited financial statements of each Borrower and audited combined accounts of the Group (including Nikka and Primera) "signed by the Managing Director or the Chief Financial Officer of the corporate guarantor [Primera]." [] That a true and complete copy of the MOA for the sale of the SEAGLASS II was provided to HSH Nordbank is specifically warranted.

Thus, many of the documents requested by d'Amico were provided to the head office of HSH Nordbank in Hamburg, Germany. It is improbable that this German, E.U. regulated bank, does not have these documents available to them as part of this $200 million loan.

B.    Primebulk Management Agreement–Primebulk assumed the management of the SEAGLASS II on or about April 30, 2009 after Primera

ceased its activities. The Management Contract between Nikka and Primebulk requires that Primebulk maintain all of the owner's documents in its custody until two years after the termination or dissolution of the Management Agreement. The Management Agreement is still in operation today. Therefore, Primebulk should have copies of all documents relating to the operation of the SEAGLASS II after April 30, 2009 through to today. []

C.   Moore Stephens' Services to Primebulk—In or around May 2015, Moore Stephens, an international accounting firm with offices, in among other places, Piraeus, Greece, performing under agreed procedures, reviewed the records of Primebulk dating back to April 30, 2009 including documents supporting their chartering commissions, management fees, sale and purchase commissions, administrative expenses, etc. This includes documents relating [to] the M/V SEAGLASS II. []

In his Affidavit, Mr. Coronis makes no reference to having contacted Moore Stephens for any of the documents requested. Moore Stephens will necessarily have received some of the requested documents from Nikka in order to prepare their May 21, 2015 report. Moreover, it is probable that Moore Stephens was the accounting firm which issued the audited financial statements Nikka, Primera and the other Borrowers or Secured Parties were obligated to file as part of the Facility Agreement.

D.   Nikka's Response to d'Amico's Request to Admit—d'Amico's Request for Admissions and Nikka's Response to RFA number 13 state as follows:

13.   Admit that during the operative period Nikka and/or Bulknav did not have financial statements prepared by outside independent accounting firms.

**RESPONSE**:  Deny

By its denial, Nikka has admitted that Nikka and Bulknav did have financial statements prepared by outside accounting firms during the operative period despite their protestations to the contrary and their Responses to the RFPs.

E.   Nikka's Document Production—Further questions are raised by Nikka's own production. In response to requests for employment contracts, evidence of salary payments, etc., concerning Nikka's employees, Nikka has provided only a four-page document listing what appear to be crew members of the SEAGLASS II. [] No dates or positions of employment and no other identifying information is provided. The

information, however, had to originate from something other than a list which was clearly created as a response to a document request, but the underlying documents on which it was based have not been provided. Nikka has argued in these proceedings that it employed and paid the crew and that the SEAGLASS II was their "floating office." [] The underlying documents upon which this list was created should be produced.

      F.    <u>Nikka's Production of Primera's Records</u>—At a pre-motion conference before Judge Koeltl, Nikka's counsel represented to the Court that Nikka had possession of Primera's records which were relevant to Primera's management of the SEAGLASS II. [] Moreover, Mr. Coronis testified at trial that when he last saw the Primera corporate records they were in the offices then occupied by Primebulk, and that he made no effort to search for these records. []

      There can be no excuse for Nikka's failure to produce these records which go to the very heart of the alter ego issues.

.    .    .

      27.    In summary, Nikka has failed to satisfy its obligation to produce documents within its custody and control. Clearly, outside auditors were engaged by Nikka, Primebulk (and Primera before it) in order to satisfy the requirements of HSH Nordbank's office in Hamburg as the documentary agent under the Facility Agreement. Primebulk was required to maintain documents which are responsive to Plaintiff's RFPs but those documents have also not been produced. Nor has Nikka attempted to obtain documents from HSH Nordbank or to produce documents relating to the loan facility from Mr. Bairactaris who assisted Mr. Coronis in the negotiation of that agreement. This Court should order the production forthwith of all documents within Nikka's care, custody and control responsive to d'Amico's First RFP and Second RFPs or to provide specific evidence of the efforts made to obtain them before Mr. Coronis' deposition scheduled for October 24, 2018.

(*Id.*)

In its response, Nikka stakes the position that it has fully complied with its discovery obligations under the Federal Rules of Civil Procedure and this Court's Orders and, therefore, that Plaintiff's motion to compel should be denied. (*See generally* Doc. 136). The anchor point for Nikka's position is that it has produced all responsive documents in its possession, custody and control and, further, the additional responsive

documents sought by d'Amico "simply no longer exist because they are related to a transaction that concluded nearly ten years ago." (Doc. 136, at 22; *compare id. with id.* at 2 (same)).

## CONCLUSIONS OF LAW

Against this procedural backdrop, the undersigned considers Plaintiff's three legal bases for its request that this Court compel Nikka to produce the documents requested in its First and Second Set of Requests for Production and to produce a more detailed affidavit of Paul Coronis explaining the steps taken to search for documents central to its claim, which "Nikka claims to be missing." (*See* Doc. 129, at 1). Before specifically addressing Plaintiff's legal arguments, the undersigned notes that the demand for both an order directing Nikka to produce the documents and a more detailed affidavit from Paul Coronis contained in the motion (Doc. 129) is disconnected from the affidavit of Tom Tisdale, Esquire, whose concluding request is that this Court "order the production forthwith of all documents within Nikka's care, custody and control responsive to d'Amico's First RFP and Second RFPs *or* to provide specific evidence of the efforts made to obtain them before Mr. Coronis' deposition scheduled for October 24, 2018." (Doc. 129, Exhibit 3, Tisdale aff., at 14 (emphasis supplied)). The undersigned concludes that this disconnect is attributable to Mr. Tisdale's implicit recognition that this particular discovery dispute has progressed far beyond Plaintiff's arguments relative to waiver and dilatory conduct and resides now in the lap of "care, custody, and control." Even so, the Court proceeds now to take up all of d'Amico's legal arguments but will combine the first two lines of argument together before addressing the issue of care, custody and control.

**A.** **Putative Waiver by Nikka of its Objections to Plaintiff's Requests for Production, including Relevance, and Whether Nikka is Guilty of Dilatory Discovery Conduct**. Plaintiff first argues that Nikka waived any and all of its objections to Plaintiff's Requests for Production, engaged in a pattern of dilatory discovery conduct by attempting to enforce an arbitrary timeline limiting its discovery obligations, and that it interposed fatuous relevancy objections. (Doc. 129, at 6-11). The overarching problem with these legal arguments, however, is the focus on Nikka's initial response to Plaintiff's First Set of Request for Production (*see id.*) without regard to what occurred following the undersigned's several informal discovery conferences with the parties.

To be sure, the general rule is that "if a party fails to respond in writing within [the time limit] of being served with a request for production of documents, it is appropriate for the court to find that the party's objections are waived, unless the court finds good cause and excuses that failure[,]" *Enron Corp. Sav. Plan v. Hewitt Assocs., L.L.C.,* 258 F.R.D. 149, 156 (S.D. Tex. 2009) (citations omitted), and here there can be little question but that Nikka did not respond to d'Amico's First Set of Requests for Production within twenty (20) days of service as required by the Expedited Scheduling Order (*see* Doc. 46, at 3). Therefore, the undersigned could arguably find that Nikka has waived all its objections to Plaintiff's First Set of Requests for Production due to its failure to timely respond; however, such a determination would be inconsistent with the undersigned's earlier pronouncement, after the first informal conference related to this issue, that "[t]his Court will not now or later deem Nikka to have waived its right to object to the propounded requests for production[.]" (Doc. 93, at 5.) More importantly, such a determination would have no practical import because it is now clear that the objections

16

originally interposed by Nikka were largely form objections. Nikka has now taken a more developed position, both in the Paul Coronis declaration, its representations made to this Court in its response to the instant motion to compel, and in previous informal discovery conferences, that it has no additional documents responsive to Plaintiff's First Request for Production of Documents (as well as, for that matter, d'Amico's Second Request for Production). The Court now **DECLINES** to go through the motions of ordering Nikka to produce the documents requested in d'Amico's First Requests for Production, on the basis that Nikka has waived all objections thereto by failing to timely serve its responses,[10] in light of the reality that Nikka will produce no further documents because they do not exist. This Court simply cannot order a party to produce documents—nor can it make them have documents—which it represents not to have in its possession, custody, and control.

As for Plaintiff's arguments that Nikka has engaged in a pattern of dilatory discovery conduct by attempting to enforce an arbitrary timeline limiting its discovery obligations and making fatuous relevancy objections (Doc. 129, at 8-11), the undersigned disagrees with Plaintiff for several reasons. First, the Court's July 5, 2018 Order denying Nikka's motion to vacate the Rule B attachment related to the M/V SEA GLASS II prominently noted that "the singular issue before the Court is whether d'Amico has demonstrated that it has a valid maritime claim *against Nikka* – i.e., that Nikka is

---

[10]     With respect to the first two prongs of its legal attack, d'Amico can make no argument that Nikka waived its objections to Plaintiff's Second Requests for Production or, otherwise, was dilatory in the manner it responded (*see* Doc. 129, at 6-11) because Nikka timely responded to the Second Requests for Production (*see id.* at 2 (served September 7, 2018)) and, importantly, makes clear in its responses that no other responsive documents are being withheld from production (*see* Doc. 136, Exhibit 1 (served September 25, 2018)).

Primera's alter ego[,]" and went on to observe "that the relevant time period for analyzing dominion and control is between September 2, 2008, when d'Amico and Primera entered into the FFA and at the latest June 19, 2009 when the English Judgment was entered." (Doc. 40, at 12 & 13 (emphasis in original)). Therefore, when d'Amico served its First Requests for Production on Nikka a week later, on July 12, 2018 and sought documents from 2008 **to the present**, it should have come as no surprise that Nikka would point to the dominion and control time range set forth in the Court's July 5, 2018 Order to structure its responses, in light of the arbitrary timeline set forth in the requests for production and recognizing that Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense **and** proportional to the needs of the case, considering the importance of the issues at stake in the action . . . ." Fed.R.Civ.P. 26(b)(1) (emphasis added). As a result, the undersigned simply cannot agree that the manner in which Nikka crafted the majority of its discovery responses was a "Facile Attempt to Enforce an Arbitrary Timeline Limiting Its Discovery Obligations." (Doc. 129, at 8).

Second, the initial failure of Nikka to provide d'Amico with any documents responsive to Requests for Production 13 and 22 was addressed, as was the timeline issue, after the undersigned conducted the first informal conference with the parties and specifically informed the parties that "the appropriate date range for discovery in this matter is January 1, 2008 through December 31, 2011, with the exception that Nikka should produce a copy of the vessel building contract for the M/V SEA GLASS II regardless of when the contract was executed." (Doc. 93, at 5.) Therefore, the

18

undersigned **DECLINES** to live in the past, as Plaintiff desires,[11] and dub Nikka's responses to Requests for Production 13 and 22 fatuous (that is, "[s]mugly or foolishly stupid[,]" WEBSTER'S II New Riverside Dictionary, at 467),[12] particularly in light of the undersigned's parenthetical notation in the August 21, 2018 Order that Nikka would be required "to produce copies of the vessel building contracts for any other vessel of which Nikka was or is the registered owner (*see* d'Amico's RFP #13) *if* such contracts were executed during the relevant date range for discovery identified above." (Doc. 93, at 5 n.7 (emphasis supplied)).

In light of the foregoing discussion, the undersigned concludes that d'Amico's first two legal arguments are **UNPERSUASIVE** and an order will not be entered on

---

[11]     If d'Amico seriously wants this Court to live in the past, it will do so at no small price to Plaintiff. Technically, the instant motion to compel could be denied out-of-hand by the undersigned both as untimely, having been filed after the extended deadline of the close of business on October 9, 2018, which the undersigned objectively finds to have been 5:00 p.m. CST (*see* Doc. 129 (filed at 5:22 p.m. on October 9, 2018)), and due to d'Amico's failure to follow the dictates of the Expedited Scheduling Order (Doc. 46, at 6), requiring any motion to compel "to quote in full (1) each . . . request for production to which the motion is addressed . . ., and (2) the response or the objection and grounds therefor, if any, as stated by the opposing party." D'Amico's citation to the affidavit of Tom Tisdale (Doc. 129, at 1) does not suffice because it merely incorporates by reference the reasons set forth in the Tisdale affidavit and nowhere quotes in full each request for production to which the motion is addressed (and the response or objection of Nikka). It would have been near impossible for d'Amico to adhere to this requirement given the numerous informal conferences and subsequent Orders issued addressing Plaintiff's Requests for Production. Nonetheless, to the extent Plaintiff wants this Court to cleave to the past when analyzing Nikka's discovery responses, the undersigned would necessarily have to hold Plaintiff's feet to the fire with respect to the requirements of the Expedited Scheduling Order and deny the motion on the basis of this procedural deficiency, as well as its technical untimeliness.

[12]     To the extent it is not clear, the undersigned is troubled by d'Amico's counsel's choice of vocabulary here and elsewhere in its motion.

either of these bases compelling Nikka to produce the documents requested in Plaintiff's First Request for Production.[13]

**B.** **Whether Nikka Has Custody and Control of Certain Documents which it has not Produced.**  The present motion, at its core, boils down to whether Nikka has custody and control over certain documents not produced in this matter and, therefore, should be compelled to produce these documents (Doc. 129, at 11-13)[14] *or*, otherwise, should "provide specific evidence of the efforts made to obtain them before Mr. Coronis' deposition scheduled for October 24, 2018." (Doc. 129, Exhibit 3, Tisdale aff., at 14). And while Mr. Tisdale's affidavit does make an articulate and considered showing of why he "believes" certain documents sought in d'Amico's First and Second Requests for Production exist within the custody and control of Nikka, this belief simply does not mandate that this Court disbelieve Nikka's assertions and representations that it does not have such documents in its custody and control and here is why.

The undersigned will not again set forth all the directions given Nikka in the September 7, 2018 Order but does restate that when ordering Nikka to make its final supplementation to its supplemental response to d'Amico's first request for production of documents, that final supplementation was "to be accompanied by an affidavit from a single source about the steps taken to uncover responsive and relevant

---

[13]     Again, nothing about these two prongs of d'Amico's three-pronged attack is tied to Nikka's responses to Plaintiff's Second Request for Production, which was timely served and advised that no documents otherwise responsive to any of the four requests were being withheld from production. (*See* Doc. 136, Exhibit 1, at 1-2).

[14]     Again, to the extent Plaintiff begins its argument citing to Nikka's initial general responses that it "'is not in possession, custody, or control of non-party [] corporate documents[,]'" (Doc. 129, at 11), this issue is past the point of castigating Nikka for its initial responses or otherwise wasting any more ink relative thereto.

documentation/information, the fruits of those efforts, and, if applicable, why certain responsive information is unavailable." (Doc. 107, at 6.) And while, as the undersigned stated in the informal telephone conference conducted on October 5, 2018, the Declaration of Paul Coronis was not the "greatest[,]" it did "hit the marks that the Court . . . set out[.]" (*See* Doc. 135, at 15.) And, indeed, it did hit those marks as it set forth not only the searches conducted in 2015 and the documents produced in the New York Action but, as well, the additional search for records in storage conducted in 2018 at the order of this Court on August 31, 2018 which produced additional responsive documents (*see* Doc. 129, Exhibit 3, Tisdale aff., at ¶ 17), the contacting of the law firm that represented Nikka in the purchase of the SEA GLASS II, the contacting of banks, and the "contacting the P&I Club the vessel was entered with in 2008 and 2009. (*See* Doc. 120, Exhibit 1, Declaration of Paul Coronis.) And, most importantly, after setting forth the additional documents found in the 2018 search (or searches) for documents in Paragraph 9,[15] and noting that the majority of documents requested in this action were previously produced in the New York Action, in that same paragraph Mr. Coronis explicitly states, under penalty of perjury, that "[n]o other documents requested by d'Amico, other than the ones identified in paragraph 9, could be located." (*Id.* at ¶ 9.) This statement, combined with the Rule 11 representations of counsel in Nikka's response in opposition, make clear that the reason certain responsive information is unavailable is due to the passage of time. And given Nikka's previous production of

---

[15]      It appears that there may have been two searches in 2018 because the Bill of Sale supplied by Nikka in response to Plaintiff's Second Requests for Production was clearly new and does not appear to have been provided when Nikka initially supplemented its responses on August 31, 2018.

various Bulknav documents (*see, e.g.,* Doc. 136, at 5-6), as well as invoices and payments to Primera and Primebulk (*see id.* at 18), it is clear that at all times Nikka has appreciated its duty to produce documents that it can obtain from affiliated corporations and that its failure to produce those documents referenced in Mr. Tisdale's affidavit is because those documents do not exist. Again, this Court simply cannot compel Nikka to produce that which it has represented by declaration, and under Rule 11, it does not have in its possession, custody or control. Nor will this Court require Nikka to produce additional specific evidence of efforts made to obtain these documents before Mr. Coronis' deposition on October 24, 2018. Instead, the undersigned chooses to believe the representations of the Defendant, and in particular defense counsel, that it does not have these documents in its custody, possession and control until given reason to doubt these representations. *Compare, e.g., Deutsch v. Arrow Fin. Servs., LLC,* 2009 WL 10670785, *5 (M.D. Fla. May 1, 2009) ("The Court will not assume Counsel has made false representations and will give deference to the responses and presume them true unless given reason to assume otherwise.") *with, e.g., Malautea v. Suzuki Motor Co., Ltd.,* 987 F.2d 1536, 1546 (11th Cir.) ("All attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice. An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly."), *cert. denied,* 510 U.S. 863, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993).

The undersigned will not require Nikka to produce more specific evidence of efforts made to obtain these documents before Mr. Coronis' deposition on October 24, 2018; however, the Court will direct some comments to Mr. Coronis regarding his

deposition, which by concurrent order the undersigned is allowing to be videotaped. As Defendant's 30(b)(6) and records custodian, Mr. Coronis need be prepared to answer in full d'Amico's many relevant questions that will be posed to him over the course of one day of 9 hours, exclusive of time attributable to objections and breaks. In particular, Mr. Coronis should be well-prepared to answer Plaintiff's detailed questions about the searches for documents conducted in 2015 and 2018, who conducted those searches, what directions the searchers were given prior to searching, what facility or facilities were searched, etc. In addition, Mr. Coronis may well be asked to confirm that these searches were conducted with a particular awareness of the need to search for Nikka business, corporate and financial, and other records, whether group or not, that it could obtain on demand from affiliated companies, like Primera, Primebulk, or Bulknav, or others. As well, Mr. Coronis will undoubtedly need to answer questions directed toward those certain documents referenced in Mr. Tisdale's affidavit, in particular ¶ 26. And while these are obviously not the only questions Mr. Coronis should be prepared to answer substantively, the undersigned simply informs him that a litany of "I don't know" answers will not serve him or the Defendant well.

## CONCLUSION

For the reasons set forth above, the undersigned, within the broad discretion afforded him in matters of discovery, *see, e.g., Harrison v. Culliver,* 746 F.3d 1288, 1297 (11th Cir. 2014) ("Discretion means the district court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.' . . . 'Accordingly, under the abuse of discretion standard, we will leave undisturbed a district court's ruling unless we find that the district

23

court has made a clear error of judgment, or has applied the wrong legal standard.' . . . Moreover, 'we will not overturn discovery rulings unless it is shown that the District Court's ruling resulted in substantial harm to the appellant's case."), **DENIES** Plaintiff's motion to compel (Doc. 129).

      **DONE** and **ORDERED** this the 19th day of October, 2018.

                s/P. BRADLEY MURRAY
                **UNITED STATES MAGISTRATE JUDGE**