UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
-----------------------------------------------------------x
d'AMICO DRY D.A.C. (f/k/a d'amico Dry Ltd.),      :
                                                  :
                        Plaintiff,                :
                                                  : Civil Action:  1:18-cv-00284-KD-MU
               - against -                        : IN ADMIRALTY
                                                  :
NIKKA FINANCE INC.,                               :
as owner of the SEA GLASS II,                     :
                                                  :
                        Defendants.               :
-----------------------------------------------------------x
```

**NIKKA FINANCE INC.'S MOTION FOR SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW**

COMES NOW Nikka Finance Inc. [1] ("Nikka"), on behalf of the vessel M/V SEA GLASS

II (the "Vessel"), as Defendant *in rem*, and respectfully submits this Motion for Summary

Judgment and Incorporated Memorandum of Law pursuant to Federal Rule of Civil Procedure 56.

**PRELIMINARY STATEMENT**

The Court's jurisdiction is derived solely from Plaintiff, d'Amico Dry D.A.C. f/k/a

d'Amico Dry Limited's ("d'Amico"), Rule B attachment of Nikka's Vessel.  The only issue in this

case is whether Nikka is the alter ego of Primera Maritime (Hellas) Limited (Primera) ("Primera")

and, thus, liable for the $1,766,278.54 English judgment entered in favor of d'Amico and against

Primera. Nikka is, and has been, the owner of the Vessel since its purchase in October 2009.

Primera managed the Vessel for a few months between the fall of 2009 and the spring 2010.

For d'Amico to prevail on its alter ego claim, it must prove by a preponderance of the

evidence that Nikka is the alter ego of Primera. Despite ten years of litigation in multiple

---

[1] Nikka Finance, Inc. continues its restricted appearance pursuant to Supplemental Rule E(8), Fed.R.Civ.P.

jurisdictions in the United States, full and fair discovery and a trial in the Southern District of New York before Judge Koeltl, and further discovery in this matter, d'Amico cannot meet its burden of proving by a preponderance of the evidence that Nikka is the alter ego of Primera. This is not surprising since Nikka is not the alter ego of Primera.

Further, d'Amico's failure to commence this action against Nikka within six years of entry of the English judgment is fatal and precludes d'Amico from enforcing the English judgment against Nikka as a matter of both Alabama and English law so as to require dismissal of the action.

For the reasons stated herein, the Court should grant summary judgment in favor of Nikka.

## STATEMENT OF UNDISPUTED FACTS

### A. Plaintiff d'Amico

1.      Plaintiff d'Amico Dry Limited ("d'Amico") was at all material times a dry bulk vessel owning and operating company incorporated in Ireland. (ECF 13-2 at ¶ 1).

2.      d'Amico is a wholly owned subsidiary of non-party d'Amico International S.A., which is a wholly owned subsidiary of non-party d'Amico Societa di Navigazione SpA. (*Id*).

### B. Nikka

3.      Nikka was incorporated in the Marshall Islands on September 5, 2007. Nikka's registered address is Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960. (Ex A.)

4.      At the time of Nikka's incorporation, five bearer shares Nos. 1 through 5 were issued. (Ex B.)

5.      On September 25, 2008, Bulknav Inc. ("Bulknav"), a holding company, became the holder of 100% of the shares of Nikka. (Ex E.)

6.      Bulknav had five shareholders, including members of the Coronis family, who in total own seventy percent (70%) of Bulknav via a company called Shelly Ventures. (ECF 13-2 at 332:16-19, 339:12-14.)

7.      The remaining thirty percent of Bulknav's shares are owned by four separate and unrelated shareholders. (ECF 13-2 at 332:20-25, 333:1.)

8.      The five bearer shares were canceled when Bulknav became the sole owner of Nikka. Bulknav's shareholders were the former bearers of shares Nos. 1 through 5, which included Coronis family members, and four other parties. (ECF 13-3, at 73, Tr. 197:2-25; 198:2-11.)

9.      On May 21, 2008, and as amended over the years, a $204 million Facility Agreement (the "Facility Agreement") was executed between HSH Nordbank and various "Joint and Several Borrowers." (ECF 13-2 at ¶ 42; Ex. C.)

10.     The Borrowers under the Facility Agreement were several ship owning entities, including Nikka. (CONFIDENTIAL Ex. C.)

11.     The Facility Agreement was collateralized by cash deposits made by the Borrowers, shareholders of the shipowning entities, and by each new ship that was built. (ECF 13-2 at ¶ 44; Ex. C.)

12.     Primera was a corporate guarantor of the May 2008 Facility Agreement to build the new bulkers. (ECF 13, at ¶ 30.)

13.     Paul Coronis and his father Nicholas Coronis provided limited personal guarantees under the Facility Agreement. (ECF 13, at ¶ 33.)

14.     The personal and corporate guarantees expire when the loans are paid off. The bank also has security in the earnings of the vessels. (ECF 13-3, at 336:3-18.)

15.     Nikka, not Primera, was the undisputed owner of the Vessel as evidenced by the following:

a. On October 21, 2008, JBU Loggers Pte Ltd. remitted Commercial Invoice to Nikka Finance Inc. in the amount of $37,500,000 for the purchase of the Vessel. (Ex. F.)
b. On October 21, 2008, a swift from HSH Nordbank confirmed Nikka paid USD32,075,000 to JBU Loggers Pte Ltd. for Hull NK0002. (Ex. G.)
c. On October 21, 2008, the Protocol of Delivery and Acceptance and the Bill of Sale confirmed JBU Loggers Pte. Ltd. sold and delivered the Vessel to Nikka. (Ex. H; Ex. I.)
d. Nikka paid tonnage tax to the Marshall Islands for the Vessel for the periods of January 1, 2010 to December 31, 2010 and January 1, 2011 to December 31, 2011. (Ex. Q.)
e. Nikka insured and classed the Vessel. (Ex. R; Ex. S.)

16.     On August 1, 2009, Nikka entered into a Time Charter with Qingdao Ocean Shipping Co. Ltd. for the charter of the Vessel. (Ex. L.) It is undisputed that at the time of the Time Charter with Qingdao, Primera was the shipmanager for the Vessel under a shipmanagement agreement.

17.     On October 15, 2009, the Resolutions of the Board of Directors of Nikka appointed Mr. Niccolo Benvenuti as President/Director, Mr. George Papadopoulos as Secretary-Treasurer/Director. (Ex. O.)

18.     On October 16, 2009, Paul Coronis resigned as Director of Nikka (Ex. P.)

## C. **Judgment Debtor Primera**

19.     Primera was at all material times a Liberian corporation incorporated on June 22, 1990, and was engaged in the business of ship management with a registered address at 80 Broad Street, Monrovia, Liberia. (ECF 13-2, at ¶ 2).

20.     Primera's operating address was 6, Roupel Str., 145 64, Kifissia, Athens, Greece. (ECF 13-2, at ¶ 31).

21.     Shareholders of Primera included Nicholas Coronis, Eleftherios Atherinos, and Mr. Gregoris. (ECF 1, at ¶ 47).

22.     Nicholas Coronis served as the Greek Law 89 company representative of Primera from 1990 to 2009, and as General Manager, Director, President, Treasurer and Secretary of Primera. (ECF 1-10, at 22; ECF 13-2, at ¶ 25).

23.     At a November 21, 2008 Primera meeting, the shareholders accepted Nicholas' resignation of those positions. (ECF 1-10, at 22).

24.     Paul Coronis was a director of Primera from 2002 to November 15, 2008. (ECF 13-2, at ¶¶ 26-27).

25.     In 2009, Primera, under certain shipmanagement contracts, managed the SEAGLASS II (owned by Nikka Finance) and other vessels. (ECF 13, at ¶ 35.)

26.     Under the ship management agreement, Primera managed the accounts and records of Nikka as part of its duties. (*Id.*)

27.     With the downturn of the FFA market, Primera suffered significant financial duress in late 2008-early 2009 and eventually was forced into liquidation.  (ECF 13, at 24.)

28.     Because of Primera's financial distress, it was no longer capable of managing the Vessel. By a separate shipmanagement agreement, Primebulk Shipmanagement ("Primebulk") became the new ship manager for the Vessel. (ECF 13-3, at 79, Tr. 220:21-23.)

29.     It is undisputed that Primebulk replaced Primera as the guarantor under the Facility Agreement. (ECF 13-3, at 86, Tr. 251:7-9.)

30.     None of the three shareholders of Primera, Nicholas Coronis, Eleftherios Atherinos, and Mr. Gregoris, were shareholders or officers of Primebulk. Primebulk's shareholders are Paul Coronis (40%), Mr. Georgopoulos (30%), and Mrs. Kaligirou (Paul Coronis's grandmother) (30%). (ECF 13-3 at p. 79, Tr. 221:13-17.)

### D.  d'Amico's English Judgment Against Primera

31.     Primera and d'Amico, through a third-party broker, entered into a Forward Freight Agreement (the "FFA") dated September 2, 2008, whereby Primera agreed to buy and d'Amico agreed to sell freight futures for forty-five days within the months of January, February and March 2009 respectively, with settlement monthly. (ECF 13-2, at ¶¶ 32, 34). Nikka was not a party to the FFA.

32.     By early 2009, the freight rate for Panamax bulk carriers had dropped significantly so that Primera was obligated under the FFA to pay d'Amico the difference. (ECF 13-2, at ¶ 35).

33.     d'Amico demanded payment and Primera failed to remit same, breaching the FFA in January 2009. (ECF 13-2, at ¶ 36).

34.     On February 23, 2009, d'Amico terminated the FFA with Primera. (ECF 13-2, at ¶ 38).

35.     Pursuant to Clause 15 of the FFA, d'Amico commenced proceedings against Primera in the English High Court in England with English law to apply (High Court of Justice Queen's Bench Division, Commercial Court under Claim No. 2009, Folio 218). (ECF 13-2, at ¶ 40).

36.     On June 19, 2009, d'Amico obtained a final judgment against Primera from England's High Court of Justice in the amount of $1,766,278.54 plus post-judgment interest and future legal fees (to be incurred to enforce the judgment). (ECF 13-2, at ¶ 41).

### E.  The Pending Action

37.     On June 22, 2018, d'Amico initiated this admiralty action in this Court, seeking $4,698,225.20, by filing a Verified Complaint against Nikka with a motion for Rule B Attachment of the vessel M/V SEA GLASS II (and supporting Affidavit), as well as a motion to appoint a substitute custodian. (ECF 1-3, 6-7.)

38.     d'Amico's Verified Complaint alleges three (3) counts against Nikka: 1) alter ego liability; 2) Rule B attachment as security for the S.D.N.Y. action; and 3) Rule B attachment and alter ego determination (in the event the S.D.N.Y. determines it lacks personal jurisdiction over Nikka). (ECF 1.)

39.     The Rule B writ of attachment for vessel M/V SEA GLASS II issued on June 22, 2018. (ECF 10.)

40.     On June 23, 2018, Nikka filed a motion for an emergency Rule E(4) hearing to vacate the Rule B attachment. (ECF 11.)

41.     On June 25, 2018, Nikka moved to vacate the Rule B attachment. (ECF 13.)

42.     The Court held a Rule E evidentiary hearing on June 27, 2018. (ECF 18.)

43.     On July 5, 2018, the Court denied Nikka's Motion to Vacate the Rule B attachment. In its Order, the Court analyzed the alter ego factors under a probable cause burden to determine whether vacatur of d'Amico's Rule B attachment is merited at that point in the proceedings. The Court found that only four of the twelve factors weighed ***slightly*** in favor of d'Amico. (ECF 40.)

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact in the case, and it appears from the pleadings and any supporting affidavits or depositions that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998). To defeat a motion for summary judgment, the nonmoving party must show the existence of genuine factual disputes that are material to the issues to be decided. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party must respond by setting forth specific evidence in the record and articulating the precise manner in which that

evidence supports his or her claim, and may not rest upon the mere allegations or denials of the pleadings. FED. R. CIV. P. 56(e); *Johnson v. Board of Regents of University of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001). "Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment." *Strickland v. Champion Enters*., No. 1:06-cv-682-TFM (WO), 2007 U.S. Dist. LEXIS 46329, at *9 (M.D. Ala. June 26, 2007) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).)

When the nonmoving party has the burden of proof on a particular issue and fails to provide sufficient evidence on that issue, then there is no genuine issue of material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Strickland*, 2007 U.S. Dist. LEXIS 46329, at *9 (*citing Celotex*, 477 U.S. at 322; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).

## ARGUMENT

Nikka is entitled to summary judgment because d'Amico cannot meet its burden of proving Nikka is the alter ego of Primera based on the undisputed evidence in this case.

### I.   U.S. Federal Common Law Applies to d'Amico's Alter Ego Claim.

"In admiralty disputes, federal courts apply federal common law when analyzing corporate identity." *Hawknet Ltd. v. Overseas Shipping Agencies*, 2008 WL 1944817, *3 (S.D.N.Y. Apr. 29, 2008) (citation omitted). *See also Daughtry v. Jenny G. LLC*, 703 Fed. Appx. 883, 886 (11th Cir. 2017) ("[t]o determine whether to disregard the corporate form in an admiralty case, we apply federal common law[]").

### II.   d'Amico Cannot Meet its Burden of Proving by a Preponderance of the Evidence that Nikka is the Alter Ego of Primera

"'[T]he burden rests on the party seeking to pierce the veil,' and this burden is a 'significant one.'" *Eitzen Chem. (Sing.) PTE, Ltd. v. Carib Petroleum*, No. 17-14697, 2018 U.S. App. LEXIS 25023, at *14 (11th Cir. Sep. 4, 2018) (*quoting Edwards Co., Inc. v. Monogram Indust., Inc.*, 700 F.2d 994, 999 (5th Cir. 1983).) *See, Hawknet Ltd.*, 2009 WL 1309854 at *2 ("the Court held an initial hearing, pursuant to Rule E(4)(f) in order to establish whether the plaintiff had made a prima facie showing...Now that a Rule E(4)(f) hearing has been held and discovery has taken place, the Court believes that a standard of proof higher than simply proving a prima facie case should be required of plaintiff….we find that plaintiff must show, ***by a preponderance of the evidence***, that TOM Shipping is an alter-ego of MOS in order to maintain its attachment….").

## III.     There is no Evidence that Nikka and Primera are Alter Egos

As this Court previously noted in its July 5, 2018 Order, "'a corporate entity is liable for the acts of a separate, related entity only under *extraordinary* circumstances…'" *d'Amico Dry d.c.a. v. Nikka Fin., Inc.*, No. 1:18-00284-KD-MU, 2018 U.S. Dist. LEXIS 112728, at *17 (S.D. Ala. July 5, 2018) (quoting *Vitol, S.A. v. Primerose Shipping Co., Ltd.*, 708 F.3d 527, 541 (4th Cir. 2013) (emphasis in original) (ECF 40, at 12.) "The conclusion to disregard the corporate entity may not, however, rest on a single factor…but must involve a number of such factors; in addition, it must present an element of injustice or fundamental unfairness." *d'Amico,* 2018 U.S. Dist. LEXIS 112728, at *17 (*quoting DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 687 (4th Cir. 1976) (ECF 40, at 12.) It is only in those "extraordinary cases" where courts find alter ego and then "pierce the corporate veil and disregard the corporate entity[.]" *Id.* (*quoting Vitol*, 708 F.3d at 544.).) As explained in *LIG Ins. Co. Ltd. v. Inter-Florida Container Transport, Inc.*, 2013 WL 4516104, *6 (S.D. Fla. Aug. 23, 2013), *aff'd*, 564 Fed. Appx. 495 (11th Cir. 2014) (footnote omitted):

> ….To pierce the corporate veil, "the individual must have used the corporate entity to perpetrate a fraud or have so dominated and disregarded the corporate entity's corporate form that the corporate entity primarily transacted the individual's personal business rather than its own corporate business." *Lobegeiger v. Celebrity Cruises, Inc.*, 2011 WL 3703329 at *15 (S.D.Fla. Aug.23, 2011) (Altonaga, J.). Reaching the "alter egos" of corporations is especially valuable "where the separate identity of two corporations should be disregarded where one corporation becomes the conduit of another" or "where the near identity of two corporations should be disregarded in order to prevent manifest injustice to third parties." *Talen's Landing Inc. v. M/V Venture II*, 656 F.2d 1157, 1160 (5th Cir.1981)[]….

*Id*. at *18; (ECF 40, at 12.)

As guided by federal common law, this Court must apply the factors set forth by the Eleventh Circuit in *United Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co*., 855 F.2d 1499, 1505 1507 (11th Cir. 1988), in its analysis of dominion and control. (ECF 40, at 13.) The factors include whether:

1. the parent and the subsidiary have common stock ownership;
2. the parent and the subsidiary have common directors or officers;
3. the parent and the subsidiary have common business departments;
4. the parent and the subsidiary file consolidated financial statements and tax
5. returns;
6. the parent finances the subsidiary;
7. the parent caused the incorporation of the subsidiary;
8. the subsidiary operates with grossly inadequate capital;
9. the parent pays the salaries and other expenses of the subsidiary;
10. the subsidiary receives no business except that given to it by the parent;
11. the parent uses the subsidiary's property as its own;
12. the daily operations of the two corporations are not kept separate; and
13. the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

*Id*. at *18-19; (ECF 40, at 13.) No one of the above factors is dispositive; nor does the list exhaust the relevant factors.

As the Court noted in its July 5, 2018 Order, the relevant period for analyzing dominion and control is between September 2, 2008, when d'Amico and Primera entered into the FFA and at the latest June 19, 2009 when the English Judgment was entered. *Id*.; (ECF 40, at 13.)

- 10 -

Here, d'Amico cannot show by a preponderance of the evidence that Nikka is the alter ego of Primera because none of the above factors exist in this case.

### A. Fraud

In its complaint, d'Amico makes conclusory allegations, without support, that the Coronis family, used Nikka "to perpetuate a fraud", "and/or was so dominated and its corporate form so disregarded that it primarily transacted the business of Primera and the Coronis family rather than its own corporate business." (ECF 1 at ¶ 96). d'Amico also stated, without evidence, that Primebulk was created as a fraud by Primera, solely to avoid enforcement of the foreign judgment.

At the Rule E(4) hearing, this Court correctly determined "there has been no evidence that either of these alleged diversion schemes benefited Nikka or that monies were diverted directly or indirectly to Nikka." (ECF 40, at 13-14) and "there is no evidence implicating Nikka in this alleged scheme."

Since the Court's July 5, 2018 ruling, d'Amico has failed to show any evidence, let alone a preponderance of the evidence, showing fraudulent transfers from Primera to Nikka. This is not surprising, however, because no fraud has been committed. This factor weighs against finding Nikka to be an alter ego of Primera.

### B. Dominion and Control

#### 1. Common stock ownership

The shareholders of Primera included Nicholas Coronis, Eleftherios Atherinos, and Mr. Gregoris. (ECF 1, at ¶ 47). In contrast, Nikka is 100% owned by Bulknav. (Ex. E.) Shelley Ventures owns 69% of Bulknav, and per Paul Coronis, that entity is "[t]he vehicle through which several Coronis family members own shares in Bulknav." (ECF 13-1, at 73). Nicholas Coronis, the only common shareholder between Primera and Nikka owns an approximate 8.28% interest in

Nikka. (ECF 13-3, at 130.) Paul, according to Nikka's attorney, owns "a little bit more than Nic[h]olas." (ECF 30, at 51.) The remaining 30% of Bulknav is not owned by Coronis family members and the remaining owners are not without authority. (ECF 13-3, at 67).

As the Court previously found at the Rule E(4) hearing, the only common stock ownership between Primera and Nikka is a less than 9% interest held by Nicholas Coronis. d'Amico has not – and cannot – provide any evidence refuting this conclusion.

**This factor weighs against finding Nikka to be an alter ego of Primera**.

### 2.   Common directors or officers

Paul Coronis was a director of Primera from 2004-2008, and Nicholas Coronis served as General Manager, Director, President, Treasurer and Secretary of Primera. (ECF 1-10, at 22). At a November 21, 2008 Primera meeting, the shareholders accepted Nicholas Coronis's resignation of those positions. (ECF 1-10, at 22).

Paul Coronis was Nikka's sole director from the date of its incorporation on September 5, 2007, until he resigned as director on October 16, 2009. (Ex. P.) On October 10, 2008, Nikka and Primera executed a management agreement, (ECF 1-11, at 2), which provided for ship management services.

Evidence of intertwined common or overlapping officers, without more, is insufficient to find alter ego liability. *See, e.g., Gibralter Sav. b. LDBrinkman Corp*., 860 F.2d 1275, 1287 (5th Cir. 1988) (footnote omitted) ("[m]any wholly-owned subsidiaries and closely-held corporations are not factually distinct from their owners. Many are in fact controlled and operated in close concert with the interests of the owners, and do not have a distinct factual existence: separate employees, offices, or properties; consolidated financial reporting and tax returns; and the like. Such conduct is perfectly natural and proper and provides no basis for ignoring legal

independence.[ ]…The problem arises when such a corporation is not treated as legally distinct; when, in other words, the owners neglect to maintain the formal independence of the corporation as required by law[]"). *See also Austral Asia PTE, Ltd. v. SE Shipping Lines Pte., Ltd*., 2012 WL 2567149, *2 (E.D. La. Jul. 2, 2012) ("as this Court has previously emphasized, some overlap of ownership, officers, directors, and other personnel, is not unusual in this [maritime] industry…without more, the Court finds such commonalities to be of little import[]").

While it is correct that Paul Coronis served as a director for both Primera and Nikka and executed the shipmanagement agreement between Nikka and Primera during the relevant time period, there is no evidence that Primera or Nikka neglected to maintain the formal independence of the corporation as required by law. Indeed, to the contrary, as noted in factor 12 below, Nikka observed all corporate formalities, and d'Amico has not shown by a preponderance of the evidence that it did not do so.

**This factor weighs against finding Nikka to be an alter ego of Primera**.

3.   Common business departments/common office space

Primera's operating address was 6, Roupel Str., 145 64, Kifissia, Athens, Greece. (ECF 13-2 at ¶ 31.) Nikka was incorporated in the Marshall Islands on September 5, 2007. Nikka's registered address is Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960. (Ex. A.) Primera did not share an address or telephone numbers with Nikka and Nikka used the Vessel as "floating office and all had their own employees." (ECF 13-3, at 64). Moreover, Primera managed Nikka's vessels under an executed ship management agreement, which is common in the shipping industry. (ECF 1-11, at 2.) Thus, as the Court noted in its July 5, 2018 Order, the fact that Primera managed Nikka's affairs from Primera's office does not support d'Amico's alter ego theory.

**This factor weighs against finding Nikka to be an alter ego of Primera**.

### 4. Consolidated financial statements and tax returns

d'Amico does not contend – and has not presented any evidence – showing Nikka and Primera have consolidated financial statements and tax returns.

**This factor weighs against finding Nikka to be an alter ego of Primera.**

### 5. One finances the other

Nikka maintains its own separate bank accounts, accounting records, and financial records. (Ex. M; Ex. N; ECF 136-3.)

Moreover, on May 21, 2008 (and as amended over the years), a $204 million Facility Agreement was executed between HSH Nordbank and various "Joint and Several Borrowers." (ECF 13-2 at ¶ 42; Ex. C.) The Borrowers under the Facility Agreement were Nikka and other ship owner entities. (Ex. D.) The Facility Agreement was collateralized by cash deposits made by the Borrowers and by each new ship that was built. (ECF 13-2, at ¶ 44; Ex. D.)

As this Court noted in its July 5, 2018 Opinion, and the Court in *Flame S.A. v. M/V LYNX*, 2010 WL 11571118, *11 (E.D. Tex. Aug. 6, 2010), noted in its August 6, 2010 Opinion, Primera's guarantee is not evidence of an alter ego finding:

> These facts suggest that, while Primera might have had to pay off on its guarantee, that did not become necessary. There is no evidence that Primera advanced funds to Camela to finance the purchase of the Lynx or its ongoing operations. There is no indication that Primera made any of the payments on the HSH Nordbank loan. The court finds that this factor does not weigh in favor of an alter ego finding.

The Court also noted that d'Amico has not provided any evidence that any assets of Primera were used to prop up any ship owner entity, much less Nikka. Nor is there evidence that Nikka or Primera was subsidized in any of these transfers of money.

**This factor weighs against a finding Nikka to be an alter ego of Primera.**

### 6. One caused the incorporation of the other

Primera was incorporated in Liberia on June 22, 1990. (ECF 13-2 at ¶ 2). Nikka was incorporated in the Marshall Islands on September 5, 2007. Nikka's registered address is Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960. (Ex. A.) The shareholders of Nikka caused the incorporation of Nikka.

The fact that Paul Coronis served as a Director of Primera when Nikka was incorporated does not establish that Nikka is the alter ego of Primera.

**This factor weighs against finding Nikka to be an alter ego of Primera**.

### 7.   One operates with grossly inadequate capital

As this Court noted in its July 5, 2018 Opinion, "[u]ndercapitalization is often critical in alter ego analysis." *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 447 F.3d 411, 420 (5th Cir. 2006). *See also Gardemal v. Westin Hotel Co*., 186 F.3d 588, 594 (5th Cir. 1999) ("undercapitalization is a critical factor in our alter ego analysis…"); *Wm. Passalacqua Builders, Inc. v. Resnick Dev. S., Inc*., 933 F.2d 131, 142 (2nd Cir. 1991) ("the degree of capitalization . . . is clearly relevant to the piercing inquiry…"); *Classic Maritime Inc. v. Limbungan Makmur SDN BHD*, 646 F. Supp. 2d 364, 371 (S.D.N.Y. 2009) ("Evidence of substantial undercapitalization . . . is significant because it can be evidence of a company's lack of independent substance.") (Koeltl, J.).

Primera and Nikka have always been legitimate separate legal entities with distinct assets and adequate capital. With the downturn of the FFA market, Primera was forced into liquidation in late 2008. In contrast, Nikka has always been adequately capitalized by shareholder contributions and independent bank loans, and is an ongoing corporate entity that has not dissolved nor filed bankruptcy. Thus, while it is correct that Primera was liquidated in 2008, d'Amico has not provided any evidence that Nikka was either the cause of the liquidation or benefited from it.

**This factor weighs against finding Nikka to be an alter ego of Primera**.

        8.   <u>One pays the salaries and other expenses of the other</u>

Nikka employed the crew on the Vessel. (ECF 32, at 11). The executed management agreement between Nikka and Primera called for Primera, as the ship management company, to "procure and/or terminate the services of…Master, Mariners, Officers, Engineers….and other necessary persons as the Manager may think proper and negotiate and pay their fees and/or wages[.]" (ECF 1-11, at 2 ¶ 2(2)). d'Amico cannot establish by a preponderance of the evidence that Nikka failed to reimburse Primera for payments made for the Vessel's operating expenses or salaries of its crew.

**This factor weighs against finding Nikka to be an alter ego of Primera**.

        9.   <u>One receives no business except that given to it by the other</u>

Primera was a ship manager and it derived its business proceeds from the fees it earned under separate ship management contracts with vessel owners. (ECF 13, at ¶ 35.) Although in 2009, Primera entered into a separate shipmanagement contract with Nikka to manage the SEAGLASS II (ECF 13, at ¶ 35), Primera received business from other vessel owners besides Nikka. In addition, Primera – as and for its own business – entered into numerous FFA contracts with entities such as d'Amico, TMT, Charbons, FLAME and ICI. (ECF 13-3 at 74; Tr. 203: 14-16; 19-21 and Tr. 75: 6-8; 16-22.) This was not business generated by Nikka.

In contrast, Nikka's business proceeds are derived solely from companies that charter the Vessel. For example, on August 1, 2009, Nikka entered into a Time Charter with Qingdao Ocean Shipping Co. Ltd. for the charter of the Vessel. (Ex. L.)

**This factor weighs against finding Nikka to be an alter ego of Primera**.

      10. <u>One uses the other's property as its own</u>

d'Amico has not alleged nor has it presented any evidence that Primera shifted property or money or assets to Nikka. Primera briefly managed Nikka's Vessel.

d'Amico claims Paul Coronis's email, sent as the FFA default was impending, offering to guarantee a vessel owning company is indicia of control of the vessel-owning company, and use of the property as an extension of Primera's own. (ECF 33, at 37 (citing ECF 1-22, at 2)).

It is undisputed that Paul Coronis never offered a guarantee but merely offered to investigate a guarantee on a "without prejudice" settlement basis. (ECF 13-3, at 77: Tr. 213:13;214:5.) Further, Nikka was not the proposed guarantor, but rather the guarantee was going to come from **non-party** Moondance Maritime. The record is clear, Primera, with a guarantee from one of the ship-owning companies (Moondance), offered to pay off d'Amico's debt in twelve equal installments. Paul Coronis discussed this with d'Amico's counsel on a "without prejudice" basis and for settlement purposes only. Ultimately, the terms of the guarantee between Primera and the ship-owning company were never negotiated because d'Amico rejected the deal. In particular, the trial transcript provides:

> Q. Okay. By the way, you had offered to provide d'Amico Dry with – **to investigate** whether you could provide them with a shipowner guaranty, correct?
>
> A. What I did was -- and **not to put words out of context** --was -- and we get to look at the email I sent -- I was trying to reach any type of solution with them in order to avoid the situation we are in today, and that -- an idea that I had on my own, without getting any approval at that stage, was that perhaps some sort of guaranty of an asset would assist with their acceptance in a proposed payment plan. In fact, this was something that their lawyers, Ince & Co., who was in constant communication with me on this issue, thought was quite reasonable. However, what happened was that d'Amico did not accept it, at least at that stage, and I also replied to them afterwards, **when I did check with the board and with the shareholders of the other company, that there would be too much of a conflict of interest and it wouldn't be acceptable, given the fact that the shareholders were completely different.**

(ECF 13-3, at 77: Tr. 213: 13-214: 5.)

- 17 -

Q. So that there was no conversation about conflict of interest. It was rejected by d'Amico Dry and there is no correspondence that you can point to which talks about this guaranty not being provided because of some conflict of interest, correct?

A. What happened was, I believe, after a certain point in time, **their lawyer contacted me and said, you know, perhaps we're willing to consider it, and at that point in time there was an official discussion with the shareholders of the – of one company which I discussed it with, being Moondance Maritime Enterprises and also with legal advice, and it was – the position was that there was too much conflict of interest**.

(ECF 13-3, at 77: Tr. 215: 10-21.)

As indicated above, Paul Coronis had to seek authority from the shareholders of non-party Moondance Maritime in order to offer the guarantee, which was denied, and clearly shows he, in fact, exercised no control of the vessel-owning company.

And, in any event, as the Court acknowledged, however, this alleged "offer" **is not specific to Nikka** (ECF 40, at 20) and, thus, does not meet the preponderance of the evidence burden of showing Primera uses Nikka's property as its own.

**This factor weighs against finding Nikka to be an alter ego of Primera.**

11. Daily operations of the two corporations are not kept separate

In 2009, Primera, under certain separate shipmanagement contracts, managed the SEAGLASS II (owned by Nikka Finance) and other vessels. (ECF 13, at ¶ 35.) Under the ship management agreement, Primera managed the accounts and records of Nikka as part of its duties. (*Id.*) The shipmanagement contract between Primera and Nikka Finance was a standard shipmanagement contract with standard consideration management fee and does not establish by a preponderance of the evidence that Nikka is an alter ego of Primera.

**This factor weighs against finding Nikka to be an alter ego of Primera.**

12. One does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings

Nikka Finance observed all corporate formalities, including but not limited to, documenting:

<ol type="a">
<li>Incorporation (Ex. A and Ex. B);</li>
<li>Election of directors and took minutes of its board of director meetings (Ex. O);</li>
<li>Purchase of the Vessel (Exs. F-G; Ex. I);</li>
<li>Annual Report & Accounts showing profits and losses (Ex. M and Ex. N);</li>
<li>Paid tonnage tax for the Vessel (Ex. Q); and</li>
<li>insured and classed the Vessel (Ex. R; Ex. S).</li>
</ol>

d'Amico has not presented any evidence regarding Primera's adherence to the corporate form.

**This factor weighs against finding Nikka to be an alter ego of Primera**.

## IV.   d'Amico's English Judgment is Time Barred As Against Nikka

Under Alabama law, "an action to recognize a foreign-country judgment must be commenced within the later of the time during which the foreign-country judgment is effective in the foreign country or 5 years from the date that the foreign-country judgment became final, conclusive, and enforceable in the foreign country." Ala. Code § 6-9-258. The comment on the Uniform Foreign-Country Money Judgment Recognition Act states that "if the period of effectiveness of the foreign-country judgment has expired in the foreign country where the judgment was rendered, the foreign-country judgment would not be subject to this act." The Alabama Uniform Foreign-Country Money Judgment Recognition Acts limits the recognition of foreign-country judgments to those that are "final, conclusive, and enforceable." Ala. Code § 6-9-252. d'Amico's judgment was issued in England and based on Section 24(1) of the English

Limitation Act 1980, which provides a six year time limit for bringing an action to enforce an English judgment,[2] d'Amico's complaint against Nikka is time barred.

Courts that have analyzed this issue have held a new action to enforce an English judgment is time-barred under English law after six years from the date of the judgment. *See, e.g., See, e.g., Soc'y of Lloyd's v. Shell,* No. C-1-04-188, 2005 U.S. Dist. LEXIS 22104, at 28-31 (S.D. Ohio Sept. 30, 2005) (refusing to recognize an English judgment on the ground that the judgment was not "enforceable where rendered" pursuant to the UFMJRA where England's six-year time limit for the enforcement of judgments had expired); *see also Overseas Dev. Bank in Liquidation v. Nothmann,* 480 N.Y.S.2d 735, 740-41 (1984), *rev'd* on other grounds, 477 N.E.2d 1086 (N.Y. 1985).

Here, d'Amico's English Judgment is dated June 19, 2009 and the pending action in this Court was filed on June 22, 2018, nearly **nine years** after the issuance of the English Judgment. d'Amico has not obtained permission from an English court allowing it to enforce its Judgment outside of the six year statute of limitations and, thus, under Alabama law and English law d'Amico is barred from enforcing the English Judgment against Nikka.

## **CONCLUSION**

Because there are no material facts in genuine dispute in relation to the foregoing alter ego analysis, Nikka is entitled to summary judgment.

---

[2] Section 24.(1) of the English Limitation Act 1980 provides: "An action shall not be brought upon any judgment after the expiration of **six years** from the date on which the judgment became enforceable." *See* Doc. 60-1; Declaration of Nicholas Parton dated July 13, 2018, at ¶ 3. (emphasis added.)

WHEREFORE, Nikka respectfully requests that this Court grant its motion for summary judgment; dismiss d'Amico's complaint in its entirety; and grant such other and further relief as this Court deems appropriate.

Dated: October 19, 2018

BURR & FORMAN LLP

By: /s/ John P. Kavanagh, Jr.
John P. Kavanagh, Jr.
11 North Water Street
Suite 22200
Mobile, Alabama 36602
Tel. (251) 345-8246

    -and-

BLANK ROME LLP

By: */s/ William R. Bennett, III*
    William R. Bennett, III
William R. Bennett, III*
Lauren B. Wilgus*
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel.:  (212) 885-5000
WBennett@BlankRome.com

*Counsel for Defendant*
*Nikka Finance Inc.*
*\*Admitted Pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing document by ECF on this the 19th day of October, 2018.

Thomas S. Rue
J. Ben Segarra
Maynard Cooper & Gale PC
RSA Battle House Tower Suite 27000
11 North Water Street
Mobile, AL 36602-5027
Email: true@maynardcooper.com
bsegarra@maynardcooper.com

Thomas Leonard Tisdale
Tisdale Law Offices, LLC
60 East 42nd Street
Suite 1638
New York, NY 10165
212-354-0025
Fax: 212-869-0067
Email: ttisdale@tisdale-law.com

_<u>s/William R. Bennett, III</u>_

OF COUNSEL