IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| d'AMICO DRY d.a.c. | : | |
| f/k/a d'Amico Dry Limited | | |
| **Plaintiff,** | : | |
| v. | : | Civil Action No. CV-18-284 |
| NIKKA FINANCE, INC., | : | IN ADMIRALTY |
| as Owner of the | | |
| M/V SEA GLASS II, | : | |
| **Defendant.** | : | |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

d'Amico Dry d.a.c. ("d'Amico") by its attorneys, Maynard, Cooper & Gale and Tisdale Law Offices, LLC, submits the within as its Opposition to the Motion for Summary Judgment by Defendant, Nikka Finance, Inc. ("Nikka".)

## PRELIMINARY STATEMENT

Genuine issues of material fact abound in this action. While d'Amico did not itself move for summary judgment, the evidence supporting its alter ego allegations is extensive despite Nikka's efforts at discovery obfuscation and trickery. Contrary to Nikka's motion, d'Amico's burden in opposing this motion is not to establish that Nikka is Primera's alter ego by a preponderance of the evidence (Doc. 143, p. 2), but d'Amico will assuredly do so at the time of trial. And in those instances where Nikka claims that d'Amico cannot put forward

evidence to support a particular point, the reason therefor is Nikka's failure to provide any such evidence. "The absence of evidence is not evidence of absence." CARL SAGAN, THE DEMON-HAUNTED WORLD: SCIENCE AS A CANDLE IN THE DARK 213 (1996.)[1]   Because of Nikka's repeated discovery failings and its 30(b)(6) witness' ignorance about its retention policies and production efforts, d'Amico will be filing a combined Motion in Limine/Motion for Rule 37 Sanctions.

For the reason set forth herein, Nikka's Motion for Summary Judgment must be denied.

## D'AMICO'S STATEMENT OF UNDISPUTED FACTS

### A.    The Parties.

1.     d'Amico Dry was at all material times a dry bulk vessel owning and operating company incorporated in Ireland. (Nikka Fact No. 1.)[2]

2.     Primera Maritime (Hellas) Limited ("Primera") was, at all material times a Liberian corporation engaged in the business of ship management with its registered address at 80 Broad Street, Monrovia, Liberia. (Nikka Fact No. 19.)

---

[1] Sagan's aphorism illustrates the logical fallacy that a premise is not necessarily true merely because it has yet to be proven false and is particularly apt in this case. There is often insufficient evidence to come to a conclusive determination. This is axiomatic in both science and law. *See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL* No. 1869, 725 F.3d 224, 254 (D.C. Cir. 2013); *Mathison v. Boston Scientific Corp.*, No. 2:13-CV-05851, 2015 WL 2124991, at *27 (S.D.W. Va. May 6, 2015); *Hart v. Colvin*, No. 13-CV-01415-REB, 2014 WL 4627456, at *3 (D. Colo. Sept. 16, 2014); *Hall v. City & Cnty. of Denver*, No. 03-CV-00140-MSK-CBS, 2006 SL 1685246, at *6 (D. Colo. June 15, 2006) *aff'd*, 200 Fed. Appx. 754 (10th Cir. 2006); *In re Levaquin Products Liab. Litig.*, No. MDL-08-1943 JRT, 2010 WL 8399942, at *7 (D. Minn. Nov. 4, 2010); *Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, 147 N.M. 583, 594, 227 P.3d 73, 84 (2010.)

[2] Where there is agreement to Nikka's Statement of Undisputed Facts, (Doc. 143, p. 2 to 7), Nikka's Fact is noted as the source. All others not specifically agreed are disputed.

3.      J.P.C. Investments S.A. a/k/a JPC Investments S.A. ("JPC") was, at all material times, incorporated in Liberia with its registered address of 80 Broad Street, Monrovia, Liberia. (Exhibits 1 and 2.)

4.      Nikka Finance, Inc. ("Nikka") was, at all material times, incorporated in the Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, the Marshall Islands MH 96960. (Nikka Fact No. 3.)

5.      Bulknav, Inc. ("Bulknav") was, at all material times, a Marshall Islands corporation with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, the Marshall Islands MH 96960. (Doc. 26-1, ¶ 15.)

6.      On September 25, 2008, Bulknav became a holding company for all of the shipowning companies' shares, among others, Nikka. (Doc. 26-1, ¶ 16.)

7.      Primebulk Shipmanagement, Ltd. ("Primebulk") was, at all material times, a ship-management company incorporated in the Marshall Islands with its registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, the Marshall Islands MH 96960. (Doc. 26-1, ¶17.)

8.      Paul Coronis was and still is an individual born in England to Nicholas Coronis and Annabel Charlton. He was educated and qualified as an English solicitor and practiced with the firms Reed Smith and Norton Rose. (Doc.

13-3, at 63, Tr. 156-157.) Nicholas is the father of Paul Coronis. Annabel Charlton, a/k/a Annabel Coronis, is the wife of Nicholas Coronis and the mother of Paul Coronis, Chianna Coronis, and Jonathon Coronis. Chianna Coronis is the only daughter of Nicholas Coronis and Annabel Coronis. Jonathon Coronis is the youngest son of Nicholas Coronis and Annabel Coronis. Anastasia Kalogirou is the grandmother of Paul Coronis, Chianna Coronis and Jonathon Coronis. (Doc. 26-1, ¶20-24.)

9.     Together, these individuals make up the shareholders of Shelly Ventures which initially owned 70% of Nikka and, after 100% Nikka's shares were transferred to Bulknav, the 70% owners of Bulknav. (Nikka Fact No. 6, 8.) There is no evidence of any involvement by the other Coronis family members in the day to day or corporate existence of any of these entities in question. The only names appearing to act on behalf of Nikka and Primera were those of Paul and Nicholas Coronis.

### 1.     *Primera*.

10.     Primera's operating address was 6, Roupel Str., 145 64 Kifissia, Athens, Greece. (Nikka Fact No. 20.)

11.     As of September/October, 2008, when Coronis knew that Primera's financial doom was imminent, the President, Secretary and Treasurer of Primera was Paul's father, Nicholas Coronis.  (Nikka Fact No. 22.) However, Paul Coronis

swore in a declaration in a U.S. Court that in 2008 he was an "officer" of Primera. (Exhibit 3.)

12.   At that time, the only directors of Primera were Nicholas and Paul Coronis. (Nikka Fact Nos. 22 and 24; Ex. 13 at 92-000129.)

13.   The latest official representation of ownership of Primera prior to September/October 2008 shows the sole shareholder to be Nicholas Coronis. (Doc. 13-3, at 24-   However, Paul Coronis held himself out on social media as the owner of Primera at that time and is identified that way even today. (Ex. 12.)

14.   Foreign ship management companies wishing to do business in Greece, like Primera, must seek authorization and comply with Greek Law 89. Submissions under Law 89 must be truthful and accurate. (Doc. 13-3, at 64, Tr. 163/1-16.) Nicholas Coronis was the company representative for Primera under Greek Law 89. Ex. 13 at 92-000133, 92-000198.

15.   Although incorporated in Liberia, Primera had no offices or employees there. Instead, at all material times, Primera operated out of 6, Roupel Str., 145 64, Kifissia, Athens, Greece. (Doc. 13-3, at 64, Tr. 161/2-22.) Said building is owned by Paul Coronis, Jonathan Coronis and Chianna Coronis. (Doc. 13-3, at 64, Tr. 161/24-25; 13-2, ¶¶ 30 and 31.)

16.    Paul Coronis was responsible for vessel purchases and sales at Primera in 2008 and 2009. However, he purchased and sold vessels only for other Coronis' controlled companies. (Doc. 13-3, at 68, Tr. 179/4-10.)

      **2.**   *Nikka*.

17.    Nikka was incorporated in the Marshall Islands on September 5, 2007. (Nikka Fact No. 3.) It had no offices or employees in the Marshall Islands. In fact, it had no employees at all, but operated out of the Primera office at 6 Roupel Str., 145 64, Kifissia, Athens, Greece. (Doc. 13-3, at 63-64, Tr. 158-160.)

18.    Nikka was incorporated at the request of Paul Coronis. (Ex. 4, 26/9 – 26/11.)

19.    In 2008, Paul Coronis was the President, Secretary and Treasurer of Nikka and its sole Director. (Ex. 4, 161/22 – 162/5.) The Coronis family owned 70% of Nikka through its family corporation Shelly Ventures. (Nikka Fact Nos. 6 and 8.)

20.    Correspondence for Nikka originated with Primera, was received through Primera's email or facsimile and official correspondence with the bank, charterers, etc., were addressed to Nikka c/o Primera in Athens. (Ex. 4, 43/2-45/2, 46/8-46/17; 53/7-18.)

**B.**   **d'Amico/Primera's FFA.**

21.    This action arises out of the breach of a Forward Freight Agreement

("FFA") entered into by Paul Coronis on behalf of Primera and d'Amico dated September 2, 2008. (Doc. 26-1, ¶¶ 32-41.)

22.    At that time, Primera agreed to buy and d'Amico agreed to sell freight futures for 45 days within the months of January, February and March 2009 respectively. (Doc. 26-1, ¶¶ 32 and 34.) Paul Coronis was responsible for trading FFAs at Primera. (Doc. 13-3, at 68, Tr. 178/16-18.) (Nikka Fact No. 31.)

23.    At the time it entered into this and other FFA trades representing potentially tens of millions of dollars of debt for Primera, Primera had assets of approximately $132,000. (Doc. 26-2 at 49-51; Doc. 26-7; Doc. 26-9; Doc. 26-11; Doc. 13-3, at 75, Tr. 205/11-15.) Primera was grossly undercapitalized for the $10 million FFA business it was conducting.

24.    Starting on or about September 8, 2008, the freight market dropped precipitously. As of October 2008, Paul Coronis believed that Primera would lose substantially on its FFA trade with d'Amico, as it already had and would in many of its other FFA trades. (Doc. 13-3, at 75, Tr. 207/6-23.) Paul Coronis knew as of that time that he would likely be unable to pay Primera's FFA obligations because others, especially Industrial Carriers, Inc. ("ICI"), were not paying Primera. (Doc. 13-3, at 74-76, Tr. 206-210.)

25.    As of January 30, 2009, Primera owed d'Amico $795,963.20 under the FFA. (Doc. 26-6, at 34.) Despite d'Amico due demand for payment, Primera

failed to remit payment to d'Amico in respect of the January 2009 contract month. This was a breach of the FFA. (Doc. 26-1, ¶¶ 35, 36.) (Nikka Fact No. 33.)

26.    As a result of Primera's breach, d'Amico became entitled to terminate the FFA. (Doc. 26-1, ¶37.) (Nikka Fact No. 34.)

27.    In late 2008 and early 2009, Primera was unable to pay its FFA obligations. Primera had lost significantly to Flame and d'Amico and at the same time was unable to collect its FFA gains from ICI and TMT Asia. (Doc. 13-3, at 76, Tr. 210/1-16.)

28.    d'Amico terminated the FFA on or about February 23, 2009. (Doc. 26-1, ¶38.)

29.    Primera's breach of the FFA resulted in d'Amico's loss of $1,752,973.30 exclusive of interest, costs and attorneys' fees. (Nikka Fact No. 36.)

30.    Pursuant to clause 15 of the FFA contract, all disputes arising thereunder were to be submitted to the English High Court with English law to apply. Pursuant to Cl. 11 of the ISDA Master Agreement, the Defaulting Party shall be responsible for the other party's costs of collection. (Doc. 26-1, ¶ 39.) (Nikka Fact No. 36.)

31.    d'Amico Dry commenced legal proceedings against Primera in the High Court of Justice Queen's Bench Division, Commercial Court under Claim No. 2009 Folio 218 in accordance with the FFA contract. (Nikka Fact No. 35.)

32.     On June 19, 2009, the High Court of Justice, by The Honorable Mr. Justice Flaux, entered a final un-appealable judgment against Primera in the sum of US$1,766,278.54 (comprising the principal due of US $1,752,973.3 together with interest at the contractual rate accrued up to June 19, 2009.) Legal costs in the amount of GBP 17,000 which converts to US $28,056.39 were also awarded. Doc. 26-1 ¶41. Post judgment interest at the rate of 8% was also awarded in accordance with English law as were future legal fees incurred to collect the judgment. (Nikka Fact No. 36; Ex. 15.)

### C.     Facility Agreement.

33.     On May 21, 2008, a $204 million Facility Agreement was entered into between HSH Nordbank and various Joint and Several Borrowers. (Nikka Fact No. 9.) The Borrowers were several Coronis controlled ship-owning entities including Nikka. (Nikka Fact No. 10.) The Facility Agreement was to help finance the purchase of several new bulk carriers including the vessel later to be named SEAGLASS II. (Nikka Fact No. 12; Doc. 143-3, at 8, 13, 17.)

34.     Paul and Nicholas Coronis were the personal guarantors of the loan. (Nikka Fact No. 13.) Primera was the corporate guarantor of the Facility Agreement. (Nikka Fact No. 13.) These guarantees expire when the loan is paid off which has not yet occurred (10 years later.) (Nikka Fact No. 14.) (Ex. 4, 128/16-24.) Primera received no consideration for the guarantee and was not party to any

indemnity agreement from Nikka and the other shipowning companies as occurred later with Primebulk. (Doc. 143-11.)

35.    The Facility Agreement was signed for Nikka by Paul Coronis (Doc. 143-3, at 17) and Paul Coronis likely signed the Corporate Guarantee for Primera. (Ex. 4, pg. 263/21 – 264/17) (Nikka Fact No. 12.)

36.    The Facility Agreement also required that 80% of the beneficial ownership of Nikka and Primera remain the same through the life of the loan. (Doc. 143-3, at 48-49; Doc. 13-3, at 71, Tr. 189.)

### D.    Nikka/Primera Consolidated Financial Statements.

37.    Under the Facility Agreement negotiated and executed by Paul Coronis, Nikka, Primera and the other Borrowers were obligated to provide annual audited consolidated financial statements for the "Group," combining Primera and Nikka's "total equity." (Doc. 143-3, at 8, 10, 13,17-18, 48-49.)

38.    Nikka and Primera were obligated to provide unaudited consolidated financials at each mid-year, signed by Nicholas Coronis as Managing Director of Primera. (*Id.*.) All of Nikka's financial statements were requested, but none of the nature discussed in the Facility Agreement were ever produced. (Doc. 129-3 at 56-71; 93-95.)

39.    Paul Coronis' testimony in his 2015 deposition, trial and 2018 deposition about the non-existence of the audited and unaudited consolidated

financial statements for 2008-2011 is incredible and likely perjurious. (Ex. 5, pg. 000950-000965; Ex. 6, pg. 155/7 – 156/8, 218/9 – 219/6; Doc. 13-3, at 134, Tr. 354/7 – 355/16; Ex. 7, 174/6 – 174/14, 238/22 – 240/13, 241/10 – 252/4.)

### E.      Primera was the likely "Buyer" of the SEAGLASS II.

40.     Critically relevant to this case is the missing Memorandum of Agreement ("MOA") which was first entered into for the purchase of the SEAGLASS II from JBU Loggers, Pte. Ltd. ("JBU") and evidence of the $5.25 million down payment. On October 30, 2006, JBU entered into a shipbuilding contract with a Chinese yard for the construction of what was later to be named SEAGLASS II. According to the Facility Agreement, this shipbuilding contract was then sold to the Coronis family pursuant to a MOA dated July 10, 2007. (Doc. 143-3, at 8, 13, 17.) The MOA predates the incorporation of Nikka which occurred on September 5, 2007, two months later. (Doc. 143-1.) Paul Coronis was the point person at Primera negotiating the MOA (Ex. 4, 388/17 – 388/19) and could not rule out that Primera was the "Buyer" under the MOA. (Ex. 4, 394/3 – 394/13.)

41.     At the same time as the JBU transaction, Coronis was negotiating two other bulk carrier shipbuilding contracts with Jiangsu Eastern Heavy Industry Co., Ltd. and Ningbo Ningshing International, Inc. ("shipyards".) According to pleadings filed in the Southern District of New York and the English High Court of Justice, these shipbuilding contracts identified the "Buyers" or "Purchasers" as

"Primera Maritime (Hellas) Limited, Astra Finance, Inc. and Comet Finance, Inc.," two other Coronis owned companies. (Ex. 4, 388/17 – 388/25; Ex. 7 and 8.) As was the case with Nikka and the MOA for the purchase of the SEAGLASS II, Astra and Comet did not exist when the December 1, 2006 contract was executed, thus neither Astra nor Comet could have been the "Buyers." (Ex. 16 and 17.)

42.     Paul Coronis' contorted and conveniently vague testimony about these transactions left no explanation why the New York and English counsel he directed would have identified Primera as one of the purchasers of these vessels, but he finally conceded that the judgment identified Primera as a purchaser. (Ex. 4, 390/18 – 393/14.) The only logical, rational explanation why Primera is identified as a purchaser in two different court's pleadings is because Primera entered into the contract(s) and Primera made some or all of the deposits to the shipyard(s.) Otherwise, Primera would not be a "purchaser." According to the Facility Agreement and corporate records produced in the New York Action, at least two other shipbuilding contracts were entered into before the ultimate owning companies were incorporated, Pasha Finance, Inc. and Movida Finance, Inc. (143-3, at 8, 17-18; Ex. 9 and 10.)

43.     Coronis, a trained English solicitor, attempted to claim that perhaps it was permissible to enter into the contracts in the names of the not-yet incorporated entities because the names were "reserved" under Marshall Islands law. (Ex. 4,

297/20 – 299/2.) Marshall Islands law in effect then and today provides that a corporation's existence commences upon the filing of the article of incorporation. (Ex. 11, §§ 30-31.) In each of the cases discussed above, incorporation occurred subsequent to the date of the contracts in issue.

44.     As part of the Facility Agreement, the Borrowers were obligated to provide a copy of and warrant to HSH Hamburg the accuracy of the SEAGLASS II MOA (Doc. 143-3, at 46), yet Coronis and Nikka made no inquires of HSH Hamburg for this document. (Ex. 4, 287/1 – 289/6.) He didn't recall who entered into the MOA with JBU, but he knew of no reason why it couldn't have been Primera. (Ex. 4, 389/7 – 389/10, 393/23 – 394/13.)

45.     While Nikka contends that it paid $32,075,000 of the $37,500,000 purchase price (Nikka Fact No. 15), Nikka has neither produced the MOA nor has it identified the source of the $5.25 million down payment but based on Coronis' practice at the time, the MOA Buyer and depositor was likely Primera. (*Id.*.)

46.     Based on this practice, Primera was the likely purchaser of the SEAGLASS II and source of the $5.25 million down payment.

**F.     Primera's Management and FFAs.**

47.     Primera and Nikka allegedly chartered the vessel in late 2008 to SK Shipping but Nikka has never produced this charter party. (Ex. 4, 326/15 – 327/8; Doc. 129-3 at 56-71 93-95.)

48.     Primera and Nikka allegedly entered into a ship management agreement dated October 10, 2008 (Doc. 26-11) but Paul Coronis, the only officer and director of Nikka (and thus the only authorized person) could not recognize the party executing the agreement for Nikka. (Ex. 4, 190/14 – 190/24.) (Nikka Fact No. 26.)

49.     Under that ship management agreement, Primera managed Nikka's accounts and records and reconciled its bank accounts. (Nikka Fact No. 26; Ex. 4, 45/15 – 46/7, 50/12 – 51/6.)

50.     Primera's demise was partly due to its inability to collect on some of its FFA trades (Nikka Fact No. 27) but also its gross undercapitalization (assets of $132,000 while entering into FFA's of tens of millions of dollars. (Doc. 26-2 at 49-51; Doc. 26-7; Doc. 13-3, at 75, Tr. 205/11-15.)

### G.     Coronis' diversion of Primera's assets.

51.     After the freight market collapsed, parties sought to enforce their FFA debts against Primera. Paul Coronis diverted funds belonging to Primera to other Coronis controlled companies. Paul Coronis and Primera used a Three Way Netting Off agreement to collect on Primera's earlier FFA trade with TMT Asia. Despite the fact that Primera was the party to the FFA, instead of directing payment to Primera's account, Paul Coronis siphoned funds that should have been paid to Primera to other Coronis controlled entities, $203,228.58 to Primrose

Shipping, Ltd., a Coronis controlled company and $185,000.00 to Seadance Maritime, a company related to Primrose controlled by the Coronis family. (Doc. 26-14; Doc. 26-15; Doc. 13-3, at 87, Tr. 254; at 88, Tr. 256, 259; at 89, Tr. 261.)

52.   Also in 2008 and 2009, Paul Coronis directed other payments due to Primera to other Coronis controlled companies including JPC Investments. In each of the FFAs Nikka relies on as business activities of Primera, Coronis was actually diverting payments under those FFAs away from Primera and into JPC's account. (Doc. 13-3, at 92, Tr. 275/2-276/1; Doc. 26-3; 26-4; 26-5; 26-6; 26-9; 26-19.)

53.   JPC Investments was at all material times a company controlled by Annabel Charlton, a.k.a. Annabel Coronis, Paul Coronis' mother. She is the only known Director of JPC Investments. (Doc. 13-3, at 92, Tr. 272/24-273/25; *see also* Exhibit 1; Exhibit 2.)

54.   Primera diverted funds to JPC Investments, Seadance and Primrose without any consideration for the transfer having been established. (Doc. 13-3, at 87, Tr. 255; at 88, Tr. 256, 259; at 89 Tr. 261; at 90, Tr. 264-266.)

**H.   <u>Coronis offers guarantee from shipowning company</u>.**

55.   On January 26, 2009, (despite allegedly having resigned from Primera although using his Primera email address) Paul Coronis contacted d'Amico Dry to offer a guarantee backed by one of the vessel owning companies managed by

Primera in exchange for d'Amico Dry agreeing to payment in installments by Primera. (Doc. 13-3, at 77, Tr. 212-214; Doc. 26-22.)

56.    Paul Coronis suggested he could provide a guarantee to d'Amico from one of the Bulknav companies including Nikka (a company whose Director was Paul Coronis and was majority owned by the Coronis family.) (Ex. 6, 270/12 – 271/12.)

57.    When d'Amico did not respond to Coronis' settlement attempts to Coronis' satisfaction, on February 9, 2009, Paul Coronis wrote to d'Amico stating:

> I therefore understand that this is to mean that you are not interested in a commercial solution as per the terms previously put forward and <u>your sole interest is to pursue something aggressively and with limited or no results</u>." (emphasis added.)

(Doc. 26-22, at 5; Doc. 13-3, at 77, Tr. 212, 213.)

## I.    <u>Coronis creates Primebulk.</u>

58.    Within days of writing this "good luck getting blood from a stone" January 26, 2009 email to d'Amico (on Jan. 26), on February 25, 2009, Paul Coronis ordered the incorporation of Primebulk. (Doc. 26-1, ¶46; Doc. 26-22, at 5; Ex. 14, at 95-000011.) Primebulk did not have any employees or office in the Marshall Islands. It operated out of 6 Roupel St. (Doc. 13-3, at 78, Tr. 216/14-217/10.)

59.    Once incorporated, Primebulk for all intents and purposes took the place of Primera. With the exception of one person (Jonathon Coronis), all of the

employees of Primebulk had been employed by Primera. (Doc. 26-1 ¶57; Ex. 13, at 92-000198; Ex. 14, at 95-000059, 95-000085A; Doc. 13-3, at 78, Tr. 217/11-21.) Primebulk took over the offices and office equipment/furniture previously occupied by Primera. (Doc. 13-3, at 78-79, Tr. 219-220; at 129, Tr. 334.) Primebulk used the same computers previously used by Primera. (Doc. 26-1, ¶58.) Paul Coronis contends that "the landlord," provided the furnishings and equipment, but nothing of that sort is found in Primebulk's lease. Most interesting is that Primebulk's lease is with Nicholas Coronis and his wife Annabel Charlton, but Coronis recently testified that his parents are not among the building owners. (Ex. 4, 95/15 – 96/17; Doc. 26-38.)

60.     Primebulk assumed the management of the vessels previously managed by Primera (all Coronis controlled entities) and used the Primera books and records to prepare financial statements for each of these owning companies. (Doc. 13-3, at 79, Tr. 220; Ex. 13, at 92-000199A; Ex, 14, at 95-000061.) No consideration was paid by Primebulk to Primera for these assets. (Doc. 13-3, at 82, Tr. 234/11-23.)

61.     Like Primera, Primebulk was controlled by the Coronis family and its proxies. When it was established, Paul Coronis and Anastasia Kalogirou, his grandmother, were the 70% shareholders of Primebulk through Riverside Holdings Co. (Doc. 26-1, ¶48; Doc. 13-3, at 79, Tr. 221.) The only Officer and Director

initially appointed was Anna Papanikolaou, one of the Coronis Family lawyers employed by the firm G.E. Bairactaris & Partners. (Doc. 13-3, at 82, Tr. 234/17-25.)

62.    In October 2009, a year after the FFA breach, the Facility Agreement guarantee from Primera was replaced by a guarantee from Primebulk. (Nikka Fact No. 29.) Primebulk, unlike Primera, received an indemnity from the vessel owning companies in the event its Corporate Guarantee was enforced by HSH. (Doc. 143-11.) Primera had no such agreement.

63.    Although vessel managers approved in Facilities Agreements generally must have a proven track record as ship managers, Primebulk replaced Primera as ship management company despite having only been in operation for less than 6 months. (Doc. 13-3, at 86-87, Tr. 251, 252; Doc. 26-1, ¶60.) Despite having been specifically requested, Nikka has produced none of the correspondence with HSH requesting that Primebulk replace Primera as the SEAGLASS II managers. (Doc. 129-3 at 56-71; 93-95.)

## STANDARD OF REVIEW

Under Rule 56, the court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. In a motion for summary judgment, "[t]he basic issue before the court . . . is 'whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Silver Ships, Inc. v. Codega*, No. CV 17-0404-CG-N, 2018 WL 4345257, at *2 (S.D. Ala. Sept. 11, 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986)). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992); *see also CDG Int'l Corp. v. Q Capital Strategies, LLC*, No. 17-23902-CIV, 2018 WL 4510143, at *5 (S.D. Fla. Sept. 20, 2018).

As the Eleventh Circuit has eloquently stated, "by definition, a summary judgment ruling involves no findings of fact." *Rich v. Sec'y, Fla. Dep't of Corr.,* 716 F.3d 525, 530 (11th Cir. 2013). It is not a court's job to "weigh conflicting evidence." *Torres v. First Transit, Inc.*, No. 17-CV-81162, 2018 WL 4469026, at *2 (S.D. Fla. Sept. 18, 2018). Instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992).

The evidence is viewed "in the light most favorable to the nonmoving party." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018); *see also CDG Int'l Corp.*, 2018 WL 4510143, at *5 ("The [c]ourt draws all reasonable inference in favor of the party opposing summary judgment.").

**ARGUMENT**

Nikka has failed in its burden of establishing the non-existence of genuine issues of material fact and its motion must be denied.

**I.      Federal Common Law Applies**

d'Amico agrees with Nikka that U.S. Federal Common Law applies to d'Amico's alter ego claim. (Doc. 143, p. 8.)

**II.     Preponderance of the evidence does not apply until trial. Nikka, however, miscites the burden.**

Nikka miscites the burden of proof in Point II when it refers to the preponderance of evidence standard. (Doc. 143, p. 8-9.) This standard, which d'Amico is confident it shall sustain, applies only at trial. In this summary judgment motion, the existence of genuine issues of material fact mandates denial of Nikka's motion. (See Standard of Review, *supra*.)

**III.    The credible evidence establishes that Primera had a $5.25 million property interest in the SEAGLASS II**

Critically relevant to this case is the Memorandum of Agreement ("MOA") which was first entered into for the purchase of the SEAGLASS II from JBU Loggers, Pte. Ltd. ("JBU") and evidence of the $5.25 million down payment. On October 30, 2006, JBU entered into a shipbuilding contract with a Chinese yard for the construction of what was later to be named SEAGLASS II. According to the Facility Agreement, this shipbuilding contract was then sold to the Coronis family

pursuant to a MOA dated July 10, 2007. (Doc. 143-3, at 8, 13, 17.) The MOA predates the incorporation of Nikka which occurred on September 5, 2007, two months later. (Doc. 143-1.) However, ignoring d'Amico's Second Request for Production of Documents (Doc. 129-3 at 93-95) and Judge Murray's admonition (Doc. 107), Nikka failed to ask its lawyer or HSH Bank in Hamburg, where Nikka was required to provide a "true and accurate copy" pursuant to the Facility Agreement, whether copies of the MOA were available. (Doc. 143-3, at 46; Ex. 4, 125/6 – 128/21, 287/1 – 289/6.)

Primera is likely the purchaser under the MOA and the party making the $5.25 million deposit. At the same time as the JBU transaction, Coronis was negotiating two other bulk carrier shipbuilding contracts with Jiangsu Eastern Heavy Industry Co., Ltd. and Ningbo Ningshing International, Inc. ("shipyards".) According to pleadings filed in the Southern District of New York and the English High Court of Justice, shipbuilding contracts were entered into December 1, 2006 and July 2007 with the shipyards – both of which identified the "Buyers" or "Purchasers" as "Primera and two other Coronis owned companies. (Ex. 4, 388/17 – 388/25; Ex. 7 and 8.) As was the case with Nikka and the MOA for the purchase of the SEAGLASS II, these other companies did not exist when the contract was executed, thus neither company could have been the "Buyer."

Paul Coronis' contorted and conveniently vague testimony about these transactions gave no logical explanation why the experienced New York and English counsel he directed would have identified Primera as one of the purchasers of these vessels, but finally conceded that the judgment identified Primera as a purchaser. (Ex. 4, 390/18 – 393/14.) There is only one logical, rational explanation why Primera is identified as a purchaser in two different court's sworn pleadings: Primera entered into the contract(s) and Primera made the deposits to the shipyard(s.) Otherwise, Primera would not be a "purchaser." This explains how Primera could be identified as "purchaser" and is consistent with the Coronis family practice at that time of entering into shipbuilding contracts <u>before</u> the ultimate owning companies was incorporated. (Doc. 143-3, at 8, 17-18, 23; Ex. 9 and 10.)

Coronis, a trained English solicitor, nonsensically attempted to claim that perhaps it was permissible to enter into the contracts in the names of the not-yet incorporated entities because the names were "reserved" under the Marshall Islands law. (Ex. 4, 297/20 – 299/2.) The Marshall Islands law in effect then and today provides that a corporation's existence commences upon the filing of the article of incorporation. (Ex. 11, §§ 30-31.) After claiming a loss of recollection of the details of the $37 million transaction, Coronis concluded that, although he

could not recall who entered into the MOA with JBU, he knew of no reason why it could not have been Primera. (Ex. 4, 389/7 – 389/10, 393/23 – 394/13.)

Why Coronis would have a copy of JBU's 2006 shipbuilding contract but not a copy of the MOA remains unexplained by Coronis and defies logic. Why Coronis has a copy of the $32 million partial payment for the vessel (Doc. 143-7) but no evidence of the $5.25 million down payment is similarly unexplained and a mystery. Why Coronis failed to ask HSH Hamburg for those records (as directed by Judge Murray) and why he failed to ask Mr. Bairactaris, the lawyer who negotiated the Facility Agreement and its addenda (and which continues in effect today) (also as directed by Judge Murray) is a valid question but nonetheless is a breach of Nikka's obligations and a violation of the Court's Order. (Doc. 107.)

The simple reason is that production of the MOA would show Primera as the purchaser and depositor of the $5.25 million down payment. When Nikka was later incorporated, the contract would have been novated to Nikka which would then take delivery of the vessel and pay the remaining $32,070,000 which it did on October 10, 2008. (Doc. 143-7.) However, because Coronis knew Primera was on its deathbed, returning the down payment to Primera would partially satisfy Primera's many creditors and deplete the Coronis family of $5.25 million of otherwise hidden cash. Nikka's choice to frustrate discovery and ignore the Court's Order was a rewarding one, $5.25 million-worth.

If, as the credible evidence shows, Primera has a property interest in the SEAGLASS II, d'Amico has correctly attached Primera's property within the district as security for its soon-to-be judgment in New York. No need for an alter ego analysis then exists. d'Amico will amend the pleadings as necessary to conform to the evidence in the interests of justice.

**IV.   <u>The evidence establishing the existence of an alter ego relationship between Primera and Nikka is overwhelming.</u>**

The facts of this case, as set forth herein and as will be clearly established at trial, are extraordinary and establish just the sort of "extraordinary circumstances" Courts rely on in piercing the corporate veil. *d'Amico Dry d.a.c. v. Nikka Fin. Inc.,* 2018 U.S. Dist. LEXIS 112728, at *17 (S.D. Ala. July 5, 2018) (quoting *Vitol, S.A. v. Primerose Shipping Co., Ltd.,* 708 F.3d 527, 541 (4th Cir. 2013)).

> …To pierce the corporate veil, "the individual must have used the corporate entity to perpetrate a fraud or have so dominated and disregarded the corporate entity's corporate form that the corporate entity primarily transacted the individual's personal business rather than its own corporate business.' *Lobegeiger v. Celebrity Cruises, Inc.,* 2011 WL 3703329 at *15 (S.D. Fla. Aug. 23, 2011) (Altonaga, J.). Reaching the "alter egos" of corporations is especially valuable "where the separate identity of two corporations should be disregarded where one corporation becomes the conduit of another" or "where the near identity of two corporations should be disregarded in order to prevent manifest injustice to third parties." *Talen's Landing Inc. v. M/V Venture II,* 656 F.2d 1157, 1160 (5th Cir. 1981)[]…

*LIG Ins. Co. Ltd. – Inter-Florida Container Transport Inc.,* No. 12-20990, 2013 WL 4516104, \*6 (S.D. Fla. Aug. 23, 2013), *aff'd.* 564 Fed. Appx. 495 (11th Cir. 2014).

As established herein, Nicholas Coronis and Paul Coronis, the pioneer and successor of the Coronis family enterprise, engineered and executed a scheme to defraud d'Amico and their other creditors by ignoring their debts and diverting funds due Primera to other Coronis family companies. At the same time, the Coronises wound down Primera and handed its business, lock, stock and barrel, to another family owned and controlled entity, Primebulk, while sheltering the family's assets, ships, in single purpose foreign corporations with little to no independent corporate identity. When called upon to produce relevant evidence, the Coronises have obfuscated and attempted to frustrate d'Amico's lawful discovery demands, but even the documents the Coronises have produced, and the conflicting and sometimes perjurious testimony they have provided, sufficiently establishes the existence of an alter ego relationship. The Coronises dominated and controlled Nikka and Primera as to render them as one and the same, thus, alter ego.

"Instead of a firm rule, the general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result." *Williamson v. Recovery Ltd. P'ship.,* 542

F.3d 43, 53 (2d Cir. 2008); *see also Vitol, S.A. v. Primerose Shipping Co., Ltd.*, 708 F.3d 527, 544 (4th Cir. 2013); *William Wrigley Jr. Co.,* 890 F.2d at 601; *Louis Dreyfus Co. Freight Asia Pte Ltd. v. Uttam Galva Metallics Ltd.,* 256 F. Supp. 3d 509, 513 (S.D.N.Y. 2017); *British Marine PCL v. Aavante Shipping & Chartering Ltd.*, No. 13-0839, 2013 WL 6092821, at *5 (E.D.N.Y. Nov. 19, 2013); *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC,* 851 F. Supp. 2d 504, 510 (S.D.N.Y. 2012); *In re M/V RICKMERS GENOA Litigation*, 622 F. Supp. 2d 56, 75 (S.D.N.Y. 2009). Piercing the corporate veil allows an equitable result by putting an end to the Coronis sport of "judgment ducking" and forces them to face their legal obligation, perhaps a new experience.

d'Amico agrees with Nikka's recitation of the factors which this Court should consider in evaluating the existence of an alter ego relationship (Doc. 143 at 10) subject to the maxim that no factor is determinative. "[T]he alter ego inquiry is meant to be flexible and fact-specific and an alter ego relationship may be shown from the *total* dealings of the corporations and the individual." *Flores v. Bolden*, 488 F. App'x. 770, 776 (5th Cir. 2012) (emphasis added). When courts apply the factors, they should focus on "reality and not form, on how the corporation operated and the individual defendant's relationship to that operation." *Vitol, S.A.,* 708 F.3d at 544.

d'Amico will satisfy both tests by establishing fraud and domination and control. The avoidance of manifest injustice and the promotion of equity is achieved only by piercing these shirkers' corporate veils.

### A.   Nikka/Primera Has Committed Fraud against d'Amico.

"It is clear that proof of a stripping of the assets of the subsidiary by the parent, motivated by a desire to render the subsidiary judgment proof, would constitute a fraud or wrong justifying piercing of the corporate veil." *In re Arb. between Holborn Oil Trading Ltd. & Interpetrol Berm. Ltd.,* 774 F. Supp. 840, 847 (S.D.N.Y. 1991). The "injury caused by [alter ego's] domination-and the one that warrants exercise of this Court's equitable powers to pierce [defendant's] corporate veil-is that the diverted funds are unavailable to satisfy [defendant's] liability to the Plaintiffs unless and until the veil is pierced." *Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC,* No. 07 Civ. 6665, 2009 WL 1803458 at *18 (S.D.N.Y. June 23, 2009). "A classic example of a 'fraud or wrong' in satisfaction of this prong of the alter ego analysis is the stripping of the assets of the dominated corporation for the purpose of rendering it judgment proof." *Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.,* No. 07-CV1003, 2008 WL 905188 at *5 (E.D.N.Y. Mar. 31, 2008). Proof "of a stripping of the assets of the subsidiary by the parent, motivated by a desire to render the subsidiary judgment proof, would

constitute a 'fraud or wrong.'" *Carte Blanche (Sing.) PTE., Ltd. v. Diners Club Int*

*'I, Inc.,* 758 F. Supp. 908, 917 (S.D.N.Y. 1991).

The test does <u>not</u>, however, require evidence that the diversion of funds scheme directly benefitted Nikka—somewhat contrary to the Court's preliminary thoughts on the matter as reflected in its Opinion denying Nikka's Motion to Vacate (Doc. 40, at 13-14.) "[S]iphoning off of funds by the dominant shareholder…" for instance, is sufficient. *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc*., 98 F.3d 13, 18 (2d Cir. 1996) (citing *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d Cir. 1989)). In *Flynn,* then Judge Ginsburg referred to the "intra-family transfer of assets without consideration" as a "sham," thus fraud, *Flynn v. R.C. Title*, 353 F.3d 953, 959 (citing *Cent. States, SE & SW Areas Pension Fund v. Sloane,* 902 F.2d 593, 597 (7th Cir. 1990)).

Paul Coronis' diversion of assets from Primera to other Coronis controlled companies such as his mother's company, JPC Investments [coincidentally the initials of her three children, Jonathon, Paul and Chianna], and to Primerose and Seadance, both controlled by the Coronis family, is a siphoning off of assets of the judgment-shirker Primera to benefit the ultimate parties in control, the Coronis family. Coronis' testimony about these companies was fraught with falsehoods.

Paul Coronis testified that, even though he was directing Primera's money to Seadance Maritime under the FFA, he had no knowledge of the owners or officers

of Seadance. (Doc. 13-3, 87-89, Tr. 254, 259-262.) Annabel Charlton, his mother, and Nicholas Coronis, his father, were shareholders of Seadance, and Nicholas Coronis was the "proxy" for the shareholding. (Doc. 26-15; Doc. 13-3, at 90-91, Tr. 267-269.)

Paul Coronis also testified that, even though he was directing money to JPC Investments under various FFAs, he had no knowledge of the officers, directors or shareholders of JPC Investments. (Doc. 13-3, at 92-93, Tr. 274-276.) Paul Coronis' mother, Annabel Charlton, is the only known officer and/or director of JPC Investments. (Doc. 13-3, at 92, Tr. 272/24-273/25.) Furthermore, Paul Coronis testified that he was not aware of the $1.5 million non-interest bearing loan provided by JPC Investments to Primera in 2008 while Paul Coronis was a Director of Primera. (Doc. 13-3, at 66-67, 91-92, Tr. 171-172, 271-273.) The loan documents were signed by Annabel Charlton, Paul Coronis' mother, in 2008. (Doc. 26-17; Doc. 13-3, at 92, Tr. 273.) However, the loan never appeared on Primera's balance sheet. (*See* Doc. 26-7.)

Within days of writing his January 26, 2009, "good luck getting blood from a turnip" email to d'Amico Dry, (Doc. 26-22), Paul Coronis ordered the incorporation of Primebulk. (Doc. 26-23 at 12.) Primebulk was incorporated on February 25, 2009. (Doc. 26-1 at ¶ 46.) Once incorporated, Primebulk stepped immediately into Primera's shoes. All of the employees of Primera (save one)

became employees of Primebulk. (Doc. 26-1 at ¶ 57; Doc. 26-10 at 24; Doc. 26-23 at 61, 93; Doc. 13-3, at 78 Tr. 217.) Primebulk took over the offices and office equipment and furniture previously occupied by Primera. (Doc. 13-3, at 78-79, 129, Tr. 219-220, 334.) Primebulk used the same computers previously used by Primera. (Doc.. 26-1 at ¶ 58.) Paul Coronis contends that "the landlord," *i.e*., his family, provided the furnishings and equipment, but nothing of that sort is found in Primebulk's lease. (Doc. 13-3, at 79, Tr. 222-223; Doc. 26-38.)  In fact, the lease is signed by Nicholas Coronis and Annabel Charlton as "Landlords" but Paul Coronis testified that his parents have no ownership in the property. (Ex. 4, 96.) Primebulk assumed the management of the vessels previously managed by Primera including SEAGLASS II. No consideration was paid by Primebulk to Primera for these assets. (Doc. 13-3, at 79, Tr. 222.) Primebulk is, of course, another company in which the Coronis Family owns 70% of the shares, this time by way of yet another company, Riverside Holdings. (Doc. 26-1 at ¶ 48; Doc. 13-3, at 79, Tr. 221.) Primebulk is "merely a sham, creating a 'disguised continuance' of the predecessors' operations." *Flynn,* 353 F.3d at 959 (citing *Fugazy Cont'l Corp. v. NLRB*, 725 F.2d 1416, 1419 (D.C. Cir. 1984).)

Coronis' siphoning of assets of Primera, "divert[ing] funds [to render them] unavailable to satisfy [Primera's] liability to the Plaintiff [d'Amico]" *Atateks, supra,* is grounds alone for this Court to pierce the Nikka corporate veil.

**B.**   **Domination and Control**

The Coronis family is far too clever and experienced to have their control open and obvious and lodged in one or two corporations. Instead, they spread it out in a web of business enterprises so that at a casual glance everything appears legitimate. To complicate it further, they slyly layer their ownership and control with the family owning a bearer share corporation which owns the controlling interest in another corporation that in turn owns a controlling interest in yet another corporation with other family members or attorneys as their "proxies."

Nikka asks this Court to limit its analysis to Primera and Nikka only, and only to the date range September 2, 2008 to June 28, 2009, but it relies upon evidence from other companies, Primebulk and Bulknav for example, and documentary evidence dating as recently as 2015. Evidence submitted about these other entities' activities supports the alter ego argument, in some cases highlighting the corporate formalities which Primera and Nikka should have followed but didn't, and in others highlighting the overall Coronis family domination and control. The relevant time period is the date of the breach of the FFA, "the time of the transaction complained of." *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991); *see also American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988), cert. denied, 488 U.S. 852 (1988.) *See also, United Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co.*,

855 F.2d 1499, 1506-07 (11th Cir. 1988.) Evidence of prior events is relevant to show the access, opportunity and history of fraud, domination and control, and evidence after the breach shows the fraudulent efforts to cover up or "backfill" over that evidence of domination and control by inserting new corporations, creating new entities with deceivingly similar names, "Primera" to "Primebulk," to carry on the business while siphoning out the assets of the indebted servant, all at the direction of the puppet masters, Paul and Nicholas Coronis.

1. *Piercing the corporate veil of family enterprises.*

While alter ego cases often involve a parent/subsidiary relationship, the evolution of the corporate structure has called for courts to evaluate a wider range such as familial corporate relationships for alter ego liability. Courts have recognized activities involving family entities and their use of sister corporations may constitute the misuse of the corporate form.

The Eleventh Circuit recently noted in its alter ego analysis that the two corporations at issue were not parent-subsidiary corporations, but sister corporations with common ownership. *Eitzen Chem. (Singapore) PTE, Ltd. v. Carib Petroleum*, No. 17-14697, 2018 WL 4203586, at *5 (11th Cir. Sept. 4, 2018). The Court noted there was no precedent in the circuit prohibiting it from piercing the corporate veil horizontally between sibling corporations under alter ego liability. *Id.* at n. 7. Thus, applying the same factors applied in the parent-

subsidiary context, the Court concluded that a corporation may be held liable for the debts of a sister corporation because of the actions of the family which controlled them. *Id.* at \*7.

The Fifth Circuit did similarly in *Talen's Landing, Inc. v. M/V VENTURE II*, 656 F.2d 1157 (5th Cir. 1981). There, one company was the registered owner of the vessel, while another entity paid past invoices for goods and services provided to the vessel. *Id.* at 1158. Noting the shareholders' total domination of both corporations, confusion of corporate records, and failure to follow corporate formalities, the Fifth Circuit affirmed the district court's piercing of the corporate veils of both entities. *Id.* at 1161-1162. This was not a case of a parent-subsidiary domination, but rather a web of entities, like the Coronis family enterprise, used for the main purpose of shirking legitimate creditors.

Numerous other courts have also recognized similar relationships when evaluating alter ego liability. *See e.g., Wm. Passalacqua Builders, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991) (veil pierced of family businesses consisting of various partnerships and corporations controlled directly or indirectly by family members with under-capitalized corporations, blurred lines of corporate control and intermingling of funds); *In re Madison Bentley Assocs., LLC*, No. 09-15479(SHL), 2015 WL 6125893, at \*8 (Bankr. S.D.N.Y. Oct. 16, 2015) (family's domination and control including the family's overlapping ownership in the corporations

warranted piercing the veil of the defendants);  *Flame S.A. v. Indus. Carriers, Inc.*, 39 F. Supp. 3d 769, 789-790 (E.D. Va. 2014), *aff'd sub nom. Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572 (4th Cir. 2015) (where the court recognized that the family in control diverted debtor's funds, made all decisions for all companies and used the corporate form to work a great injustice against creditors); *Flynn v. R.C. Tile*, 353 F.3d 953, 956 (D.C. Cir. 2004) (court found overwhelming evidence that, because of the different family members' ownership, two of the corporations involved had essentially the same ownership and management and control, evidencing an alter ego relationship).

Through the family corporations Shelly Ventures and Riverside Holdings, Paul Coronis and Nicholas Coronis dominated and controlled Nikka, Primera and Primebulk. Only their names appear on documents leading up to and during the FFA breach. Paul Coronis negotiated the FFA, Paul Coronis directed the efforts to collect Primera's winning FFAs, and Paul Coronis diverted Primera's assets to other Coronis family companies. Paul Coronis' and Nicholas Coronis' activities after late 2008 were efforts to forestall collections of Primera's debts and to distance themselves and their shipowning web of companies from their albatross, Primera.

> 2.    *The Elements of Domination and Control.*

> > i.    <u>Common stock ownership</u>.

Despite being specifically requested to produce Primera's records, which were last seen in Paul Coronis' office (Ex. 4, 64-65) and also held by a Piraeus law firm used by the Coronis family (Ex. 4, 66-67), Nikka has done nothing to produce Primera's records despite Magistrate Judge Murray's Order. (Doc. 107, fn. 5, p. 5.) Nikka has produced no documents evidencing the ownership of Primera.

The last record of ownership before September 2, 2008 show Nicholas Coronis as Primera's sole shareholder (Ex. 13, p. 109.) While he contends not to have been a shareholder of Primera, Paul Coronis held himself out to the world on electronic media as "Owner" of Primera. (Ex. 12.) Contrary to Nikka's comments (Doc. 143, at 11) Gregorious' and Atherinos' names appear on none of Primera's records, corporate or otherwise, until well after the breach of the FFA.

As for Nikka, the Coronis family corporation, Shelly Ventures, owned 70% of Nikka. (Nikka Facts No. 4-6.) So, important was this overlap in beneficial ownership in Nikka and Primera that HSH made Nikka warrant that the beneficial ownership it would not change while the Facility Agreement was in force. (Doc. 143-3, at 48; Doc. 13, Tr. 189.) Thus, there is 70% overlap of ownership by the Coronis family in Primera and Nikka, a factor weighing significantly in d'Amico's favor.

Although requested, Nikka has produced no documents relating to the beneficial ownership of Nikka and Coronis' prior testimony without production of

the documentary evidence to support it should be ignored. (Doc. 129-3 at 56-71; 93-95.) The "ownership of corporate shares is a strong factor favoring unity of ownership and interest…a 'strong factor' in evaluating alter ego." *Brown v. Kinross Gold U.S.A., Inc*., 531 F. Supp. 2d 1234, 1242 (D. Nev. 2008).

ii.   <u>Common directors or officers</u>.

At the operative time, Paul Coronis was the President, Secretary and Treasurer of Nikka. (Ex. 4, 161/22 – 162/5.) Nicholas Coronis was the General Manager, President, Secretary and Treasurer of Primera. (Nikka Fact No. 22.) There is 100% overlap within the Coronis family.

Also, at that time, Paul Coronis was the sole director of Nikka (Ex. 4, 161/22 – 162/5) and Nicholas Coronis and Paul Coronis were the only directors of Primera. (Nikka Fact Nos. 22 and 24; Ex. 13, at 92-000129.) As the Court noted earlier the overlap of directors "would make it difficult, if not impossible for the management contract between Primera and Nikka to be considered an arm's length transaction. (Doc. 40 at 16.) This correlation is made more concrete by the fact that Paul Coronis, Nikka's sole officer and director at the time, could not recognize the signatory for Nikka to the agreement. (Ex. 4, 190/14-24.)

Here, also, there is 100% overlap domination and control within the Coronis family. *See, MCI Telecommunications Corp. v. O'Brien Mktg. Inc.,* 913 F. Supp. 1536, 1542 (S.D. Fla. 1995) (sole officer, shareholder and director of companies

had complete control, justifying finding an alter ego.) This factor also favors d'Amico.

iii.   <u>Common business departments/common office space</u>.

Primera had its only offices at 6, Roupel Str., 145 64 Kifissia, Athens, Greece. (Doc. 26-1 at ¶13.) Although Nikka was a Marshall Islands corporation, it had no offices or employees there. (Doc. 13-3, at 63-64, Tr. 158/16.) Instead, any mail, faxes and phone calls were made from or to Primera. (Ex. 4, 46/8 – 46/17, 52/12 – 54/14.) Even notices from HSH were sent to Nikka c/o Primera at its Athens address. (Doc. 143-3, at 84.) Primera maintained Nikka's books and records. (Ex. 4, 45/15 – 46/7.)

Nikka argues that it employed the crew and that its ship was its "floating office." (Doc. 143 at 13.) Under the ship management agreement with Primera and Primebulk, Primera and Primebulk were the ones which hired and fired the officers and crew, negotiated their pay and wages, supervised their efficiency and arranged crew training in accordance with Primera and Primebulk's practices. (Ex. 4, 192/22 – 193/8; Doc. 26-11; Doc. 26-35.) They can hardly be considered Nikka's employees. Nikka produced no employment contracts though requested (Doc. 129-3 at 56-71, 93-95) and Coronis could not identify the source of Nikka's alleged "Employee List" or when or what position any of those individuals held. (Ex. 4, 203/25 – 204/12.)

It is clear, Nikka had no employees and that all of its operations were performed by Primera and later Primebulk. This factor favors d'Amico.

### iv.   Consolidated financial statements.

It is beyond dispute that Nikka and Primera were contractually obligated to provide HSH Hamburg with audited and unaudited consolidated financial statements. (Doc. 143-3, at 13, 48-49.) Nikka never produced them despite d'Amico's request and Magistrate Judge Murray's specific Order. (Doc. 129-3 at 56-71, 93-95; Doc. 107.) Coronis testimony on the point flip-flopped into sheer inconsistency and nonsense. "[I]t's impossible to provide such a thing. It's a mis- - mis- - -misly- - mis- - -misly written clause." (Ex. 4, 252/3 – 252/4; Ex. 6, 218/9 – 219/6; Doc. 13-3, at 134, Tr. 354/7 – 355/16; Ex. 4 174/6 – 174/14, 238/22 – 240/13, 241/10 - 252/4.)

It is clear Nikka and Primera issued consolidated financial statements for 2008-2011. Regardless of Coronis' contorted and inconsistent testimony on the subject, Nikka and Primera were obligated to provide them. Coronis either entered into a $204 million contract knowing he would provide consolidated financial statements, or he entered into the $204 million contract knowing he would breach it!  If he offered them, clearly he had the capacity to provide them.

This factor weighs heavily in favor of a finding of alter ego.

v.     <u>One finances the other</u>.

Primera and later Primebulk had one source of revenue: management of the SEAGLASS II for Nikka and the two or three other Coronis owned vessels. (Doc. 13-3, at 79, Tr. 222.)

Nikka argues that it provided HSH with collateralized cash deposits (Doc. 143 at 14) yet no statements were provided for this account (Doc. 107, (Doc. 129-3 at 56-71, 93-95)) and this deposit is absent from Nikka's yearly balance sheet. (Ex. 4, 351/5 – 351/19.) However, according to Coronis, Nikka "can't touch it, I consider it's not my money right now or the money of Nikka." (Ex. 4, 219/19 – 219/21.)

Finally, Primera guaranteed Nikka's $204 million Facility Agreement, without consideration and without any indemnity agreement, such as the one Primebulk later received from Bulknav. (Doc. 143-10; Doc. 143-11.) Primera essentially agreed to guarantee Nikka's joint and several $204 million debt with no right of recourse and for no consideration.

This fact also weighs heavily in d'Amico's favor.

vi.     <u>One caused the incorporation of the other</u>.

Nikka was incorporated in September 5, 2007 at Paul Coronis' request while he was the director of Primera in charge of legal matters and vessel purchases and sales. (Ex. 4, 24/16 – 25/44, 26/9 – 26/13, 43/2 – 43/25.)

This fact favors d'Amico.

vii.   <u>One operates with grossly inadequate capital</u>.

As this Court earlier noted:

> "Undercapitalization is often critical in alter ego analysis." *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 447 F.3d 411, 420 (5th Cir. 2006). *See also Gardemal v. Westin Hotel Co*., 186 F.3d 588, 594 (5th Cir. 1999) ("undercapitalization is a critical factor in our alter ego analysis…"); *Wm. Passalacqua Builders, Inc. v. Resnick Dev. S., Inc.*, 933 F.2d 131, 142 (2nd Cir. 1991) ("the degree of capitalization . . . is clearly relevant to the piercing inquiry…"); *Classic Maritime Inc. v. Limbungan Makmur SDN BHD*, 646 F. Supp. 2d 364, 371 (S.D.N.Y. 2009) ("Evidence of substantial undercapitalization . . . is significant because it can be evidence of a company's lack of independent substance.") (Koeltl, J.).

(Doc. 40 at 17-18):

The Court also correctly noted: "Primera had assets of $132,000 at the time it executed the FFA with d'Amico. (Doc. 1-2 at 32.) D'Amico claims the FFA represented 'potentially tens of millions of dollars of debt….' (Doc. 21 at 17.) If true that Primera's obligations exceeded tens of millions while holding assets totaling $132,000, it would appear that Primera was vastly undercapitalized." (Doc. 40 at 18.) It was, and Nikka does not argue otherwise. (Doc. 143 at 15-16.)

The Court then asked whether this inadequate capitalization benefitted Nikka. No court has required such a connection to be drawn. *See Bridas, supra; Passalacqua supra, etc.* While it does not directly benefit Nikka, it clearly benefitted the controller and dominator of Primera and Nikka, Paul and Nicholas

Coronis, by shielding them from the tens of millions of dollars of debt they would have faced.

This factor favors d'Amico.

> viii.  One pays the salaries and other expenses of the other.

Nikka concedes that the management agreement placed the burden on Primera and Primebulk to "procure and terminate the services of …Master, Mariners, Officers…and other necessary persons…and to pay their fees and wages." (Doc. 143 at 16.) Nikka then boldly states:

> d'Amico cannot establish by a preponderance of the evidence that Nikka failed to reimburse Primera for payments made for the vessel's operating expenses of salaries of its crew.

(*Id.*.)

That is simply because Nikka failed to produce such evidence despite specific requests to that effect and a Court Order from Magistrate Judge Murray. (Doc. 129-3 at 56-71, 93-95; Doc. 107.) It would be a perverse injustice to allow Nikka to benefit from its own discovery failings and flaunting of Court Orders. To the contrary, Nikka has provided no evidence that it has reimbursed Primera and Primebulk for the crew's wages and expenses, and this factor should weigh in favor of d'Amico.

ix.   <u>One receives no business except that given to it by the other</u>.

In September 2008, Primera was operating <u>only</u> the SEAGLASS II for Nikka and two other Coronis owned vessels without which Primera had no source of revenue. (Doc. 13-3, at 67, Tr. 173-174.)

In a remarkable display of gall, Nikka argues that Primera "as and for its own business . . . entered into numerous FFA contracts with entities such as d'Amico, TMT, Charbons, FLAME and ICI." (Doc. 143, p. 16.) In each of these FFAs, Primera diverted all of the gains away from Primera and into the accounts of other Coronis controlled companies including JPC Investments, Seadance Maritime and Primrose. (See Point IV. A, *supra*.)

Primera's business was solely from Nikka and two other Coronis controlled companies – nothing else. As it did in the Court's earlier decision (Doc. 40, p. 19), this factor weighs in favor of d'Amico.

x.   <u>One uses the other's property as its own</u>.

When purchasing the SEAGLASS II, with no services contract in place or remuneration exchanged, Coronis negotiated the contract as a Primera director, used the employees of Primera to review and evaluate the vessel's technical specifications and her employment capabilities with the technical and commercial departments of Primera, had Primera forecast cash flow and projected income for

the vessel, and Primera provided instructions to Nikka's outside counsel. (Ex. 4, 274/5 – 275/17.)

Later, Coronis offered a guarantee on behalf of Primera from one of the shipowning companies to secure Primera's debt to d'Amico (Doc. 26-22.) As this Court noted earlier: "This is evidence that Paul exercises considerable power, acting on Primera's behalf, to negotiate and use one of the Primera – managed vessels as a bargaining chip." (Doc. 40, at 20.)

Nikka argues that Coronis was offering security from Moondance Maritime, not Nikka. (Doc. 143, p. 17.) This is contrary to Coronis' earlier deposition testimony when he testified that the guarantee – "most probably would have been the ships we mentioned yesterday, i.e., the SEAGLASS II, the MOONDANCE II and the SUNRAY, from memory." (Ex. 6, 270/2 – 271/22.) It would be convenient for Nikka and Coronis later to have the security be the MOONDANCE instead of the SEAGLASS, since Moondance Maritime was not a party to the New York Action. (Doc. 26-1.)

Coronis' control over Primera and the owning companies Primera managed at that time, including Nikka, is evidenced by his offer of the guarantee. How could he make such an offer without such control?

As before, this factor weighs in d'Amico's favor.

xi.   <u>Daily operation of the two corporations are not kept separate</u>.

As the Court correctly observed the evidence suggests that Paul "was the person who primarily controlled the operations of Primera and Nikka and that he was intentionally involved in trying to solve Primera's financial problem." (Doc. 40 at 20.) There is in fact, no evidence otherwise.

Primera wrote every communication and made every payment Nikka required from the start of its existence with the exception of those few payments made by Paul Coronis himself, and even those were confirmed to a Primera fax, recorded at Primera and reconciled by a Primera employee. (Ex. 4, 45/15 – 15/6.)

Here, too, d'Amico's ability to prove more was frustrated by Nikka's failure to provide the necessary documents in response to d'Amico's requests and Magistrate Judge Murray's Order (Doc. 129-3 at 56-71, 93-95; Doc. 107.) This factor, as before, weighs in d'Amico's favor.

xii.   <u>One does not observe the basic corporate formalities such as keeping separate books and records and holding shareholder and board meetings</u>.

Despite having access to the counsel holding the Primera records, (Ex. 4, 64/12 – 66/14), Nikka produced nothing although the documents were within its control. (Doc. 107; Ex. 4, 64-67.)

Nikka's records show few, if any, shareholder or board meetings before the FFA breach. No By-Laws, no Powers of Attorney, Board of Directors or

Shareholder Minutes authorizing, for instance, Nikka to purchase the SEAGLASS II or enter into the $204 million Facility Agreement were produced although ordered. (Ex. 4 162/6 – 166/11, 173/15 – 177/2; Doc. 107.) Furthermore, after Nikka's shares were transferred to Bulknav, Nikka no longer had directors' meetings or shareholder meetings. (Ex. 4, 186/18-187/3.) The corporate formalities of Nikka were ignored.

This factor weighs in favor of d'Amico.

## V.   d'Amico Has Not Filed an Action to Recognize the English Judgment in Alabama.

Like the rest of its motion, Nikka miscasts the evidence and the substance of d'Amico's case. d'Amico has not asked this Court to recognize its English judgment. (Doc. 143 at 19.) That relief is part of d'Amico's 2009 New York Action filed against Primera. (S.D.N.Y. 09-CV-7840, Doc. 1.) Now that the Second Circuit Court of Appeals has confirmed that maritime subject matter exists, there is no impediment to that relief being granted. Unlike the alter ego defendants there, Primera did not challenge the Court's personal jurisdiction. Recognition of the foreign judgment is not sought in this action and Nikka's arguments concerning time bar are irrelevant. The cases on which Nikka relies (Doc. 143, p. 20) involve both recognition of the foreign judgment and enforcement, and are thus inapplicable to this action.

Because this is a maritime claim, the doctrine of laches applies. "The timeliness of an action brought under the general maritime law is to be determined under the doctrine of laches 'immemorially applied to admiralty claims.'" *Pub. Adm'r of New York Cty. v. Angela Compania Naviera, S.A.,* 592 F.2d 58, 63 (2d Cir. 1979) (quoting *Moragne v. States Marine Lines,* 398 U.S. 375 406 (1970)). Further, "The existence of laches is a question primarily addressed to the discretion of the trial court." *Id.* (quoting *Czaplicki v. The Hoegh Silvercloud,* 351 U.S. 525, 534 (1956)). The questions to be answered in the exercise of that discretion are whether there existed satisfactory excuse for the delay in bringing the cause of action and whether allowing the action to go forward despite the delay would unfairly prejudice the defendant. These questions are to be evaluated in light of the "peculiar equitable circumstances" of the case. *Id.* (quoting *Czaplicki,* 351 U.S. at 533).

With regard to admiralty claims, the United States Court of Appeals for the Eleventh Circuit maintains that courts should "look to the analogous [state] statute of limitations as a benchmark in determining whether to apply the doctrine of laches." *TransMontaigne Prod. Servs., Inc. v. M/V WILBUR R. CLARK*, 679 F. Supp. 2d 1308, 1318 (S.D. Ala. 2009) (quoting *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1230 (11th Cir. 2000)). The pre-split Fifth Circuit Court of Appeals stated that "the analogy rule serves primarily to determine where

rests the burden of proof." *TransMontaigne*, 679 F. Supp. 2d at 1318. In other words, "[w]hen a plaintiff files a claim in admiralty within the analogous [state] statutory period, the defendant must show inexcusable delay and resulting prejudice in order to establish a laches defense." *TransMontaigne*, 679 F. Supp. 2d at 1318 (quoting *Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209, 1215 (5th Cir. 1980)); *see also id.* (collecting cases).

Instead of barring Plaintiff's case, as Nikka argues, Section 6-9-258 of the *Alabama Code* (1975) only shifts the burden of proof of undue delay and unfair prejudice. [Arguably, the 5 years referred to in the statute is a clerical error since the Uniform Comment to the Section relies on and refers to the nation-wide time limit of 15 years.] However, the statute relates only to actions for recognition of foreign judgments, not enforcement of domestic judgments based on foreign judgments, as is the case here. Finally, regardless of which party bears the burden of proof, a review of the New York Action docket clearly establishes that there was no undue delay on d'Amico's part and Nikka mentions nothing in its motion about any undue prejudice it has suffered.

This enforcement action is timely.

## CONCLUSION

For all the foregoing reasons, Nikka's Motion for Summary Judgment must be denied.

*(s)  J. Ben Segarra*
Thomas S. Rue (RUETH8241)
J. Ben Segarra (SEGAJ6478)
Attorneys for Plaintiff, d'Amico Dry d.a.c.,
f/k/a d'Amico Dry Limited
11 North Water Street, Suite 24290
Mobile, Alabama 36602-5024
Telephone:   (251) 432-0001
Facsimile:    (251) 432-0007
E-mail:  *true@maynardcooper.com*
           *bsegarra@maynardcooper.com*

OF COUNSEL:
MAYNARD, COOPER & GALE, P.C.

*/s/  Thomas L. Tisdale*
Thomas L. Tisdale (Pro Hac Vice)
Attorney for Plaintiff, d/Amico Dry
d.a.c., f/k/a d'Amico Dry Limited
60 East 42nd Street, Suite 1638
New York, New York 10165
Telephone:   (212) 354-0025
Facsimile:    (212) 869-0067
E-mail:       ttisdale@tisdale-law.com

OF COUNSEL:
TISDALE LAW OFFICES, LLC

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on this 9th day of November, 2018, filed the foregoing pleading with the Clerk of the Court via the CM/ECF Filing System, which will automatically serve an electronic copy of same on all counsel of record.


*/s/ J. Ben Segarra*