THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
---------------------------------------------------------------x
d'AMICO DRY D.A.C. (f/k/a d'amico Dry Ltd.),      :
                                                  :
                        Plaintiff,                :
                                                  :  Civil Action:  1:18-cv-00284-KD-MU
             - against -                          :  IN ADMIRALTY
                                                  :
NIKKA FINANCE INC.,                               :
as owner of the SEA GLASS II,                     :
                                                  :
                        Defendants.               :
---------------------------------------------------------------x
```

### NIKKA FINANCE INC.'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW Nikka Finance Inc. [1] ("Nikka"), on behalf of the vessel M/V SEA GLASS II (the "Vessel"), as Defendant *in rem*, and respectfully submits this reply memorandum of law in further support of its motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (ECF 143) and in response to d'Amico Dry d.a.c.'s ("d'Amico") opposition filed on November 9, 2018 (ECF 153.)

### PRELIMINARY STATEMENT

d'Amico's opposition fails to advance a single piece of evidence or even an affidavit purporting to demonstrate that there are any genuine issues of material fact warranting a trial. On its face, D'Amico's opposition appears to raise "disputed facts." However, upon closer inspection, its arguments rely largely on erroneous and unpersuasive "facts" concerning companies who are not parties to this lawsuit. The Court should decline d'Amico's invitation to engage in an unnecessary analysis of extraneous matters relating to companies that are not parties to this

---

[1] Nikka Finance, Inc. continues its restricted appearance pursuant to Supplemental Rule E(8), Fed.R.Civ.P.

litigation because, as the Court has previously stated: "[t]he crux of the dispute between d'Amico and Defendant Nikka . . . is whether d'Amico can collect against Nikka, under an alter ego theory, on the $1,766,278.54 foreign judgment entered in favor of d'Amico and against Primera [Maritime (Hellas) Limited]." (ECF 40, at 1-2 (footnotes omitted)).[2] And, when all else fails, d'Amico resorts to the tired argument that Nikka failed to produce documents, which this Court and the Southern District of New York, have already considered and rejected. (ECF 136-4 at pp. 6-7 and ECF 141.)

What is not in dispute, is that the material facts presented in the documentary evidence and the Declarations, and the deposition and trial testimony of Paul Coronis both in this action and the Southern District of New York action, are uncontroverted, readily supporting Nikka's entitlement to summary judgment because d'Amico cannot meet its extraordinary burden of proving Nikka is the alter ego of Primera. In particular, there is no dispute that:

1. Nikka paid for and owns the Vessel.
2. The only common stock ownership between Primera and Nikka is a less than 9% interest held by Nicholas Coronis.
3. Paul Coronis was never a shareholder or employee of Primera.
4. Primera and Nikka had only one common director for a short period of time – Paul Coronis.
5. Primera managed Nikka's ship operational affairs for a few months between the fall of 2008 and the spring 2009 under a fully executed ship management agreement It did not manage its corporate and finance/borrowing affairs.
6. Nikka and Primera did not have consolidated financial statements and tax returns.
7. Nikka and Primera had different sources of revenue and different business models.
8. Nikka collateralized the Facility Agreement with a $500,000 cash deposit, which is held by HSH Bank in a retention account.
9. HSH Bank also has security in the earnings of the Vessel and the Vessel itself by way of first preferred mortgage.

---

[2] In the Clarifying Order dated October 19, 2018, the Court reiterated:

"The trial beginning November 26, 2018 **will concern only d'Amico Dry d.a.c.'s claim that Nikka Finance, Inc. is Primera Maritime (Hellas) Limited's alter ago**. Any and all remaining claims will be determined only after that issue is resolved."

(ECF 142)(emphasis added.)

10. Primera was not a Borrower but was the approved ship manager and corporate guarantor under the Facility Agreement.
11. Nikka's shareholders caused the incorporation of Nikka.
12. Primera and Nikka have always been legitimate separate legal entities with distinct assets and adequate capital.
13. Nikka paid its employees either directly to a manning agent, directly to the crew, or through the manager as part of its duties.
14. Primera had its own separate and distinct employees and submitted their details to the public authorities in Greece in accordance with Greek law.
15. Paul Coronis negotiated the purchase of the Vessel via third party brokers on behalf of the shareholders of Nikka.
16. Nikka observes all corporate formalities.
17. Primera's debt to d'Amico under the FFA became due January 30, 2009 – two months after Paul Coronis and Nicholas Coronis resigned from Primera in November 2008.[3]

Under United States law, "a corporate entity is liable for the acts of a separate, related entity only under *extraordinary* circumstances…." There is no genuine dispute that such extraordinary circumstances do not exist here. It is this simple premise that the Court should recognize, and therefore, grant Nikka's motion for summary judgment.

Finally, d'Amico does not dispute its English Judgment is dated June 19, 2009 and the pending action in this Court was filed on June 22, 2018, nearly **nine years** after the issuance of the English Judgment. It is undisputed that d'Amico has not obtained permission from an English court allowing it to enforce its Judgment outside of the six-year statute of limitations. Thus, d'Amico's claim is time-barred as against Nikka under Alabama and English law. For this reason alone, Nikka's motion should be granted.

## STATEMENT IN RESPONSE TO DISCOVERY ARGUMENTS

This Court should disregard d'Amico's hyperbolic arguments about the discovery produced in this case. (ECF 153.) Throughout this litigation, Nikka has steadfastly asserted that it has produced all responsive documents in its own records, from affiliated corporations, attorneys

---

[3] ECF 26-6 at p. 34.

and banks, and has provided Declarations affirming the steps it took to search for the responsive documents and explained why certain documents were unavailable. (ECF 136.) This Court considered this issue on multiple occasions and, most recently, on October 19, 2018, entered an Order denying d'Amico's motion to compel on the basis that:

> this Court simply cannot compel Nikka to produce that which it has represented by declaration, and under Rule 11, it does not have in its possession, custody or control. Nor will this Court require Nikka to produce additional specific evidence of efforts made to obtain these documents before Mr. Coronis' deposition on October 24, 2018. Instead, the undersigned chooses to believe the representations of the Defendant, and in particular defense counsel, that it does not have these documents in its custody, possession and control until given reason to doubt these representations.

(ECF 141 at 22.)  Pursuant to the Court's instructions in its October 19, 2018 Order, Paul Coronis fully answered to the best of his ability d'Amico's many detailed and repetitive questions about the searches for documents conducted in 2015 and 2018. (ECF 141 at 23.)

In sum, this Court has already determined that Nikka has fully complied with its discovery obligations in this case. d'Amico's salacious attempt to inflame this Court by rehashing unmerited discovery arguments should be ignored.

## REPLY TO d'AMICO'S COUNTERSTATEMENT OF MATERIAL FACTS

d'Amico does not dispute the material facts set forth in Nikka's Memorandum in Support of its Motion for Summary Judgment at paragraphs 1, 3, 6, 8-10, 12-15, 19-20, 22, 24, 26, 27, 29, 31, 33-36. (ECF 153.)

Pursuant to Federal Rule of Civil Procedure 56, Nikka does not dispute the material facts set forth in the following paragraphs in d'Amico's Counterstatement of Material Facts: 19, 21, 22, 25, 26, 27, 28, 29, 36, 49.

The remaining so-called factual matters set forth in d'Amico's counterstatement of facts fundamentally evidence its dogged and transparent efforts to litigate wholly irrelevant matters

4

surrounding companies that are not parties to this litigation – J.P.C. Investments S.A. a/k/a JPC Investments S.A., Bulknav, Inc., Primebulk Shipmanagement, Ltd., Astra Finance, Inc. and Comet Finance, Pasha Finance[4], Inc. and Movida Finance, Inc., Primrose Shipping, Ltd., and Seadance, Riverside Holdings Co. (ECF 153, ¶¶ 3, 5, 6, 7, 41 42, 51, 52, 53, 54, 58, 59, 60-63.)[5]  d'Amico does not confine its statement to factual matters. Instead, it injects legal and evidentiary characterizations, which are objectionable and refuted by the evidence. (ECF 153, ¶¶ 9, 11, 12, 13, 17, 18, 20, 23, 34, 35, 37, 38, 39, 40, 47, 48, 50, 55, 56.)  Other statements are merely impermissible legal argument dressed up as factual allegations (ECF 153, ¶¶ 24, 30, 32, 43, 51, 57.) The remaining contentions (ECF 153, ¶¶ 8, 14, 15, 16) are wholly irrelevant to this action.

---

[4] Adopting the same arguments, on January 9, 2015, d'Amico commenced a Rule B action against Pasha Finance Inc – the Owners of the Cape Talara – in the Southern district of Texas. There, d'Amico made the same arguments against Pasha that it makes against Nikka here. In particular, d'Amico alleged Pasha Finance was an alter ego of Primera based on a "commonality of shareholders and directors" and that the May 2008 Facility Agreement, referred to in the Verified Complaint here, established a sufficient connection between Primera and Pasha Finance. d'Amico also alleged that Primera tried to avoid its debts by diverting assets to unrelated companies, such as Primrose. Judge Ellison flatly rejected d'Amico's argument that overlapping officers and directors established an alter ego relationship and was similarly uninterested in reviewing allegations concerning companies not party to the lawsuit, such as Primrose or Primebulk. At bottom, the Court dismissed the Complaint on the basis that d'Amico failed to meet its burden of showing an alter ego relationship between Primera and Pasha because there was no evidence of any assets being transferred to Pasha. *D'Amico Dry. Ltd. v. Pasha Finance, Inc., as owners of the M/T CAPE TALARA* USDC-SDTX Civ. No. 4:15-cv-00039.

[5] These unrelated companies are not parties to this action so Nikka will not specifically address the insufficiency of the allegations here. To the extent the Court wishes to review the evidence refuting these allegations, Nikka requests the opportunity to do so in a supplemental submission.

## ARGUMENT

I.   **NIKKA'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED**

1.   **d'Amico Cannot Demonstrate There Are Genuine Issues in Dispute, Let Alone Meet its Burden of Proving by a Preponderance of the Evidence that Nikka is the Alter Ego of Primera**

A.   **Nikka is the owner of the Vessel**

d'Amico claims that "Primera is ***likely*** the purchaser under the MOA and the party making the $5.25 million deposit" (ECF 153 at 10) (emphasis added.) d'Amico's position is incorrect and contrary to the applicable law and the facts of this case.

First, d'Amico's conclusory assumption does not make this statement true. Indeed, assuming a fact is "*likely*," without a citation to any evidence, does not raise a genuine issue in dispute sufficient to defeat summary judgment. To the contrary, there is no evidence to support this statement.

Second, Paul Coronis clearly and unequivocally testified that (1) he asked Mr. Bairactaris for a copy of the MOA and was told he did not have it. Mr. Bairactaris confirmed this fact with a sworn declaration (ECF 136-2); (2) he asked HSH Bank for a copy of the MOA and was told they did not have a copy but would search their records and if it was located they would contact him; (3) Nikka's shareholders paid the deposit for the Vessel ("The bottom line is that the shareholders paid for the 10 percent."); and (4) he does not know which company was listed as the purchaser under the MOA but the evidence is clear that Nikka owns the Vessel and was the Buyer under the MOA. (ECF 143-3 at pp. 8, 13, 17, 22; ECF 151-4 at pp. 76-79; Tr. 297:20-307:11.).

Third, the documentary evidence shows Nikka, not Primera, was the undisputed owner and Buyer of the Vessel as evidenced by the following:

6

a. On October 21, 2008, JBU Loggers Pte Ltd. remitted Commercial Invoice to Nikka Finance Inc. in the amount of $37,500,000 for the purchase of the Vessel. (ECF 143-6);

b. On October 21, 2008, a swift from HSH Nordbank confirmed Nikka paid USD32,075,000 to JBU Loggers Pte Ltd. for Hull NK0002. (ECF 143-7);

c. On October 21, 2008, the Protocol of Delivery and Acceptance and the Bill of Sale confirmed JBU Loggers Pte. Ltd. sold and delivered the Vessel to Nikka. (ECF 143-8);

d. Nikka was invoiced and paid tonnage tax to the Marshall Islands for the Vessel for the periods of January 1, 2010 to December 31, 2010 and January 1, 2011 to December 31, 2011. (ECF 143-17);

e. Nikka insured and classed the Vessel. (ECF 143-18; ECF 143-19); and

f. The Facility Agreement defines MOA to mean *"...a memorandum of agreement dated 10 July 2007 and an addendum no. 1 dated 5 September 2007 **made between the MOA seller and Borrower F**, pursuant to which MOA Seller agreed to sell and Borrower F agreed to purchase the First MOA ship..."* Borrower F is defined under the Facilities Agreement as Nikka Finance Inc. and MOA seller is defined as JBU Loggers Pte.  Therefore, it is clear that the Buyer under the MOA was Nikka Finance Inc. and the seller was JBU Loggers Pte. (ECF 143-3 at pp. 8, 17).

In sum, d'Amico has in no way demonstrated the existence of any "genuine issue necessary to be litigated." To the contrary, d'Amico cannot dispute that the shareholders of Nikka paid the deposit to purchase the Vessel and Nikka is the owner and the Buyer under the MOA as defined in the Facilities Agreement. Thus, d'Amico's argument that Primera "*likely*" purchased the Vessel and has a proprietary interest in it is without merit, contrary to the documentary evidence, and must be denied.

### B.  There is no Evidence That Primera and Nikka are Alter Egos

### 1.  Nikka Has Not Committed Any Fraud

d'Amico's opposition continues to make the same false and conclusory allegations, without support, that it made in its Complaint. (ECF 153 at 27-30.) The entire basis for d'Amico's fraud allegation is that the Coronis family diverted assets from Primera to other Coronis controlled companies. But the evidence d'Amico cites to in order to prove these so called "fraudulent schemes" involve three companies that are not parties to this action: (1) Seadance Maritime; (2) JPC Investments; and (3) Primebulk. (ECF 153 at 28-30.) Critically, after nine years of discovery in the SDNY action and an additional several months of discovery in this action, d'Amico cannot cite to one single piece of evidence proving these alleged fraudulent diversion schemes occurred at all or benefited Nikka in any way.

As noted in Nikka's main brief, at the Rule E(4) hearing, this Court correctly determined "there has been no evidence that either of these alleged diversion schemes benefited Nikka or that monies were diverted directly or indirectly to Nikka." (ECF 40, at 13-14) and "there is no evidence implicating Nikka in this alleged scheme." The same is true today.

From the foregoing, it is clear that d'Amico resorts to providing this Court with false and unsupported facts about irrelevant companies that are not parties to this lawsuit because it cannot demonstrate any genuine issue of fact showing fraudulent transfers from Primera to Nikka.

### 2.  There Is No Evidence That Primera Ever Dominated and Controlled Nikka

i.  <u>Common stock ownership</u>

It is undisputed that the only common stock ownership between Primera and Nikka is a less than 9% interest held by Nicholas Coronis. There is no genuine issue of fact refuting this conclusion.

d'Amico's claim that Nikka failed to produce Primera's records is belied by this Court's October 19, 2018 Order which held Nikka met its discovery obligations in this case. (ECF 141.) The same conclusion was reached by the Southern District of New York.[6] d'Amico's attempt to argue otherwise has no merit and must be denied.

d'Amico argues "Paul Coronis held himself out to the world on electronic media as "Owner" of Primera. (ECF 153 at 35.) Yet, Paul Coronis repeatedly testified he was never a shareholder of Primera. (November 12, 2015 Tr. 38:4-22.) Mr. Coronis further testified that he does not recall creating a LinkedIn profile and does not use LinkedIn but nevertheless, he would not describe himself as the "owner" of Primera because he was not an owner. In fact, Paul Coronis testified would never use the term "owner" to describe himself. Mr. Coronis further agreed to authorize d'Amico's counsel to access his LinkedIn history to determine who changed his profile. (ECF 151-4 at pp. 40-41; Tr. 152:23-154:21.) In any event, the fact that Paul Coronis's alleged LinkedIn profile uses the word "owner" is not evidence of his actual ownership status in Primera. To the contrary, the evidence establishes the shareholders of Primera included Nicholas Coronis, Eleftherios Atherinos, and Mr. Gregorias. (ECF 1, at ¶ 47;[7] ECF 151-4 at p. 39; Tr. 149:8-16.).

---

[6] During a discovery hearing held on October 20, 2015 in the New York Action, Judge Koeltl addressed the issue of spoliation, stating:

> Your chronology is actually helpful to me because it reflects the fact that your clients did come into the case later. So any issues of spoliation would not really be an issue with respect to documents going back to 08' or 09'.

(ECF 136-4 at pp. 6-7.)

[7] Contrary to d'Amico's mischaracterization of Mr. Atherinos's and Mr. Gregorias's role as shareholders in the Verified Complaint, there is no evidence establishing Mr. Atherinos was a minority shareholder nor evidence establishing Nicholas Coronis was managing director. Instead, Nicholas Coronis was an ex-superintendent (ECF 13-3 at p. 67; Tr. 172:14-18) and the general manager (ECF 13-3 at p. 67; Tr. 172:11-13) involved in technical issues while Mr. Atherinos was

In contrast, at the time of Nikka's incorporation, five bearer shares Nos. 1 through 5 were issued. On September 25, 2008, Bulknav, a holding company, became the holder of 100% of the shares of Nikka. (ECF 143-5.)  Bulknav has five shareholders, one being a company called Shelly Ventures, which owns seventy percent (70%) of Bulknav. Shelly Ventures is owned by Paul Coronis, his siblings Jonathon Coronis and Chiana Coronis, Paul's parents Nicholas Coronis and Annabel Charlton a/k/a Annabel Coronis and Paul's grandmother, Anastasia Kalogirou. (ECF 13-2 at 332:16-19, 339:12-14; ECF 151-4 at p. 12; Tr. 38:4-39:23.) The remaining thirty percent of Bulknav's shares are owned by four separate and unrelated shareholders. (*Id*.) The five bearer shares were canceled when Bulknav became the sole owner of Nikka. (*Id*.)

The only common stock ownership between Primera and Nikka is a <u>less than 9% interest</u> held by Nicholas Coronis.  As this Court previously found in its July 5, 2018 Order, ECF 40 at pp. 14-15, this is not sufficient to establish the complete control justifying an alter ego finding.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

ii.   <u>Common directors or officers</u>

It is undisputed that Paul Coronis, Nicholas Coronis, Mr. Gregorias and Mr. Therinos served as the directors of Primera. (ECF 151-4 at p. 19; Tr. 69:19-24; ECF 13-2, at ¶¶ 26-27).) It also is undisputed that Paul Coronis was never an employee or officer of Primera. (ECF 151-4 at p. 19; Tr. 69:13-15.) Nicholas Coronis also served as the Greek Law 89 company representative

---

the person who gave authority for the FFA. (ECF 13-3 at p. 124; Tr. 314:22-315:1). Mr. Atherinos was not a mere silent partner as misstated by Plaintiff; rather, "he was more involved. He had taken an interest in Shipmanagement because he had a lot of contacts with grain silos in the Middle East" and "he was very much involved in any major decisions that Primera would do or take." (ECF 13-3 at p. 68; Tr. 179:15-181:17.)

of Primera from 1990 to 2008, and as General Manager, President, Treasurer and Secretary of Primera. (ECF 1-10, at 22; ECF 13-2, at ¶ 25.)

Paul Coronis was the sole director and officer of Nikka from the date of its incorporation until October 16, 2009. (ECF 143-16.)  On October 15, 2009, the Resolutions of the Board of Directors of Nikka appointed Mr. Niccolo Benvenuti as President/Director and Mr. George Papadopoulos as Secretary-Treasurer/Director. (ECF 143-15.)

The fact that Primera and Nikka had only one common director – Paul Coronis – and nothing more is not sufficient to establish the complete control justifying an alter ego finding. Although Paul Coronis was Nikka's sole director for a short period of time, the evidence is clear that all shareholders had a say in all decisions relating to the vessels. (Doc. 13-3 at 67; Tr. 175: 1-6).

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

iii.   Common business departments/common office space

In 2009, Primera managed Nikka's vessels under an executed ship management agreement, which is common in the shipping industry. (ECF 1-11.) Under the ship management agreement, Primera managed the Vessel's expenses and records of Nikka as part of its duties. (*Id.*) As d'Amico contends, the fact that "mail, faxes and phone calls were made from or to Primera" and "notices from HSH were sent to Nikka c/o Primera," and Primera "hired and fired the officers and crew, negotiated their pay and wages, supervised their efficiency and arranged crew training" (ECF 153 at 37) all legitimately fall within the duties required of Primera under the ship management contract and the third-party crew manning agents and is universal ship management industry practice.

Thus, as the Court noted in its July 5, 2018 Order, the fact that Primera managed Nikka's affairs from Primera's office does not support d'Amico's alter ego theory.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

iv.   <u>Consolidated financial statements</u>

Primera maintained and produced its own Profit and Loss Statements. (ECF 1-7.)

Nikka maintained and produced in this litigation all of its Annual Reports & Accounts for the relevant time period. (ECF 143-13; ECF 143-14.) And, Paul Coronis testified that Nikka met its obligations under the Facilities Agreement and provided HSH Bank with anything it requested. (ECF 151-4 at pp. 64-65; Tr. 248:21- 253:10.) Further, HSH Bank confirmed in a letter dated September 17, 2018 that it did not receive and/or retain audited statements for Nikka. (ECF 136-3.)

d'Amico incorrectly claims Paul Coronis's testimony concerning Nikka's provision of its financial statements to HSH Bank was inconsistent (ECF 153 at 38), but its incomplete citation to Paul Coronis's testimony on this topic is disingenuous and self-serving. Paul Coronis's complete testimony is as follows:

> Q. You agreed to provide audited financial statements for Nikka Finance commencing on December 31, 2007; correct?
>
> A. It ends by saying "after each request by the documentary agent." As I said, the documentary agent requested what it requested and was happy with what it received.
>
> Q. If the documentary agent had asked for it, you would have had to produce --
>
> A. Correct.
>
> Q. -- a consolidated financial statement as of --

A. I would have produced anything they requested.

Q. Right. Next paragraph requires you to provide an audited financial statement for the group. Audited combined accounts of the group for that financial year; correct?

A. Yes.

Q. So had they asked for it, you would have had to produce –

A. I would have asked the manager to produce it, correct.

Q. You would have asked the manager to produce an audited financial statement for the -- for the group for that financial year; correct?

A. Yes, I would have asked an external accountant to decipher what that meant and produce it, correct.

Q. Okay. And the group included Nikka and Primera; correct?

A. We would have provided -- we would have asked the manager to provide its financial statements and Nikka would have provided audited financial statements.

Q. You would have provided one single combined statement on behalf of the entire group; correct?

**A. No, we would not. We would have provided a financial statement for the group -- for the manager and for the -- it's impossible to provide a combined financial statement for the manager and Nikka Finance. So we would have not.**

Q. You said here you would?

**A. No, I said what I would do is I would provide them with audited financial statements for Nikka Finance or the other borrowers on a combined basis or on a single basis, and I would have provided them with -- I would have asked the manager to provide its financial statements. Up to now -- up to now, Mr. Tisdale, ten years, that has never been requested. Why would I provide something that has not been requested?**

Q. Well, I don't know --

13

A. And when I say why, I mean why would the borrowers spend the money to provide something that has not been requested?

Q. I don't know what's been requested and not been already testified that there's no such thing.

A. There's no such thing and it's impossible to provide such a thing. It's a mis- -- mis- -- misly -- mis- -- misly written clause.

Q. And if you go to point 16.7, those financial statements are to be prepared in accordance with all applicable GAAP; correct?

A. Correct, or I'm -- I understand they would have accepted IFRS because it's basically the same thing.

Q. And, by the way, when we talk in that – in paragraph (c) about the combined accounts of the group, that –

A. If you look at 16.7, another request: "Give a true and fair view of the state of affairs of each borrower, the corporate guarantor or, as the case may be, the group at the date of these accounts." [Quote unchecked against original.] Since the case is not, as the case may be, the group, we would have provided the state of affairs of each borrower. We would have requested the corporate guarantor to provide it, and that would -- that would have completed the request under that clause.

Q. But it doesn't satisfy 16.6?

A. Well, you see, if it didn't -- if it meant that the group was – it's contradicting 17.6 because it then goes on to say: "Fully disclose or provide all significant liabilities of each borrower, the corporate guarantor, or, as the case may be, the group." [Quote unchecked against original.] Since the case is not that, and they would have not included the words "as the case may be" if they considered that as a group, they -- they allow the option to provide that separately.

(ECF 151-4 at pp. 64-65; Tr. 248:21 – 253:10) (emphasis added.)

d'Amico claims that "[i]t is clear Nikka and Primera issued consolidated financial statements for 2008-2011." (ECF 153 at 38.) Yet, as noted above, this is incorrect. Paul Coronis testified that it is impossible to provide a combined financial statement for the manager [Primera] and Nikka Finance and, thus, if HSH requested it – which it did not – Nikka would have provided

14

a financial statement for the group and a separate statement for Primera. (ECF 151-4 at p. 64-65; Tr. 249:3-250:20.). This is also evidenced by the letter from HSH Nordbank, which provides:

> Nikka Finance Inc. is a client of our Bank on a depository, operational and lending basis since 2008.
>
> The cooperation has been conducted to our entire satisfaction. During this period we have not received and do not retain independent audited Financial Statements for Nikka Finance Inc.

(ECF 136-3.)

There is no genuine issue as to any material fact concerning this element as d'Amico has not – and cannot – present any evidence showing Nikka and Primera have consolidated financial statements and tax returns.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

v.   <u>One finances the other</u>

Nikka's business is the lease and charter of the Vessel to third party charterers. (ECF 143-12.)  Contrary to d'Amico's assertion, (ECF 153 at 39), Primera did not have "one source of revenue" (ECF 153 at 39), but instead had multiple sources of income, including vessel management, survey and vetting inspections of vessels on behalf of potential purchasers, shipbuilding supervision, project evaluation and feasibility studies, sale and purchase brokerage services and execution of FFA contracts. (ECF 13-3 at 74; Tr. 203: 14-16; 19-21 and Tr. 75: 6-8; 16-22.)

Further, the following facts are undisputed:

1.   On May 21, 2008, and as amended over the years, a $204 million Facility Agreement was executed between HSH Nordbank and various "Joint and Several Borrowers." (ECF 143-3.)

2.  The Borrowers under the Facility Agreement were several ship owning entities, including Nikka. (ECF 143-3 at p. 8.)

3.  The Facility Agreement was collateralized by, among other assets, cash deposits made by the Borrowers, and by each new ship that was built.  (ECF 143-3; ECF 13-3, at 336:3-18; ECF 13-2, at ¶ 44; Ex. D; ECF 151-4 at pp. 56-57; Tr. 217:25-221:10.)

4.  "MOA Borrower" means each of Borrower F and Borrower G (ECF 143-3 at p. 17)(emphasis added.)

5.  "Borrower F" under the Facility Agreement is Nikka (ECF 143-3 at p. 8)

6.  MOA Ship means each of the First MOA Ship and the Second MOA Ship. (ECF 143-3 at pp. 13, 22.)

7.  Paul Coronis testified he did not draft or negotiate the Facility Agreement nor did he approve it on behalf of the joint and several borrowers. (ECF 13-3 at p. 69; Tr. 182:16-25.)

8.  Primera was not a Borrower but was the Approved Manager and Corporate Guarantor. (ECF 143-3 at pp. 6, 9.)

d'Amico again cites to Primera's guarantee of the Facilities Agreement as proof that Primera "agreed to guarantee Nikka's joint and several $204 million debt with no right of recourse and for no consideration." (ECF 153 at 39.) But that is not so. And, in any event, as this Court noted in its July 5, 2018 Opinion, and the Court in *Flame S.A. v. M/V LYNX*, 2010 WL 11571118, *11 (E.D. Tex. Aug. 6, 2010), noted in its August 6, 2010 Opinion, Primera's guarantee is not evidence of an alter ego finding:

> These facts suggest that, while Primera might have had to pay off on its guarantee, that did not become necessary. There is no evidence that Primera advanced funds to Camela to finance the purchase of the Lynx or its ongoing operations. There is no indication that Primera made any of the payments on the HSH Nordbank loan. The court finds that this factor does not weigh in favor of an alter ego finding.

Similarly, the Court in *D'Amico Dry. Ltd. v. Pasha Finance, Inc., as owners of the M/T*

*CAPE TALARA* USDC-SDTX Civ. No. 4:15-cv-00039 noted:

> THE COURT: Well, Mr. Tisdale, with the utmost respect, I don't
> think I even have superficial indicia. The fact that there were
> overlapping officers and directors means nothing. I mean, that's true
> in every bank, every sophisticated corporation, every limited
> partnership. That's just the way things are done. Now, the fact that
> there was some cross-collateralization or cross-guaranteeing, that
> might get there, but that would be -- what I need to see, then, would
> be that Pasha was stepping forward to collateralize or guarantee
> some of Primera's debts, because that would suggest -- there would
> be no reason to do that except that Pasha and Primera were linked
> financially. They would otherwise have no reason to guarantee
> another party's debts, anymore than I would have reason to
> guarantee somebody else's debts. But I haven't heard even that
> much. And that would not be dispositive, but that would be some
> evidence. I mean, it could be that Primera and Pasha cross-
> collateralized each other's debts, which, you know, under some
> states, that a fraudulent conveyance and some states it's not.

(ECF 13-1 at p. 44:11-45:4.)

Despite d'Amico's conclusory mischaracterizations, it presents no evidence that Primera's

guarantee was "provided without consideration and without any indemnity agreement." (ECF 153

at 39.) d'Amico has also not provided any evidence that any assets of Primera were used to finance

any ship owner entity, much less Nikka. Nor is there evidence that Nikka or Primera was

subsidized in any of these alleged transfers of money.

To the contrary, it is undisputed that (1) Nikka and Primera had different sources of

revenue; (2) Nikka collateralized the Facility Agreement with a $500,000 cash deposit, which is

held by HSH Bank in a retention account; (3) HSH Bank also has security in the earnings of the

vessels; (4) Primera was not a Borrower but was the ship manager and a corporate guarantor under

the Agreement; (5) and Nikka was subjected to numerous finance covenants under the Facility

Agreement and Primera was not.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

vi.   <u>One caused the incorporation of the other</u>

It is undisputed that Primera was incorporated in Liberia on June 22, 1990. (ECF 13-2 at ¶ 2.)

Nikka's shareholders requested its incorporation in the Marshall Islands on September 5, 2007, well before the economic crash of 2008 and the liquidation of Primera in 2009. (ECF 143-1; Tr. 161:9-21.) Nikka was incorporated in the Marshall Islands on September 5, 2007. (ECF 143-1.) At the time of Nikka's incorporation, five bearer shares Nos. 1 through 5 were issued. On September 25, 2008, Bulknav, a holding company, became the holder of 100% of the shares of Nikka. (ECF 143-5.)  Bulknav had five shareholders, including members of the Coronis family, who in total own seventy percent (70%) of Bulknav via a company called Shelly Ventures. (ECF 13-2 at 332:16-19, 339:12-14.) The remaining thirty percent of Bulknav's shares are owned by four separate and unrelated shareholders. (ECF 13-2 at 332:20-25, 333:1.) The five bearer shares were canceled when Bulknav became the sole owner of Nikka. Bulknav's shareholders were the former bearers of shares Nos. 1 through 5, which included Coronis family members, and four other parties. (ECF 13-3, at 73, ECF 151-4 at pp. 51-52; Tr. 197:2-25; 198:2-11.)

The fact that Paul Coronis served as one of the Directors of Primera when Nikka was incorporated by its shareholders does not establish that Nikka is the alter ego of Primera.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

vii.   <u>One operates with grossly inadequate capital</u>

Primera and Nikka have always been legitimate separate legal entities with distinct assets and adequate capital.

It is undisputed that Nikka has always been adequately capitalized by shareholder contributions and independent bank loans, charter revenue, and is an ongoing corporate entity that has not dissolved nor filed bankruptcy. (ECF 143-12.) This is further supported by the September 17, 2018 letter from HSH Nordbank, which confirms that the lending relationship between Nikka and HSH Bank has always been conducted to the entire satisfaction of the bank. (ECF 136-3.)

At the time Primera and d'Amico entered into the FFA in 2008, Primera was not undercapitalized, as d'Amico incorrectly contends, (ECF 153 at 40) because it had opposite positions with other FFA counterparties and therefore was due to receive considerable sums. (ECF 151-4 at pp. 37-38; Tr.141:11-144:3.) Unfortunately, as Paul Coronis testified, those counterparties defaulted on their FFAs and did not pay Primera.  However, but for the defaults, Primera would have paid d'Amico. (*Id.*) With the downturn of the FFA market and the counterparties' defaults, Primera was forced into liquidation in late 2009. (*Id.*) Thus, while it is correct that Primera was liquidated in 2009, d'Amico has not provided any evidence that Nikka was either the cause of the liquidation or benefited from it.  In fact, the evidence is clear that the cause of Primera's liquidation was due to considerable FFA defaults against Primera.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

viii.    <u>One pays the salaries and other expenses of the other</u>

Under Greek law, all ship management companies such as Primera must declare their employees.  (ECF 151-4 at p. 51; Tr. 197:14-25.) The evidence establishes that none of Primera's employees are employees of Nikka. (*Id*; ECF 1-10.). If Nikka's employees were also employees of Primera – which they are not – they would have appeared as employees on public filings with the Greek state.

Nikka employed the crew on the Vessel. (ECF 32, at 11.) It is undisputed that the executed management agreement between Nikka and Primera called for Primera, as the ship management company, to "procure and/or terminate the services of…Master, Mariners, Officers, Engineers….and other necessary persons as the Manager may think proper and negotiate and pay their fees and/or wages[.]" (ECF 1-11, at 2 ¶ 2(2).)

Tellingly, since d'Amico cannot cite to any evidence to establish this factor, it reverts to its tired argument that "Nikka failed to produce such evidence despite specific requests to that effect and a Court Order from Magistrate Judge Murray." (ECF 153 at 41.)  This argument fails for two reasons. First, this Court's October 19, 2018 Order held Nikka met its discovery obligations in this case. (ECF 141.)  Second, Nikka did, in fact, produce bank records showing direct payments to the crew and manning agents (CONFIDENTIAL NIKKA01049 - 1207) and Paul Coronis testified that Nikka paid its employees either directly to a manning agent, directly to the crew, or through the manager as part of its duties. In particular, Mr. Coronis testified:

> Q. In your usual -- in the operation of this management agreement
> with Primera, there would be a budget prepared?
>
> A. There would be a budget prepared, yes.

Q. And part of that budget would include paying the crew -- would be the crew wages?

A. Part of the -- part of the operating expenses would be the crew wages, yes.

Q. Okay.  And Nikka would then provide funds based upon the budget to Primera; correct?

A. Yes.

Q. And then Primera would then pay those wages to the crew or to the manning agent; correct?

A. Correct.

Q. And when it came to --

A. But -- but the Ukrainian crew didn't want it to go through the management. They would -- they would on occasion be paid directly by -- by either the manager or the owning company.

Q. Well, as you sit here today, do you have any evidence of Nikka paying directly any crew members?

A. Yes.  I have the evidence that there are payments from the bank accounts to crew members. Number 1. I have evidence that the audited financial statements encompassed the crew costs, so they have been included in that by the preparer. And, thirdly, I have evidence from the fact that if Primera was paying the crew and had employees who were the crew, they would be listed as employees under the official document which needs to be filed with the Greek authorities saying who your employees are. So it's impossible by definition for Primera to be paying any employee without declaring it – without declaring it to -- to the Greek authorities as their employees. So they would be -- if they were paying, they would be paying on behalf of -- of the owning company. So the employees are clearly Nikka's.

(ECF 151-4 at p. 51; Tr. 196:12-197:25.)

Thus, it is undisputed that Nikka's crew was paid either directly or through a manning agent. And, to the extent Primera paid Nikka's crew, it did so as part of its duties under the executed ship management agreement which is common industry practice.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

ix.   The subsidiary receives no business except that given to it by the parent.

As noted in Section 5, *supra*, it is undisputed that Primera and Nikka had different sources of revenue. Further, Primera is a ship manager and was not the parent of Nikka.

Nikka's business proceeds are derived solely from companies that charter the Vessel. (ECF 143-12.) In contrast, Primera had multiple sources of income, including vessel management, survey and vetting inspections of vessels on behalf of potential purchasers, shipbuilding supervision, project evaluation and feasibility studies, sale and purchase commissions, chartering commissions and execution of numerous FFA contracts with entities such as d'Amico, TMT, Charbons, FLAME and ICI. (ECF 1-14; 13-3 at 74; Tr. 203: 14-16; 19-21 and Tr. 75: 6-8; 16-22; ECF 151-4 at p. 38; Tr. 142:4-144:3.) This was not business generated by Nikka. While some of Primera's ship management services involved the Vessel, Primera was a ship manager and it derived its business proceeds from the fees it earned under separate ship management contracts with unrelated owners and prospective owners from Hong Kong, Denmark and the Middle East. (ECF 13, at ¶ 35.).

In any event, the correct test is whether Nikka received no business except that given to it by Primera and not vice versa. d'Amico does not – and cannot – cite to any evidence establishing this element vis-à-vis Primera and Nikka, so it again cites to alleged "evidence" related to wholly irrelevant matters surrounding companies that are not parties to this litigation.  (ECF 153 at 42.) d'Amico's citation to irrelevant "facts" does not advance its argument.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

x.    One uses the other's property as its own

d'Amico mischaracterizes Paul Coronis's role in the purchase of the Vessel. (ECF 153 at 42-43.) Paul Coronis testified that he, together with Mr. Bairactaris, negotiated the purchase of the Vessel on behalf of the shareholders of Nikka. This was done via third party shipbrokers. He also sought the advice of various Primera employees, including in the chartering and technical departments, because Primera was going to be the Vessel's manager under the ship management agreement and the Vessel had to be technically and operationally vetted to be acceptable to enter into service. It is common practice in the shipping industry to enter into a charter party prior to delivery in order to ensure the vessel can start making money as soon as possible. In particular, Mr. Coronis testified:

> A. The involvement was -- my involvement with the purchase of the Seaglass was receiving it from off-record contacts with brokers; discussing it with the shareholders; discussing it with the technical department in terms of its technical specification; discussing it with Mr. Benzonana in terms of his chartering ability and potential rates; running cash flows and projected income for the vessel; discussing it with the other shareholders; receiving their approval to proceed and negotiate the acquisition of it, together with the brokers; and once an agreement in principle had been reached, providing instructions to Mr. Bairactaris to conclude the MOA.
>
> Q. When -- and did you do that in your capacity as director of Primera?
>
> A. Which part?
>
> Q. Any part.
>
> A. Well, the -- the -- the part about negotiating the vessel, yes. The part about discussing it with the shareholders was in my capacity as a – as a shareholder -- as a potential shareholder with my fellow shareholders.

23

Q. Okay. So the negotiations you were doing in your capacity as a Primera director. You were also seeking the advice of the Primera chartering manager and technical manager regarding the -- the vessel itself and its chartering ability?

A. Yeah, the specification, the maker's list, the yard where it was being built, that kind of things. Vetting it.

Q. Right. And you've shown us an affidavit from Mr. Bairactaris where he says that he was the attorney involved in those negotiations; correct?

A. Yes.

Q. Okay. And you were the person to whom he was reporting directly?

A. He would be reporting generally to – to Primera, not to me directly. So he would be reporting to -- depending on what issues, he would be reporting to the technical, to the main sort of -- the whole company almost, the main system, not just me directly.

(ECF 151-4 at p. 71; Tr. 274:13-276:3.)

d'Amico incorrectly contends that Paul Coronis's offer to investigate a guarantee was from Nikka and quotes him as follows: "most probably would have been the ships we mentioned yesterday, i.e., the SEAGLASS II, the MOONDANCE II and the SUNRAY, from memory." (ECF 153 at 43 citing ECF 153-6, 270:2-271:22.) First, the plain language of Mr. Coronis's email states, in relevant part, as follows:

Without Prejudice

Dear Sirs,

Further to our last and in order to provide you with further comfort and of course subject to you accepting our installment proposal *we are willing to seek to obtain and provide you with a guarantee from a vessel owning company managed by Primera*.

(ECF 1-22 at 4.) Contrary to d'Amico's contention, the clear language of Paul Coronis's email shows his offer to investigate a guarantee was not from Nikka.

24

Second, d'Amico omits the full citation and altered Mr. Coronis's testimony. In context, Mr. Coronis was discussing which vessels Primera was managing at the time he was having a discussion with d'Amico about offering to investigation a guarantee.

The full quotation from which Mr. Coronis's citation was taken is as follows:

> Q. When you came to the conclusion that there was a conflict of interest, and you could not get it, you could not get the guarantee from the shipowning companies, Primera was managing what ships?
>
> A. I don't remember at that point in time when that happened.
>
> Q. Those were the same ships, though, that were owned either by Bulknav, or by what we called yesterday the Bulknav shareholders, perhaps in a different capacity?
>
> A. They would have most probably been the ships that we mentioned yesterday; i.e., the SEAGLASS, the MOONDANCE II, and the SUNRAY, from memory.

(ECF 151-4 at p. 70; Tr. 270:22-271:12.)  d'Amico's partial citation does not advance its argument.

Mr. Coronis further testified about this topic at trial. In particular, the trial transcript provides further clarity:

> Q. Okay. By the way, you had offered to provide d'Amico Dry with – **to investigate** whether you could provide them with a shipowner guaranty, correct?
>
> A. What I did was -- and **not to put words out of context** --was -- and we get to look at the email I sent -- I was trying to reach any type of solution with them in order to avoid the situation we are in today, and that -- an idea that I had on my own, without getting any approval at that stage, was that perhaps some sort of guaranty of an asset would assist with their acceptance in a proposed payment plan. In fact, this was something that their lawyers, Ince & Co., who was in constant communication with me on this issue, thought was quite reasonable. However, what happened was that d'Amico did not accept it, at least at that stage, and I also replied to them afterwards, **when I did check with the board and**

> **with the shareholders of the other company, that there would be too much of a conflict of interest and it wouldn't be acceptable, given the fact that the shareholders were completely different**.

(ECF 13-3, at 77: Tr. 213: 13-214: 5.)

> Q. So that there was no conversation about conflict of interest. It was rejected by d'Amico Dry and there is no correspondence that you can point to which talks about this guaranty not being provided because of some conflict of interest, correct?
>
> A. What happened was, I believe, after a certain point in time, their lawyer contacted me and said, you know, perhaps we're willing to consider it, and at that point in time there was an official discussion with the shareholders of the – of one company which I discussed it with, being ***Moondance Maritime Enterprises*** and also with legal advice, and it was – the position was that there was too much conflict of interest.

(ECF 13-3, at 77: Tr. 215: 10-21.)

The evidence is clear: Paul Coronis had to seek authority from the shareholders of non-party Moondance Maritime in order to offer the guarantee, which was denied, and clearly shows he, in fact, exercised no control over the vessel-owning company.

Finally, as the Court acknowledged, however, this alleged "offer" **is not specific to Nikka** (ECF 40, at 20) and, thus, does not establish Primera uses Nikka's property as its own.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

xi.   Daily operations of the two corporations are not kept separate

It is undisputed that Primera managed Nikka's vessel under an executed ship management agreement, which is common in the shipping industry. (ECF 1-11.) Under the ship management agreement, and as is common in the industry, Primera managed the vessel expense accounts and

records of Nikka as part of its duties. (*Id.*) As d'Amico contends, the fact that Primera communicated and made payments on behalf of Nikka to operate and maintain the vessel (ECF 153 at 44) falls within the duties required of Primera under the ship management contract and is expected by the bank and the Vessel's charterers.

Obviously dissatisfied with its lack of evidence, d'Amico again resorts to its tired argument that Nikka failed to produce documents, which this court has already considered and rejected. (ECF 141.) The fact that Primera managed part of Nikka's affairs from Primera's office does not support d'Amico's alter ego theory.

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

xii.  One does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings

It is undisputed that d'Amico has not presented any evidence regarding Primera's adherence to the corporate form. In contrast, Nikka Finance observed all corporate formalities, including but not limited to, documenting:

a.  Incorporation and good standing (ECF 143-1);

b.  Remaining current with its numerous financial and borrowing covenants. (ECF 136-3; ECF 151-4 at pp. 64-65; Tr. 248:21- 253:10);

c.  Purchase and delivery of the Vessel (ECF 143-6; 143-7; ECF 143-8);

d.  Election of directors and took minutes of its board of director meetings (ECF 143-15; ECF 143-16);

e.  Annual Report & Accounts showing profits and losses and main operational matters (ECF 143-13; ECF 143-14);

f.  Paid tonnage tax for the Vessel (ECF 143-17); and

g.  Insured and classed the Vessel (ECF 143-18; ECF 143-19.)

Further, Paul Coronis testified Nikka did not have bylaws, as they are not required under Marshall Islands law (ECF 151-4 at p. 46; Tr. 175:2-13) and Marshall Islands law permits Nikka's minutes to be included in Bulknav's board of director minutes since Bulknav is the owner of Nikka (ECF 151-4 at p. 35; Tr. 130:19-131:23). Nikka is in full compliance with the corporate formalities required under Marshall Islands law and has always been in good standing.

As for Powers of Attorney and the Board of Director minutes authorizing the purchase of the Vessel or the execution of the Facilities Agreement, Nikka submitted the Declaration of Evangelos Mr. Bairactaris dated September 14, 2018. (ECF 136-2.) In his Declaration, Mr. Bairactaris confirmed he cannot locate any of the documents relating to Nikka's purchase of the Vessel "since the transaction concluded nearly ten years ago. It is the Firm's policy not to retain documents for more than five years, which exceeds the requirements imposed by Greek law applicable to retention of documents by Greek law firms." (*Id*. at 2.) This Court has already ruled and rejected d'Amico's discovery arguments. (ECF 141.)

**The undisputed facts establish this factor weighs against finding Nikka to be an alter ego of Primera**.

### C.  d'Amico's English Judgment is Time Barred As Against Nikka

d'Amico asserts it has not asked this Court to recognize and enforce its English judgment. (ECF 153 at 45-46.) That is exactly what it has done. Indeed, in d'Amico's prayer for relief, it specifically asks this Court to enforce its English judgment against Nikka:

> C. In the event the New York action is dismissed for lack of personal jurisdiction over the defendant, that this Court consider and conclude that Defendant Nikka is the alter ego of Primera, and therefore liable to Plaintiff for the English judgment, plus interest and costs incurred in the collection of that judgment, totaling $3,758,580.22 as of the date hereof, but continuing to accrue

28

(ECF 1 at p. 26.)

Further, d'Amico attempts to avoid the time-bar issue by arguing it has not asked this Court to recognize its English Judgment because that "relief is part of d'Amico's 2009 New York Action filed against Primera." (ECF 153 at 45.)  Yet, on October 19, 2018, d'Amico filed a letter and an accompanying Notice of Withdrawal of Post-Trial Pleadings asserting a waiver of the personal jurisdiction defense and asked Judge Koeltl to dismiss the New York Complaint against Nikka only on the basis that the Court lacks personal jurisdiction. (Ex. A.) On November 14, 2018, the parties appeared before Judge Koeltl in the Southern District of New York and the Court granted Nikka's motion to dismiss d'Amico's claim against it for lack of jurisdiction. Thus, the action pending against Nikka in this Court is a new action to enforce d'Amico's English Judgment. The law is clear – d'Amico's new action in this Court is time-barred.

d'Amico's judgment was issued in England. Section 24.(1) of the English Limitation Act 1980 provides:

> An action shall not be brought upon any judgment after the expiration of **six years** from the date on which the judgment became enforceable.

(ECF 60-1; Declaration of Nicholas Parton dated July 13, 2018, at ¶ 3)(emphasis added.) Under Alabama law:

> an action to recognize a foreign-country judgment must be commenced within the later of the time during which the foreign-country judgment is effective in the foreign country or 5 years from the date that the foreign-country judgment became final, conclusive, and enforceable in the foreign country.

Ala. Code § 6-9-258.

Contrary to d'Amico's contentions, *Soc'y of Lloyd's v. Shell,* No. C-1-04-188, 2005 U.S. Dist. LEXIS 22104, at 28-31 (S.D. Ohio Sept. 30, 2005) and *Overseas Dev. Bank in Liquidation*

29

*v. Nothmann,* 480 N.Y.S.2d 735, 740-41 (1984) are directly on point. These cases stand for the notion that a new action to enforce an English judgment is time-barred under English law after six years from the date of the judgment, unless the judgment creditor submits an application and obtains leave from the English court allowing it to enforce the judgment beyond the six-year time bar. In *Soc'y of Lloyd's v. Shell*, the Southern District of Ohio refused to recognize an English judgment because the judgment was not "enforceable where rendered" pursuant to the UFMJRA where England's six-year time limit for the enforcement of judgments had expired. *Soc'y of Lloyd's v. Shell,* No. C-1-04-188, 2005 U.S. Dist. LEXIS 22104, at 28-31 (S.D. Ohio Sept. 30, 2005).

Further, in *Overseas Dev. Bank in Liquidation v. Nothmann,* the Court held: "absent a determination by the English courts pursuant to Order 46[8] granting plaintiff leave to issue a writ of execution, the judgments in question were not enforceable in England at the time of the commencement of the instant proceedings within the meaning of CPLR 5302 and defendants are, accordingly, entitled to summary judgment in their favor." *Overseas Dev. Bank in Liquidation v. Nothmann,* 480 N.Y.S.2d 735, 740-41 (1984), *rev'd* on other grounds, 477 N.E.2d 1086 (N.Y. 1985).

Finally, contrary to d'Amico's new position that because the action is based on a maritime claim the doctrine of laches applies, d'Amico's New York action to recognize and enforce the English Judgment was brought under New York law, and thus, laches does not apply to this case.

The facts and the law are clear. d'Amico filed a new action against Nikka in this Court nine years after the English Judgment was issued. d'Amico does not dispute that it has not obtained permission from an English court allowing it to enforce its Judgment outside of the six-year statute

---

[8] Order 46 also provides, however, that "[a] writ of execution to enforce a judgment or order may not issue without leave of the Court [inter alia] where six years or more have elapsed since the date of the judgment or order." *Nothmann*, 103 A.D.2d at 541.

30

of limitations.  Under Alabama law and English law, d'Amico is barred from enforcing the English Judgment against Nikka.

## <u>CONCLUSION</u>

After nine-years of litigation, four days of testimony by Paul Coronis in bench trials in New York and Texas, multiple failed Rule B attempts, full document discovery and three full days of depositions of Paul Coronis, d'Amico was able to maintain the attachment here on the basis that under the lower probable cause standard, only four (4) of the twelve (12) alter ego factors weigh in its favor; two of which the Court acknowledged were "slightly in favor." (ECF 40.) Now, d'Amico must prove by a preponderance of the evidence that Nikka is the alter ego of Primera and, thus, liable for the English Judgment. After further document discovery and a full day deposition of Paul Coronis, d'Amico cannot meet its higher burden. And, because there are no material facts in genuine dispute in relation to the foregoing alter ego analysis, Nikka is entitled to summary judgment.

WHEREFORE, Nikka respectfully requests that this Court grant its motion for summary judgment; dismiss d'Amico's complaint in its entirety; and grant such other and further relief as this Court deems appropriate.

Done this the 16th day of November, 2018.

Respectfully submitted,

**BURR & FORMAN LLP**

By: *s/John P. Kavanagh, Jr.*
John P. Kavanagh, Jr. (KAVAJ1011)
Kasee Sparks Heisterhagen (SPARK7253)
11 North Water Street, Suite 22200
Mobile, Alabama 36602
Tel: 251-344-5151
Email: jkavanagh@burr.com
        sparks@burr.com

-and-

**BLANK ROME LLP**

By: */s/ William R. Bennett, III*
William R. Bennett, III*
Lauren B. Wilgus*
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel.: (212) 885-5000
Email:  WBennett@BlankRome.com
          LWilgus@BlankRome.com

*Counsel for Defendant*
*Nikka Finance Inc.*

*\*Pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that I have served a copy of the foregoing document by electronically filing same with the Clerk of Court using the CM/ECF system, which will send notifications of such filing to the following: (or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email), on this the 16th day of November, 2018.

Thomas S. Rue
J. Ben Segarra
Maynard Cooper & Gale PC
RSA Battle House Tower Suite 27000
11 North Water Street
Mobile, AL 36602-5027
Email: true@maynardcooper.com
      bsegarra@maynardcooper.com

Thomas Leonard Tisdale
Tisdale Law Offices, LLC
60 East 42nd Street
Suite 1638
New York, NY 10165
212-354-0025
Fax: 212-869-0067
Email: ttisdale@tisdale-law.com

                                           <u>*s/John P. Kavanagh. Jr.*</u>
                                           OF COUNSEL