**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **d'Amico Dry d.a.c.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION No. 1:18-00284-KD-MU** |
| | ) | |
| **Nikka Finance, Inc.,** | ) | |
| **as owner of M/V SEA GLASS II,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ALTER EGO**

The Court conducted a bench trial to determine whether Defendant Nikka Finance, Inc. was Primera Maritime Limited's alter ego and therefore liable for a $1,766,278.54 judgment the English High Court of Justice entered against Primera on June 19, 2009. The English judgment was based on Primera's breach of a forward freight agreement ("FFA") with Plaintiff d'Amico Dry Limited d.a.c. As the Court will explain, Nikka was an alter ego of Primera, rendering it liable for the English judgment.

Much judicial ink has been spent during d'Amico's attempt to have the English judgment recognized and enforced. My colleague, the Honorable John G. Judge Koeltl of the Southern District of New York, has diligently considered d'Amico's case against Primera and multiple alleged Primera alter egos ("the New York action") for more than nine years. During that period,

parties appealed to the Second Circuit twice.[1] Moreover, creditors besides d'Amico have sought, unsuccessfully, to pierce other alleged Primera alter egos.[2] What has brought the parties to this district is the presence of the vessel M/V SEA GLASS II, owned by Nikka, which d'Amico attached on June 22, 2018.

## I.  **BACKGROUND**[3]

### A.  **Relevant Entities and Undisputed Facts**

D'Amico is a dry bulk vessel owning and operating company incorporated in Ireland. Primera was at all material times a Liberian entity incorporated on June 22, 1990 and was engaged in the business of ship management with a registered address at 80 Broad Street, Monrovia, Liberia. Nicholas Coronis (a/k/a Nikolaos or Nikolas) served as the Greek Law 89 company representative of Primera from 1990 to 2008, and as General Manager, Director, President, Treasurer and Secretary of Primera.  Nicholas Coronis' son, Paul Coronis, served as a Director of Primera from 2002 until November 15, 2008. From October 2008 until April 2009, Primera was the managing agent for the SEA GLASS II.  In March 2010, Primera commenced dissolution and

---

[1] See d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd., 756 F.3d 151 (2d Cir. 2014) (d'Amico I); d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd., 886 F.3d 216 (2d Cir. 2018) (d'Amico II).

[2] Flame S.A. attached a vessel owned by another alleged Primera alter ego in the Eastern District of Texas. Flame S.A. v. M/V LYNX, No. 1:10-CV-278, 2010 WL 11571118 (E.D. Tex. Aug. 6, 2010).

[3] This Court takes judicial notice of the prior federal proceedings related to this case before Judge Koeltl in the Southern District of New York. Rule 201 of the Federal Rules of Evidence permit judicial notice to be taken at any stage of a proceeding and a court may take notice of another court's docket and orders. McDowell Bey v. Vega, 588 Fed. Appx. 923, 926-927 (11th Cir. 2014); U.S. v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994); Hughes v. Lamrerti, 2009 WL 4894493, *1 n.5 (S.D. Fla. Dec 17, 2009).

(Continued)

liquidation proceedings in Liberia. Primebulk Shipmanagement Ltd. was incorporated on February 25, 2009.  Primebulk replaced Primera as the SEA GLASS II's manager in May 2009.

Nikka is a single-purpose ship-owning company that was incorporated in the Marshall Islands on September 5, 2007.  Nikka owns the SEA GLASS II.  Prior to its incorporation, an unidentified investor or investors provided $5.25 million, pursuant to a memorandum of agreement (MOA),[4] as an initial payment for construction of the SEA GLASS II. The remainder of the construction costs was financed through a $204 million Facility Agreement between HSH Nordbank and various "Joint and Several Borrowers" dated May 21, 2008. Primera was the corporate guarantor under the Facility Agreement. Paul and Nicholas Coronis provided limited personal guarantees under the Facility Agreement. Until October 16, 2009, Paul Coronis served as Nikka's sole director.  On October 16, 2009, Paul Coronis resigned as Nikka's director. On September 25, 2008, Bulknav, Inc. became the holder of 100% of the shares of Nikka. Shelley Ventures owns 69% of Bulknav.  Shelly Ventures is owned by the Coronis family.

### B.  The FFA and English Judgment

"An FFA is a contract for the difference between a contract rate and a settlement rate. The contract rate is a rate agreed upon by the parties. The settlement rate is the market rate for freight carried by a certain type of vessel, traveling a certain route (or group of routes), during a certain time period in the future." d'Amico II, 886 F.3d at 218-19. The Second Circuit, which addressed

---

[4] Nikka has failed to produce the MOA, alleging that it no longer has access to a copy of the agreement.  Paul Coronis testified in the New York action, without specifics, that the initial payment was made by several investors.  Paul Coronis' reliability on this issue is questionable.

whether the underlying FFA constituted a maritime contract and therefore invoked federal courts' admiralty jurisdiction, described the disputed FFA as follows:

> The d'Amico-Primera FFA covered forty-five days in the first quarter of 2009. The contract rate was $55,750 per day. The FFA was to be settled monthly; the settlement rate was the mean of the daily published Baltic Panamax Index ("BPI") for all days of the pertinent month. The BPI is one of several indices published daily by the Baltic Exchange, a London-based organization that provides maritime market information. The BPI, which is based on reports from independent freight brokers about the freight market's performance, incorporates rates for shipping on standard routes travelled by Panamax carriers. For each month that the settlement rate exceeded the contract rate, d'Amico, as seller, was obligated to pay Primera, as buyer, the difference between the two rates. If instead the contract rate exceeded the settlement rate, Primera would have to pay the difference to d'Amico.

Id. at 219.

> Primera and d'Amico, through a third-party broker, entered into a Forward Freight Agreement (the "FFA") dated September 2, 2008, whereby Primera agreed to buy and d'Amico agreed to sell freight futures for forty-five days within the months of January, February and March 2009 respectively, with settlement monthly. The freight rate for Panamax bulk carriers had dropped significantly so that by early 2009 Primera was obligated under the FFA to pay d'Amico the difference starting in late-January 2009. D'Amico demanded payment and Primera failed to remit same, breaching the FFA in January 2009. On February 23, 2009, d'Amico terminated the FFA with Primera. Pursuant to Clause 15 of the FFA, d'Amico commenced proceedings against Primera in the English High Court in England with English law to apply (High Court of Justice Queen's Bench Division, Commercial Court under Claim No. 2009, Folio 218).

(Joint Pretrial Doc. Agreed Facts/Doc. 149 at 15-16, ¶¶ 29-33).

### C. The New York Action

In September 2009, d'Amico initiated litigation against Primera in the Southern District of New York to recognize and enforce the foreign judgment. (1:09-cv-07840-JGK d'Amico Dry d.a.c. v. Primera Maritime (Hellas) Limited). In 2010, d'Amico amended its complaint in that case to add Nikka as a defendant. (Id. at ECF # 64). The parties vigorously litigated the case there, including years of discovery, numerous motions to dismiss, and a May 2016 bench trial on all issues (including d'Amico's alter ego claims against numerous defendants, one of which was

Nikka). More recently, various alleged alter ego defendants filed motions to dismiss claiming a lack of personal jurisdiction. On November 14, 2018, Judge Koeltl granted Nikka Finance Inc.'s unopposed motion to dismiss for lack of personal jurisdiction, dismissing Nikka without prejudice. (Id. at ECF # 349).

On December 22, 2018, Judge Koeltl recognized the English judgment and enforced it against Primera in the amount of $1,794,334.93 plus interest and attorneys' fees. D'Amico Dry D.A.C. v. Primera Mar. (Hellas) Ltd., 348 F. Supp. 3d 365 (S.D.N.Y. 2018); Docs. 188 & 188-1. The court also entered judgment against Primera's successors-in-interest and/or alter egos of the Coronis family and Primera, including Primebulk Shipmanagement Ltd. and Bulknav Inc. Default judgment was entered against Paul Coronis, Nicholas Coronis, Primera Ocean Services and J.P.C. Investments. (1:09-cv-07840-JGK d'Amico Dry d.a.c. v. Primera Maritime (Hellas) Limited at ECF # 351/Doc. 188-1).

### D. Present Litigation

D'Amico initiated the admiralty action in this Court on June 22, 2018, seeking $4,698,225.20, by filing a verified complaint against Nikka with a motion for Rule B Attachment of the vessel M/V SEA GLASS II (and supporting Affidavit) (Docs. 1-3, 6-7). D'Amico's original verified complaint alleged three counts against Nikka: (1) alter ego liability; (2) Rule B attachment as security for the New York action;[5] and (3) Rule B attachment and alter ego determination (in

---

[5] After Nikka's unopposed motion to dismiss Nikka from the New York action was granted, d'Amico acknowledged in open court that Count II of the amended complaint was moot. (November 27, 2018 Trial Transcript 84:14-18).

the event the District Court for the Southern District of New York determines it lacks personal jurisdiction over Nikka). (Doc. 1).

In support of its motion for a Rule B attachment, d'Amico asserted (including via Affidavit) that Nikka is Primera's alter ego and from that, attachment is proper because: (1) Nikka is the owner of the vessel; (2) Nikka is indebted to d'Amico in excess of $4,698,225.20 based on a foreign judgment; (3) Nikka cannot be found in this district; and (4) Nikka's property, the vessel M/V SEA GLASS II, is or will be located in the district. (Docs. 3 & 7).

The Rule B writ of attachment for vessel M/V SEA GLASS II issued on June 22, 2018. (Doc. 10). Nikka moved to vacate the Rule B attachment. (Doc. 13). The Court held a Rule E evidentiary hearing on June 27, 2018. (Doc. 18).

The Court denied Nikka's motion to vacate. (Doc. 40). In doing so, the Court emphasized that d'Amico only needed to show the attachment was supported by "probable cause" to successfully defend against Nikka's motion to vacate. (Id. at 21 (quoting Barna Conshipping, S.L. v. 1,800 Metric Tons, more or less, of Abandoned Steel, 2009 WL 1203923, at *3 (S.D. Ala. Apr. 29, 2009)). In addition, the Court noted that although d'Amico and Primera (along with alleged Primera alter egos) had engaged in extensive discovery throughout the litigation in the New York action, the focus of that discovery had not focused specifically on Nikka's relationship with Primera.

The Court began trial on November 27, 2018.[6] After it became apparent that d'Amico's case, and this Court's ability to determine the facts, had been impeded by Nikka's failure to

---

[6] Nikka's motion for summary judgment (Doc. 143) is **MOOT** in light of the fact that the case proceeded to trial.

produce basic documents, the Court recessed for two months to allow for additional discovery. The trial was completed on January 24, 2019.

## II.    TIMELINESS

Throughout the proceedings, Nikka has urged the court to vacate the Rule B attachment because the filing was untimely under English law.   Specifically, Nikka points to Section 24(a) of the English Limitation Act 1980 which provides that "[a]n action shall not be brought upon any judgment after the expiration of six years from the date on which the judgment became enforceable."   Nikka argues that since the English judgment became enforceable in England on June 19, 2009, the Rule B attachment of June 22, 2018 is clearly time barred.   As support, Nikka consistently directs the Court to Soc'y of Lloyd's v. Shell, 2005 U.S. Dist. LEXIS 22104 (S.D. Ohio Sept. 30, 2005).  In Soc'y of Lloyd's the court found that the action to recognize and enforce the English Judgment was untimely because it was not filed within six years of when it was rendered and therefore, as required under Ohio's Foreign Money Judgment *Recognition* Act, it was not "enforceable where rendered." Id. at *31. However, Soc'y of Lloyd's fails to provide support for Nikka's untimeliness argument for the simple fact that the action before this Court is not to recognize the English judgment against Primera.   The action to recognize (confirm) the English judgment against Primera has been successfully, and timely, litigated in the New York action.  The District Court for the Southern District of New York issued a money judgment against Primera on December 22, 2018.

The complaint in this case seeks a determination that Nikka should be liable for the English judgment, that has now been recognized by and converted to a judgment of the Southern District of New York, as an alter ego of Primera.  If the claim is successful, the asset that was found in this district (now represented by a security bond) would be available to satisfy the money judgment

entered in the New York action against Primera.   The life of the money judgment entered by the District Court of the Southern District of New York is not governed by English law.

## III.   SANCTIONS

D'Amico has repeatedly urged this court to impose sanctions on Nikka for failing to produce basic documents that are important to this case. (See Docs. 154 & 181).   After unsuccessfully petitioning Magistrate Judge P. Bradley Murray via a motion to compel on this issue, d'Amico failed to appeal Judge Murray's order denying the motion.  Instead, in preparation of trial, d'Amico urged this court to either enter judgment in its favor or disallow certain evidence in response to Nikka's failure to produce documents.   The request was denied, and the trial began.[7]  During the trial, the significance and extent of the lack of production of basic documents became clear to the Court.   But unconvinced that Nikka (or more precisely its 30(b)(6) representative Paul Coronis) would blatantly flout the Court's discovery rulings, as d'Amico alleged, the Court recessed and issued three limited orders for specific documents.     Specifically, the Court ordered Nikka to contact its bank, Piraeus Bank A.E., to retrieve its bank records for 2008, 2009, and 2010.

The Court also ordered Nikka to contact HSH Nordbank, Hamburg to request financial statements, the MOA regarding the initial financing of the SEA GLASS II, and a copy of Primera's guarantee of the Facility Agreement.  Paul Coronis previously requested the documents from HSH Nordbank in Athens.  The relationship manager in Athens, Loukas Lagaras, earlier responded that the Athens branch did not possess the documents requested due to the age of the records.   D'Amico

_____

[7] D'Amico's first motion for sanctions and motion in limine pursuant to Fed. R. Civ. P. 37 (Doc. 154) is **DENIED**.

suggested that the records were more likely maintained in headquarters in Germany. Thus, the Court ordered that the request be made to the Hamburg office.

D'Amico has renewed its motion for sanctions citing Nikka's response to the Court's orders. (Doc. 181). The Court agrees that Nikka's execution of the Court's discovery orders is disingenuous. Regarding HSH Nordbank, Hamburg, Nikka presented an email from Lagaras that impatiently and summarily states that HSH Nordbank, Hamburg does not have the requested documents. In a case of an amazing coincidence, Paul Coronis (on behalf of Nikka) asserts that Lagaras is now stationed in the Hamburg office of HSH Nordbank. While the Court has reservations about the truthfulness of the response from Lagaras (and Paul Coronis), the Court declines to sanction Nikka on this basis. The reason being that the Court does not have sufficient evidence that Nikka violated the Court's order. It appears that a request was made of HSH Nordbank, Hamburg and an employee purporting to represent HSH Nordbank, Hamburg responded that it does not have the requested documents.

However, the Court reaches a different conclusion as to Nikka's obligation to obtain its own records from Piraeus Bank. According to Nikka's counsel, in response to the Court's order, Paul Coronis and a friend walked into Piraeus Bank and orally requested the records and was told that the bank did not have them.[8] The Court finds this response lacking in veracity and, even if it did occur in this manner, a clear disregard of the Court's order. It is implausible that if Paul Coronis was attempting to execute the discovery order in good faith, he would have requested the

---

[8] Counsel for Nikka, William Bennett, III, initially told the Court that Paul Coronis had taken a letter to Piraeus Bank requesting the documents and was rebuffed. Later, Mr. Bennett corrected that statement and said that Paul Coronis did not make a written request to Piraeus Bank.

documents in this manner.  Moreover, as circumstantial evidence of the implausibility of Nikka's response, d'Amico submitted an affidavit from another customer of Piraeus Bank that indicated when she contacted Piraeus Bank, she was told records (albeit for a different bank customer) for the time period in question were available.  (Doc. 181-3).

Pursuant to Fed. R. Civ. P. 37(b)(2)(A), where a party fails to obey an order to provide discovery the court may direct "that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims[.]"  After consideration, the Court finds that based on Paul Coronis' clear disregard (acting on Nikka's behalf) of this Court's order to retrieve records from Piraeus Bank warrants sanctions.  Thus, the Court will assume any missing bank records regarding Nikka's reimbursement of funds expended by Primera (as the managing agent of SEA GLASS II) would be adverse to Nikka.   Accordingly, d'Amico's motion for sanctions (Doc. 181) is **GRANTED IN PART**.

## IV.   <u>JURISDICTION</u>

Nikka argues the Court lacks subject matter jurisdiction for two reasons. First, it argues that because an English statutory bar prevents this Court from recognizing the 2009 English judgment against Primera, the SEA GLASS II's attachment is invalid. Second, Nikka argues the current action is a post-judgment enforcement action and not a maritime claim subject to Supplemental Rule B attachment.

Both issues involve whether the attachment of the SEA GLASS II is valid. <u>Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.</u>, 817 F.3d 241, 244 (5th Cir. 2016) ("The propriety of the attachment of [a vessel] goes to the district court's jurisdiction over [the vessel], so we begin there."). For a valid Rule B writ of attachment, a plaintiff must establish four requirements: (1) the plaintiff has a valid prima facie maritime claim against the defendant; (2) the

defendant cannot be found within the district where the action is commenced; (3) property belonging to the defendant is present, or soon will be present, within the district; and (4) there is no statutory or general maritime law proscription to the attachment. Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2nd Cir. 2006) overruled on other grounds by The Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd., 585 F.3d 58 (2nd Cir. 2009).

Nikka first argues the attachment is invalid because the English judgment is time barred and thus there is a statutory bar to the attachment. This argument has been addressed and rejected supra.

Second, Nikka asserts that a "judgment enforcement is not a valid maritime claim" (Doc. 171 at 8) and that Judge Koeltl's order recognizing the English judgment against Primera obviates the maritime nature of the underlying 2009 English judgment.   In order for the attachment to be valid, the underlying claim must invoke admiralty jurisdiction. Nikka argues "that once a district court judgment is entered on a maritime claim, any subsequent action to impose liability under the judgment against a third party is neither an action to enforce the underlying claim nor one to enforce the judgment, but is actually a separate action seeking to 'impose, for the first time, primary liability upon the respondents themselves for the prior judgment.'" (Doc. 171 at 9 (quoting Dunsink Trading, Ltd. v. Pitsburg Financial Inc. and Vilis Cargo Ltd., 2009 U.S. Dist. LEXIS 71609 *9 (S.D.N.Y. August 4, 2009)).[9]

---

[9] In support, Nikka relies on an extremely narrow reading of Williamson v. Recovery Ltd. P'ship, 542 F.3d 43 (2d Cir. 2008), which held that "[m]aritime attachment is a *prejudg[]ment mechanism* used by parties in admiralty cases to secure jurisdiction over an absent party and to obtain security for potential judgment where the absent party's assets are transitory." Id. at 48 (emphasis added).

Nikka's reliance on <u>Dunsink</u> for the proposition that this Court lacks admiralty jurisdiction is unpersuasive. First, the language cited from <u>Dunsink</u> by Nikka, <u>see</u> <u>supra</u>, related to whether the court in <u>Dunsink</u> had ancillary jurisdiction over the new and separate action which asserted alter ego liability. Ancillary jurisdiction is not the issue in this case. Second, to the extent Nikka relies on <u>Dunsink</u> for the proposition that admiralty jurisdiction is lacking and the attachment pursuant to Rule B is improper, the Court rejects the reasoning of <u>Dunsink</u> as applied to the facts of this case.

"Maritime attachment is available whenever the plaintiff has an *in personam* claim against the defendant which is cognizable in admiralty. In other words, the plaintiff's claim must be one which will support a finding of admiralty jurisdiction under 28 U.S.C. § 1333.'" <u>Winter Storm Shipping, Ltd.</u>, 310 F.3d 263, 268 (2d Cir. 2002) (internal ellipsis omitted) (quoting Robert M. Jarvis, *An Introduction to Maritime Attachment Practice Under Rule B,* 20 JOURNAL OF MARITIME LAW AND COMMERCE, No 4 (October 1989) at 526 & n.20).

The Court finds persuasive the holding in <u>Flame SA. v. Freight Bulk Pte. Ltd.</u>, 807 F.3d 572 (4th Cir. 2015), which involved facts very similar to this case. In <u>Flame</u> an English judgment had been recognized in the Southern District of New York against a defaulting party to an FFA contract. The creditor sought to enforce the recognized judgment by registering it in the Eastern District of Virginia and attaching a vessel belonging to an alleged alter ego (Freight Bulk) of the judgment debtor. Freight Bulk challenged that court's subject matter jurisdiction. On appeal the Fourth Circuit distinguished between federal question jurisdiction and admiralty jurisdiction when bringing suit to enforce a judgment. <u>Id.</u> at 581. The Fourth Circuit concluded that "Flame's claim to enforce its English Judgment by means of a Supplemental Rule B attachment was cognizable

under the district court's admiralty jurisdiction" and that the district court also had admiralty jurisdiction to consider the question of alter ego. <u>Id.</u> at 581.

In <u>Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.</u>, 825 F.2d 709, 713 (2d Cir. 1987), the Second Circuit relied on a Fifth Circuit case, <u>International Sea Food</u>, for the proposition that "[t]he additional claim for enforcement of the British judgment asserted a maritime claim since an admiralty court has jurisdiction of a claim to enforce a foreign judgment that is itself based on a maritime claim." <u>Victrix S.S. Co., S.A.</u>,825 F.2d at 713 (citing <u>Int'l Sea Food Ltd. v. M/V Campeche</u>, 566 F.2d 482 (5th Cir. 1978)). In <u>International Sea Food</u>, the Fifth Circuit considered "whether a United States district court has subject matter jurisdiction in admiralty to enforce a foreign maritime decree which awarded money damages to the plaintiff on a claim for collision." <u>Int'l Sea Food Ltd.</u>, 566 F.2d at 483. The judgment debtor in <u>International Sea Food</u> asserted a similar argument to one Nikka raises here: "maritime aspects of this case vanished once the judgment was rendered and that there is no valid reason for permitting enforcement of a simple money judgment in an admiralty court." <u>Int'l Sea Food Ltd.</u>, 566 F.2d at 484. The Fifth Circuit rejected this line of reasoning, holding that a court of admiralty "has jurisdiction to enforce any judgment of another admiralty court regardless of its lack of maritime flavor." <u>Int'l Sea Food Ltd.</u>, 566 F.2d at 485.

Both the Second and Fourth Circuits have determined that an FFA is a maritime contract that invokes admiralty jurisdiction. <u>See d'Amico II</u>, 886 F.3d at 218 ("Because the FFA's principal objective was maritime commerce, it is a maritime contract and claims arising from it fall within our admiralty jurisdiction."); <u>Flame S.A.</u>, 807 F.3d at 577 (holding that FFAs are maritime contracts under federal admiralty law). And the undersigned agrees. That the English judgment has been recognized and converted to a federal court money judgment in the Southern District of

New York does not change the maritime flavor.  See Vitol, S.A. v. Primrose Shipping Co., 708 F.3d 527, 535 (4th Cir. 2013) (citing Int'l Sea Food Ltd., 566 F.2d 482) ("We also reject S & P's separate contention on appeal that because the English Judgment has been reduced to a monetary award it now lacks the maritime character necessary to being considered an admiralty judgment which would deprive the district court of jurisdiction in this proceeding."). Thus, d'Amico's claim against Nikka, that it should be held liable for the breach of the FFA as an alter ego of Primera, is a maritime claim.

Moreover, as the Fourth Circuit explained in Vitol, Rule B attachment is a proper mechanism to enforce a money judgment previously issued by an admiralty court.  This is because "'pre-judgment,' as it is used in the Supplemental Rule B context, must be understood to mean prior to the judgment in the particular case where a plaintiff seeks to use Supplemental Rule B." Vitol, 708 F.3d at 537-38. And "[a]ttachment of the [vessel owned by the alleged alter ego] under Supplemental Rule B is thus clearly a prejudgment mechanism in the sense which establishes jurisdiction over [the alleged alter ego] for adjudication of the alter ego dispute." Vitol, 708 F.3d at 538.   The Fourth Circuit concluded,

> [t]he district court in the case at bar had not entered any judgment against [the alleged alter ego] at the time the *ex parte* motion for Supplemental Rule B attachment was filed by [the judgment creditor]. What [the judgment creditor] sought was to establish jurisdiction through Supplemental Rule B in the District of Maryland so its underlying alter ego complaint could be adjudicated; not to enforce the English Judgment in the first instance, although we are not at all certain that usage is barred by the Rule. In any event, [the judgment creditor's] use of Supplemental Rule B was entirely consistent with the rule's purpose: "to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment."

Vitol, 708 F.3d at 539 (quoting Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp. N.V., 572 F.3d 96, 103 (2d Cir. 2009)).

Finally, alter ego determinations plainly fall within an admiralty court's jurisdiction. See Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 339 U.S. 684, 689 n.4 (1950 ("The jurisdiction of a court of admiralty to determine the question of alter ego is undoubted."); Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc., 160 F.3d 170, 174 (4th Cir. 1998) ("It is well established that an admiralty court can review questions of fraud and alter ego."); Pink Goose (Cayman) Ltd. v. Sunway Traders LLC, 2008 WL 4619880, at *2 (S.D.N.Y. Oct. 17, 2008) ("alter-ego theories of liability are prima facie admiralty claims so long as the underlying claim arose in admiralty."). For all of the foregoing reasons, the Court concludes subject matter jurisdiction is present.

## V.    ALTER EGO LAW

"[A] corporate entity is liable for the acts of a separate, related entity only under *extraordinary* circumstances…" Vitol, 708 F.3d at 541 (emphasis added). It is only in those extraordinary circumstances where courts find alter ego and then "pierce the corporate veil and disregard the corporate entity[.]" Id. at 544.   As the court explained in LIG Ins. Co. Ltd. v. Inter-Florida Container Transport, Inc., 2013 WL 4516104, *6 (S.D. Fla. Aug. 23, 2013), aff'd, 564 Fed. Appx. 495 (11th Cir. 2014) (footnote omitted) (quoting Talen's Landing Inc. v. M/V Venture II, 656 F.2d 1157, 1160 (5th Cir. 1981)), "[r]eaching the 'alter egos' of corporations is especially valuable 'where the separate identity of two corporations should be disregarded where one corporation becomes the conduit of another' or 'where the near identity of two corporations should be disregarded in order to prevent manifest injustice to third parties.'"

"In admiralty disputes, federal courts apply federal common law when analyzing corporate identity." Hawknet Ltd. v. Overseas Shipping Agencies, 2008 WL 1944817, *3 (S.D.N.Y. Apr. 29, 2008) (citation omitted).  See also Daughtry v. Jenny G. LLC, 703 Fed. Appx. 883, 886 (11th

15

Cir. 2017) ("[t]o determine whether to disregard the corporate form in an admiralty case, we apply federal common law[]"). Guided by federal common law, the Court applies the factors set forth by the Eleventh Circuit in United Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co., 855 F.2d 1499 (11th Cir. 1988) in its analysis of domination and control. The factors, all of which need not be proven to succeed in piercing the corporate veil, include whether:

> (1) the parent and the subsidiary have common stock ownership;
> (2) the parent and the subsidiary have common directors or officers;
> (3) the parent and the subsidiary have common business departments;
> (4) the parent and the subsidiary file consolidated financial statements and tax returns;
> (5) the parent finances the subsidiary;
> (6) the parent caused the incorporation of the subsidiary;
> (7) the subsidiary operates with grossly inadequate capital;
> (8) the parent pays the salaries and other expenses of the subsidiary;
> (9) the subsidiary receives no business except that given to it by the parent;
> (10) the parent uses the subsidiary's property as its own;
> (11) the daily operations of the two corporations are not kept separate; and
> (12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

Id. at 1505. Nikka and Primera do not have a subsidiary-parent relationship. Instead, they are sister corporations. Therefore, the aforementioned factors will be adjusted to reflect their relationship.[10]

No uniform standard exists, and Courts should "instead look to the totality of the circumstances." Eitzen Chem. (Singapore) PTE, Ltd. v. Carib Petroleum, 749 F. App'x 765, 770

---

[10] In a recent unpublished Eleventh Circuit decision, Eitzen Chem. (Singapore) PTE, Ltd. v. Carib Petroleum, 749 Fed. Appx. 765 (11th Cir. 2018), the panel observed that the Eleventh Circuit "has yet to address whether a corporate veil may be pierced horizontally between sibling corporations under an alter ego theory of liability. ... Therefore, we assume, without deciding, for the purposes of this opinion, that a corporation may be held liable for the debts of a sister corporation and that the same factors applied in the parent-subsidiary context to determine alter ego status apply in the sibling corporation context." Id. at 771 n.7. The Court makes the same assumption and proceeds accordingly.

(11th Cir. 2018) (citing <u>United Steelworkers of Am.</u>, 855 F.2d at 1506). The burden, which is "significant[,]" <u>Edwards Co. v. Monogram Indus., Inc.</u>, 700 F.2d 994, 999 (5th Cir. 1983), <u>on reh'g</u>, 730 F.2d 977 (5th Cir. 1984), rests squarely on the party seeking to pierce the veil. <u>Id.</u>

In order to pierce the corporate veil in a contract breach scenario, fraud constitutes "an essential element of an alter ego finding." <u>United States v. Jon-T Chemicals, Inc.</u>, 768 F.2d 686, 692 (5th Cir. 1985). The Eleventh Circuit, in an unpublished opinion, has cited to <u>Jon-T Chemicals</u> for this proposition with approval.[11] <u>Eitzen Chem.</u>, 749 F. App'x at 770 (quoting <u>Jon-T Chemicals</u> for the proposition that "in contract cases, fraud is an *essential element* of an alter ego finding") (emphasis added).

The Fifth Circuit provided a synopsis of why alter ego cases based on a breach of contract require a showing of fraud/injustice.

> [I]n contract cases, fraud is an essential element of an alter ego finding. <u>Edwards</u>, 730 F.2d at 980–81. However, we do not require a finding of fraud in tort cases[.]…The reason for this distinction is clear. *In a contract case, the creditor has willingly transacted business with the [judgment debtor]. If the creditor wants to be able to hold the [alleged alter ego] liable for the [judgment debtor's] debts, it can contract for this. Unless the [judgment debtor] misrepresents its financial condition to the creditor, the creditor should be bound by its decision to deal with the [judgment debtor]; it should not be able to complain later that the [judgment debtor] is unsound.* In a tort case, by contrast, the creditor has not voluntarily chosen to deal with the subsidiary; instead, the creditor relationship is forced upon it. Thus, the question of whether the creditor relied on misrepresentations by the [judgment debtor] is irrelevant.

<u>Jon-T Chemicals</u>, 768 F.2d at 692-693 (emphasis added).

---

[11] The Court recognizes that "although an unpublished opinion may be cited as persuasive authority, 11th Cir. R. 36–2, it is not binding authority." <u>Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.</u>, 480 F.3d 1254, 1260 n.3 (11th Cir. 2007).

The fraud analysis focuses on "whether the corporate form itself was abused and whether the misuse of the corporate form constituted the fraud or injustice complained of in the underlying suit." Eitzen Chem., 749 F. App'x at 770 (citing N.L.R.B. v. Greater Kansas City Roofing, 2 F.3d 1047, 1053 (10th Cir. 1993)). The entity sought to be held liable must be involved in the misuse of the corporate form. As the Fifth Circuit explained in Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 447 F.3d 411 (5th Cir. 2006),

> [t]o prevail, [the judgment creditor] had to demonstrate that the [dominant entity] used its control over [dominated entity] to commit a "fraud or injustice" against [the judgment creditor]. See [First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 630 (1983)]; Edwards Co. v. Monogram Indus., Inc., 730 F.2d 977, 984 (5th Cir. 1984). …[T]he decisions acknowledge that the test may be met through an "illegal act" or "[misuse of] the corporate form." [Matter of Sims, 994 F.2d 210, 217-18 (5th Cir. 1993)]. In this contract dispute, [the judgment creditor] thus had to connect the [dominant entity's] misuse of its [dominated entity] to the fraud or injustice against it.

Id. at 416-417. "[A]bsent some other wrong or injustice that would result if the corporate veil is not pierced, a creditor's inability to collect a judgment alone is insufficient to justify piercing the corporate veil." Eitzen Chem., 749 F. App'x at 773 (citing Greater Kansas City Roofing, 2 F.3d at 1053). This is because "virtually all cases in which there is an attempt to pierce the corporate veil" involves "a corporation . . . incapable of paying all its debts . . . ." Greater Kansas City Roofing, 2 F.3d at 1053.

## VI. DISCUSSION

### A. Fraud or Injustice

D'Amico must demonstrate Primera's corporate form was misused such that fraud, illegality, wrongdoing, or injustice resulted. See Eitzen Chem., 749 F. App'x at 770 (quoting Talen's Landing, 656 F.2d at 1161 n.6) (stating that once a plaintiff establishes domination and control, "it is appropriate to brush aside the corporate veil when it appears a corporation was

organized for fraudulent purposes, illegality, or wrongdoing"). And d'Amico must show that the fraud or injustice involved Nikka.

D'Amico relies on two bases to meet its burden to show fraud or injustice. First, it identifies a series of transactions, commonly called netting-off agreements, wherein $406,457.96 owed to Primera was diverted in October 2009 to Primrose Shipping Ltd. and Seadance Maritime Inc., both Coronis family controlled entities. However, no evidence was presented that Nikka benefitted from these netting-off agreements or that Nikka was used in any way to aid these transactions. Thus, for purposes of establishing the necessary fraud or injustice, the netting-off agreements are irrelevant.

Next, d'Amico claims generally that the Coronis family diverted assets from Primera to avoid paying debts. But since Nikka failed to produce any bank records relevant to the time period, d'Amico has relied on the evidence that money was diverted from Primera to other Coronis controlled entities. D'Amico also relies heavily on its contention, shown by circumstantial evidence, that in 2007 the initial $5.25 million payment for the SEA GLASS II was made by Primera. In response, Nikka argues that d'Amico cannot prove that any assets were diverted from Primera to Nikka.

The issue is whether during the relevant time period, Primera used Nikka to assist in committing a fraud or injustice against d'Amico. The relevant period of time is from the time Primera entered into the FFA agreement at issue with d'Amico (September 2008) until Primera was dissolved (March 2010).

D'Amico cannot complain or rely on evidence that Primera was unsound due to any transaction prior to September 2008, unless Primera misrepresented its financial condition to d'Amico at the time of the FFA agreement. This is because d'Amico voluntarily entered into an

agreement with Primera, and d'Amico is bound to its decision to deal with Primera in Primera's September 2008 financial condition. Any diversion of funds and unreimbursed payments made by Primera prior to September 2008 are irrelevant to the fraud/injustice inquiry because there is no evidence that Primera made misrepresentations to d'Amico.

As previously discussed, Nikka failed to produce any of its bank records for the time period that Primera managed the SEA GLASS II (October 2008 – April 2009). Nor did Nikka even attempt to have Piraeus Bank provide a written statement that the records were not available. The Court has found that Nikka, through Paul Coronis, violated the Court's order to attempt to retrieve these records. Moreover, the Court finds that it is implausible that these records no longer exist. Accordingly, the Court finds that the records would be adverse to Nikka and would show that Nikka failed to reimburse Primera for expenses paid and services rendered by Primera on behalf of the SEA GLASS II. The projected operating costs (exclusive of drydocking) for the SEA GLASS II for 2010 was $1,800,650.[12] (Def.'s Ex. 28/Doc. 189 at 17). Subtracting the insurance of $128,900, which d'Amico concedes Primera did not pay, leaves an annual operating cost of $1,671,750 or ($139,312 per month). The Court finds that $835,875 is a rough estimate of what the operating costs per month would have been for the six months that Primera managed the SEA GLASS II.[13] The Court also finds that Nikka's banking records would have confirmed that Nikka

---

[12] It is unclear whether the budget is in euros or U.S. dollars. The Court assumes that it is stated in U.S. dollars as that is how counsel referred to it at trial.

[13] This estimation is also supported by the Nikka's 2008 financial statement, which indicates for the three months the SEA GLASS III operated in 2008 it incurred expenses and management fees of $415,909. (Plf.'s Ex. 43/Doc. 168-20 at 4).

did not reimburse Primera for the these expenses for the six months that Primera managed the SEA GLASS II.

Since Primera was foregoing significant income and reimbursement from Nikka, the Court finds that Primera was diverting assets to Nikka from October 2008 to April 2009, which could have been used to fund its liability to d'Amico. This was an abuse of the corporate form which was made possible by Paul Coronis' control of both entities. See infra. Accordingly, the Court finds that d'Amico has established that Primera's diversion of assets to Nikka resulted in an injustice to d'Amico.

**B.     Domination and Control**

**1.     Common Stock Ownership**

**a.     Findings of Fact**[14]

(1) The parties agree that at the time the parties entered into the FFA, "there was some overlap in the . . . shareholders of both" Primera and Nikka. (Joint Pretrial Doc. Agreed Facts/Doc. 149 at 7, ¶ 2).

(2) Nikka Finance Inc. was incorporated on September 5, 2007. (Def.'s Ex. 30/Doc. 169-23). It was incorporated in the Marshall Islands. (Id.).

(3) Bulknav Inc. was incorporated in the Marshall Islands on February 19, 2008. (Def.'s Ex. 54/Doc. 169-34).

(4) On September 25, 2008, Bulknav, a holding company, became the holder of 100% of Nikka's shares. (Joint Pretrial Doc. Agreed Facts/Doc. 149 at 13, ¶ 4).

(5) Before Bulknav's incorporation, Nikka's shareholders included Paul Coronis, Nicholas Coronis, Jonathon Coronis (Paul's brother), Chianna Coronis (Paul's sister), Annabel Coronis (Paul's mother), and Anastasia Kalogirou (Paul's grandmother). (Paul Coronis Depo. Oct. 24, 2018 at 38:19-39:13). Thirty-one percent of the shareholders included non-Coronis family members. (Id. at 39:14-17).

---

[14] Some findings of fact apply to more than one factor. The findings of fact applicable to more than one factor will not be repeated but are meant to be considered.

(6) As of September 25, 2008, five entities or individuals owned a total of 1,000 shares in Bulknav. (Def.'s Ex. 55/Doc. 169-35). Shelly Ventures S.A. owned approximately 69%. (Id.).

(7) Shelly Ventures was owned by Paul Coronis, his siblings Jonathon Coronis and Chianna Coronis, Paul's parents Nicholas Coronis and Annabel Charlton a/k/a Annabel Coronis and Paul's grandmother, Anastasia Kalogirou. (Joint Pretrial Doc. Agreed Facts/Doc. 149 at 13, ¶ 6). The remaining thirty-one percent of Bulknav's shares are owned by four separate and unrelated shareholders. (Id. at ¶ 7). In other words, the Coronis family owned the same percentage of Nikka after Bulknav became the holding company.

(8) In a December 5, 1991 Resolution of Primera, Nicholas Coronis signed as Primera's sole shareholder. (Plf.'s Ex. 63/Doc. 168-25 at 4). This represents the last documentary evidence of Primera's beneficial ownership before the FFA market collapsed.

(9) The Coronis family therefore owned approximately 69% of Nikka and Nicholas Coronis owned 100% of Primera. The Court **FINDS** substantial overlap in the ownership of Nikka and Primera.

### b. Discussion

"The fact that two companies have 'one-hundred percent' common ownership is, alone, 'an insufficient basis for applying the alter ego theory to pierce the corporate veil.'" Eitzen Chem., 749 F. App'x at 771 (quoting Jon-T Chemicals, 768 F.2d at 691).

Nikka contends that the ownership overlap between the two companies consists solely of Nicholas Coronis' ownership of both Primera and Nikka. It argues that "the only common stock ownership between Primera and Nikka is a less than 9% interest held by Nicholas Coronis." (Doc. 143 at 12). D'Amico takes the view that the real focus of this factor should be Coronis family ownership. (Doc. 153 at 35).

Nicholas Coronis, the apparent patriarch of the Coronis family, was either the sole or primary owner of Primera. His individual shares in Shelly Ventures (and, in turn, Nikka) has not been credibly disclosed, but members of his family own almost 69% of Nikka. This overlap in ownership is significant when viewed in light of the fact that the evidence indicated that Nicholas and Paul Coronis were the only active shareholders in the business of Primera and Nikka.

The Court concludes that the overlap in ownership weighs in favor of a finding of alter ego. This conclusion differs from the conclusion the Court reached in its order denying Nikka's motion to vacate. (See Doc. 40 at 14-15 ("the only common stock ownership between Primera and Nikka is a less than 9% interest held by Nicholas Coronis. This factor weighs against finding Nikka to be an alter ego of Primera.")). This change in opinion is the result of a better understanding through evidence presented at trial of how the Coronis family managed and held their assets.

### 2. Common directors or officers

### a. Findings of Fact

(10)   D'Amico and Nikka agree that at the time the parties entered into the FFA, "there was some overlap in the officers[ and] directors . . . of both" Primera and Nikka. (Joint Pretrial Doc. Agreed Facts/Doc. 149 at 7, ¶ 2).

(11)   A Resolution of the Sole Shareholder of Primera, dated December 5, 1991, shows that Nicholas Coronis was the sole director of the company and the President, Vice President, Treasurer and Secretary. (Plf.'s Ex. 63/Doc. 168-25 at 2).

(12)   That same Resolution decreased the membership of Primera's Board of Directors from two members to one. (Id.). Nicholas Coronis therefore held the abovementioned offices and also served as Primera's sole director.

(13)   Minutes from a November 21, 2008 Joint Meeting of Primera's Shareholders and Director list Nicholas Coronis as Primera's President, Secretary, Treasurer, and director. (Plf.'s Ex. 63/Doc. 168-25 at 1). The letterhead of the meeting describes the document as "Minutes of a Joint Meeting of the Sole Director and the Shareholders of Primera . . . ." (Id.).

(14)   Documentary evidence suggests that from December 5, 1991 until November 21, 2008 Nicholas Coronis held the President, Secretary, and Treasurer officer positions in Primera, as well as its sole directorship.

(15)   However, according to jointly stipulated facts from the Southern District of New York trial, Paul Coronis served as a director of Primera from 2002 to 2008. (Plf.'s Ex. 85 at ¶ 26/Doc. 168-30 at 4, ¶ 26).

(16)   On November 21, 2008, Eleftherios Atherinos was elected as Primera's director. He also became the President, Secretary, and Treasurer. (Plf.'s Ex. 63/Doc. 168-25 at 1).

(17)   At the time of Nikka's incorporation in 2007, Paul Coronis occupied all of Nikka's officer positions. (Paul Coronis Depo. Oct. 24, 2018 at 161:22-162:5).

(18)   Until October 15, 2009, Paul Coronis served as Nikka's sole director. (Plf.'s Ex. 1/Doc. 168-1 at 115). Nikka's Board of Directors' Resolution identified Paul Coronis as Nikka's sole director. The Resolution also designated two other individuals as directors: Niccolo Benvenuti and George Papadopoulos. (Id.)

(19)   Nikka's Board of Directors' Resolution dated October 15, 2009, added Benvenuti and Papadopoulos as President and Secretary/Treasurer, respectively. (Plf.'s Ex. 1/Doc. 168-1 at 114).

(20)   The Court **FINDS** the overlap in directors between Nikka and Primera was substantial based on Paul Coronis holding the position of director of both entities.

### b. Discussion

Evidence of intertwined, common, or overlapping officers, without more, is insufficient to find alter ego liability. See, e.g., Gibralter Sav. b. LDBrinkman Corp., 860 F.2d 1275, 1287 (5th Cir. 1988) (footnote omitted) ("[m]any wholly-owned subsidiaries and closely-held corporations are not factually distinct from their owners. Many are in fact controlled and operated in close concert with the interests of the owners, and do not have a distinct factual existence: separate employees, offices, or properties; consolidated financial reporting and tax returns; and the like. Such conduct is perfectly natural and proper and provides no basis for ignoring legal independence.[ ]…The problem arises when such a corporation is not treated as legally distinct; when, in other words, the owners neglect to maintain the formal independence of the corporation as required by law[]"); Austral Asia PTE, Ltd. v. SE Shipping Lines Pte., Ltd., 2012 WL 2567149, *2 (E.D. La. Jul. 2, 2012) ("some overlap of . . . officers[ and] directors . . . is not unusual in this [maritime] industry…without more, the Court finds such commonalities to be of little import[]").

Nikka and Primera shared one common director: Paul Coronis. Paul Coronis served as one of two directors of Primera and as Nikka's sole director simultaneously, from Nikka's genesis until he purportedly resigned as a director of Primera in November 2008. Paul Coronis' overlapping directorships constitutes significant overlap. This factor weighs in favor of an alter ego finding.

24

### 3. Common business departments/common offices

#### a. Findings of Fact

(21)   Primera is a Liberian corporation with a registered address at 80 Broad Street, Monrovia, Liberia. (Plf.'s Ex. 85 at 1/Doc. 168-30 at 1).

(22)   Primera did not maintain any offices or employees in Liberia. (Plf.'s Ex. 85 at ¶ 30/Doc. 168-30 at 5, ¶ 30).

(23)   Instead, Primera operated out of a multi-story building located at 6 Roupel Street, Athens. (Plf.'s Ex. 85 at ¶ 31/Doc. 168-30 at 5, ¶ 31).

(24)   Nikka's registered address is Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960, but it had no offices or employees there. (Joint Pretrial Doc. Agreed Facts/Doc. 149 at 12, ¶ 2).

(25)   Pursuant to the May 21, 2008 Facility Agreement communications for all borrowers, including Nikka, were to be sent in care of Primera to its address at 6 Roupel Street, Athens. (Plf.'s Ex. 1 at 0083/Doc. 168-1 at 84).

(26)   Nikka had no business departments. Instead, Primera managed Nikka, as its managing agent.

(27)   Prior to purchasing the SEA GLASS II in 2007, Paul Coronis consulted various Primera departments (including the chartering and technical departments) surrounding the SEA GLASS II's acquisition. (Paul Coronis Depo. Oct. 24, 2018 at 43:1-22; id. at 275:10-17).

(28)   Paul Coronis testified in his deposition that when Nikka received Swift confirmations through Primera's fax machines, his assistant/secretary, Mrs. Galafy, filed them in Primera and later Primebulk's shelves. (Id. at 54:4-15).

(29)   Mrs. Galafy assisted Paul Coronis throughout his involvement with Nikka at Primebulk and Primera. (Paul Coronis Depo. Oct. 24, 2018 at 50:12-51:2).   Primera, and afterwards Primebulk, paid Mrs. Galafy's salary. (Id. at 51:3-6).

(30)   A "Management Agreement" between Nikka (the "owner") and Primera (the "manager"), dated October 10, 2008, contained the following:

> IT IS HEREBY MUTUALLY AGREED as follows:
> l. The Owner hereby appoints the Manager and the Manager hereby accepts the appointment to act as Manager of the Vessel and in that capacity and subject as hereinafter provided, the Manager shall have and be entrusted with the operation of the Vessel.

2. As such the Manager shall as instructed from time to time by the Owner and in the name of the Owner to do all end any of the matters and things which concern the day to day operation of the Vessel, particularly:

> (1) appoint sub-Agents on such other territories all over the world as may become from time to time necessary to attend the Vessel's business in the normal course of the trading of the Vessel;
>
> (2) procure and/or terminate the services of such persons as Masters, Mariners, Officers, Engineers, Seamen, Surveyors, Superintendents and other necessary persons as the Manager may think proper and negotiate and pay their fees and/or wages;
>
> (3) attend to and deal with the maintenance, manning, crewing, equipping, victualling, storing, loading, discharging of the Vessel and supervising all such activities;
>
> (4) check and pay the Master's accounts and disbursements at the various ports of call of the Vessel;
>
> (5) marketing and negotiating the employment of the Vessels (including executing charterparties)
>
> (6) arranging bunker fuels, issuing voyage instructions, appointing stevedores and other agents;

(Plf.'s Ex. 14/Doc. 168-4 at 1-2).

(31) The Court **FINDS** Primera and Nikka utilized common business departments and offices. Specifically, the Court **FINDS** that Nikka relied on Primera's established office and business department to conduct business matters and operations.

### b. Discussion

Any business activity Nikka conducted, it did so either via Primera's established business departments or through Primera's established equipment or address. Despite registered addresses in two different countries, Nikka's true business center and nucleus of operations consisted of the same address as Primera's: 6 Roupel Street, Athens. It is impossible to discern whether Paul Coronis was wearing the Nikka director hat or the Primera director hat when he conducted Nikka's business.

The Court appreciates that pursuant to the Primera/Nikka Management Agreement, Primera assumed certain responsibilities, such as attending to and dealing with maintenance, manning, crew, etc. (Plf.'s Ex. 14/Doc. 168-4 at 1). The agreement also called for the manager to

keep certain accounts, records, and reports. (Plf.'s Ex. 14/Doc. 168-4 at 2). That Primera served as Nikka's manager may justify its performance of some of the roles one might expect a normal corporation to conduct on its own. And this may explain a diminished need for Nikka to maintain its own business departments and offices. However, this relationship apparently predated the October 2008 Management Agreement. As an example, the May 2008 Facility Agreement designated Primera's Athens location as the address for all communications for the borrowers, including Nikka. This factor demonstrates that at least initially there was no formal division between Primera and Nikka's business operations. The lack of an independent business center supports an alter ego finding.

At the motion to vacate juncture, the Court relied on the Management Agreement to justify the significant evidence that Primera—from all outward appearances—conducted most of Nikka's affairs. However, after considering the timeline of Nikka's incorporation and the Management Agreement, the evidence demonstrates Nikka and Primera's use of common business departments and offices exceeded the purportedly arm's length transaction the Management Agreement represented.

### 4. Consolidated financial statements and tax returns

### a. Findings of Fact

(32)   D'Amico did not introduce evidence demonstrating Nikka and Primera filed or compiled joint financial statements and tax returns. The Facility Agreement, however, obligated d'Amico and Nikka (along with other parties to the Facility Agreement) to submit various combined financial documents and audits to the documentary agent.

(33)   Paul Coronis testified the "documentary agent requested what it requested and was happy with what it received." (Paul Coronis Depo. Oct. 24, 2018 at 248:14-249/2).

(34)   Nikka offered evidence that Nikka compiled distinct and separate financial statements— rudimentary though they were—titled "Annual Report & Accounts," for the following years:

      a)   2008 (Def.'s Ex. 10/Doc. 169-5).

      b) 2009 (Def.'s Ex. 21/Doc. 169-16).
      c) 2010 (Def.'s Ex. 20/Doc. 169-15).
      d) 2011 (Def.'s Ex. 19/Doc. 169-14).

(35)   Nikka maintained its own bank account. (Doc. 179 & Paul Coronis Depo. Oct. 24, 2018 at 58:6-12).

(36)   The Court **FINDS** Nikka and Primera did not compile consolidated financial statements and tax returns.

### b. Discussion

Although the explicit language of the Facility Agreement obligated Nikka and Primera to compile and submit consolidated financial statements, none were produced. And although no evidence exists that Primera and Nikka compiled a consolidated financial statement or audit, the Facility Agreement bound them to do so.

Nikka points to at least four distinct and separate financial statements, dating from 2008 though 2011, representing the most relevant time period. These reports show an abbreviated and general financial summary of Nikka's year. Documentary evidence exists that at least in the latter half of 2010, Nikka maintained its own bank account at Piraeus Bank. On balance, this factor does not add support to an alter ego theory.

### 5. One finances the other

### a. Findings of Fact

(37)   A July 10, 2007 Memorandum of Agreement set forth the initial terms for the construction of the SEA GLASS II (Def.'s Ex. 8/Doc. 169-3). The Memorandum of Agreement predated Nikka's incorporation in September 2007.

(38)   After the MOA was signed and before Nikka was incorporated, unidentified investors paid $4,025,000 into a joint account for the down payment of the SEA GLASS II. (Paul Coronis Depo. Oct. 24, 2018 at 301:7-17). The Court is unable to determine who paid the initial down payment.

(39)   The remainder of the construction costs was financed through a $204 million Facility Agreement between HSH Nordbank and various "Joint and Several Borrowers" dated May 21, 2008. Primera was the corporate guarantor under the Facility Agreement. Paul and

Nicholas Coronis provided limited personal guarantees under the Facility Agreement. (Joint Pretrial Doc. Agreed Facts/Doc. 149 at 13, ¶ 11; id. at 14, ¶ 13).

(40)   No consideration was given to Primera for agreeing to be a corporate guarantor. Primera's formal relationship with Nikka, via the Management Agreement, commenced five months later.

(41)   The Facility Agreement defines "Group" to include "the Borrowers, the Corporate Guarantor and any other ship-owning companies directly or indirectly owned by any holding company from time to time during the Security Period and 'member of the Group' shall be construed accordingly[.]" (Plf.'s Ex. 1 at 0012/Doc. 168-1 at 13).

(42)   The Facility Agreements defines "Total Assets" to mean the aggregate value of all trade debtors and the value of all stock and all other investments and other tangible and intangible assets of the Group . . . ." The Facility Agreement obligated that the Group's accounts be provided to the Documentary Agent for the purpose of calculating the ratio referred to in Clause 17.4(b). (Plf.'s Ex. 1 at 0023/Doc. 168-1 at 24).

(43)   "Total Equity" was also defined to encompass "the value of the stockholders' equity (including, without limitation, shareholder loans) of the Group determined on a consolidated basis in accordance with GAAP and as shown in the consolidated balance sheets for the Group in the Applicable Accounts[.]" (Id.).

(44)   Paul Coronis signed the Facility Agreement on Nikka's behalf. (Plf.'s Ex. 1 at 106/Doc. 168-1 at 107).

### b.  Discussion

Although no evidence demonstrated that Primera's guarantee of the Facility Agreement resulted in any expense to Primera, the fact that Primera guaranteed Nikka's (and the other vessel-owning entities') debt indicates this relationship between Nikka and Primera was less than arm's length. The Court previously opined that while Primera might have had to pay off on its guarantee, that did not become necessary, and so this factor did not weigh in favor of an alter ego determination. However, upon reconsideration, Primera's decision to act as a corporate guarantor without any apparent consideration, putting its assets at risk, weighs in favor of a finding of alter ego because it suggests that Primera treated Nikka as its own.  See Bridas, 447 F.3d at 420 n.10

(acknowledging whether one finances the other includes a determination whether "others pay or guarantee debts of the dominated corporation"). As a result, this factor supports an alter ego theory.

### 6. One caused the incorporation of the other

#### a. Findings of Fact

(45)   Primera was incorporated on June 22, 1990. (Def.'s Ex. 59/Doc. 169-37 at 1).

(46)   Nikka was incorporated on September 5, 2007. (Def.'s Ex. 31/Doc. 169-24).

(47)   Paul Coronis testified that he most likely asked for Nikka to be incorporated via outside counsel. (Paul Coronis Depo. Oct. 24, 2018 at 26:9-11). Later, he testified in his deposition that Nikka was incorporated "on the request of [himself] and Nikka shareholders." (Id. at 161:17-21).

(48)   Before Bulknav held 100% of Nikka's shares, the Coronis family owned "approximately 69 percent of Nikka." (Id. at 39:14-16).

#### b. Discussion

Paul Coronis played an essential role in incorporating Nikka. However, that does not necessarily indicate Primera's involvement with incorporating Nikka. This factor does not support an alter ego ruling.

### 7. One operated with grossly inadequate capital

#### a. Findings of Fact

(49)   Primera entered into an FFA contract with D'Amico on September 2, 2008. There was no evidence presented regarding D'Amico's financial condition in September 2008.

(50)   As of December 31, 2008, Primera had total assets of $132,862.00. (Plf.'s Ex. 35/Doc. 168-19 at 2). This figure included cash in the bank of $116,982.00. (Id.)

#### b. Discussion

"Undercapitalization is often critical in alter ego analysis." Bridas, 447 F.3d at 420. See also Gardemal v. Westin Hotel Co., 186 F.3d 588, 594 (5th Cir. 1999) ("undercapitalization is a critical factor in our alter-ego analysis..."); Wm. Passalacqua Builders, Inc. v. Resnick Dev. S.,

Inc., 933 F.2d 131, 142 (2nd Cir. 1991) ("the degree of capitalization ... is clearly relevant to the piercing inquiry..."); Classic Maritime Inc. v. Limbungan Makmur SDN BHD, 646 F. Supp. 2d 364, 371 (S.D.N.Y. 2009) ("Evidence of substantial undercapitalization . . . is significant because it can be evidence of a company's lack of independent substance.") (Koeltl, J.).

Primera appears to have been undercapitalized, considering the millions of dollars of potential losses at risk with respect to the FFAs. But the Court is mindful that d'Amico chose to deal with Primera, and no evidence demonstrates that Primera misrepresented its financial condition to d'Amico. Moreover, based on the evidence presented, the Court is unable to determine Primera's financial condition when it entered into the FFA with d'Amico.

### 8. One pays the salaries and other expenses of the other

#### a. Findings of Fact

(51)  On October 10, 2008, Primera and Nikka executed a Management Agreement. (Plf.'s Ex. 14/Doc. 168-4). The agreement contained the following:

> IT IS HEREBY MUTUALLY AGREED as follows:
> l. The Owner hereby appoints the Manager and the Manager hereby accepts the appointment to act as Manager of the Vessel and in that capacity and subject as hereinafter provided, the Manager shall have and be entrusted with the operation of the Vessel.
> 2. As such the Manager shall as instructed from time to time by the Owner and in the name of the Owner to do all end any of the matters and things which concern the day to day operation of the Vessel, particularly:
> > (1) appoint sub-Agents on such other territories all over the world as may become from time to time necessary to attend the Vessel's business in the normal course of the trading of the Vessel;
> > (2) procure and/or terminate the services of such persons as Masters, Mariners, Officers, Engineers, Seamen, Surveyors, Superintendents and other necessary persons as the Manager may think proper and negotiate and pay their fees and/or wages;
> > (3) attend to and deal with the maintenance, manning, crewing, equipping, victualling, storing, loading, discharging of the Vessel and supervising all such activities;
> > (4) check and pay the Master's accounts and disbursements at the various ports of call of the Vessel;

(5) marketing and negotiating the employment of the Vessels (including executing charterparties)

(6) arranging bunker fuels, issuing voyage instructions, appointing stevedores and other agents;

(7) perform accounting/treasury services and such other duties as the Owner shall from time to time require, provided always that in the exercise of all or any of the powers hereunder granted the Manager shall at all time as may be necessary or expedient act in consultation with and under the directions of the Owner.

(Plf.'s Ex. 14/Doc. 168-4 at 1-2).

(52)  A subsequent ship Management Agreement between Nikka and Primebulk, obligated Primebulk to provide "suitably qualified crew for the vessel . . . ." (Plf.'s Ex. 45/Doc. 168-21 at 2).

(53)  Notwithstanding these obligations, no bank records from 2008, 2009, and the first half of 2010 were produced demonstrating Nikka paid Primera for these services.

(54)  Paul Coronis testified in his 2018 deposition that part of Nikka's operating expenses would be crew wages. (November 28, 2018 Trial Transcript at 323:18-25). He stated that Nikka provided funds based upon the budget to Primera, and that Primera would then pay the wages to the crew or manning agent. (November 28, 2018 Trial Transcript at 324:1-6). The Court does not find Paul Coronis to be a credible witness as to Nikka's reimbursement of crew wages.

(55)  The reimbursements from Nikka to Primera should have included salaries and expenses Nikka incurred during the operation of the SEA GLASS II. However, the Court draws an adverse inference from the lack of Nikka's banking records for the material time period (beginning in 2008). Based on this inference, Primera funded the salaries and paid for the expenses Nikka incurred by operating the SEA GLASS II.

(56)  Contained within Nikka's "Annual Report & Accounts" for the years 2008, 2009, 2010, and 2011 was a "Payables and Accruals" line item, which totaled the following amounts for the specific years.

    a)  2008: $1,483,403. (Def.'s Ex. 10/Doc. 169-5).
    b)  2009: $1,168,349. (Def.'s Ex. 21/Doc. 169-16 at 3).
    c)  2010: $3,116,836. (Def.'s Ex. 20/Doc. 169-15 at 3).
    d)  2011: $3,855,403. (Def.'s Ex. 19/Doc. 169-14 at 3).

These reports do not indicate or demonstrate that this line item included any disbursements specifically to Primera. Moreover, these reports are not audited and there was no documentary evidence to support the report.

(57)   The Court **FINDS** that Primera paid the salaries and other expenses Nikka incurred and was not reimbursed by Nikka.

### b.   Discussion

The Management Agreement purports to be an arm's length transaction between Primera and Nikka for the management of the SEA GLASS II, but was prepared when Paul Coronis was the director of both entities. That Primera initially paid the salary of Nikka's crewmen and the expenses incurred by the SEA GLASS II would not ordinarily indicate an alter ego relationship, considering the Management Agreement contractually obligated Primera to "attend to and deal with . . . manning[ and] crewing." (Plf.'s Ex. 14/Doc. 168-4 at 1-2). However, in this case, the adverse inference drawn by this Court (Primera paid Nikka's salaries and expenses and was not reimbursed for those costs) results in the conclusion that this factor supports an alter ego finding.

### 9.   One receives no business except that given to it by the other

### a.   Findings of Fact

(58)   Primera engaged in the business of ship management. (Plf.'s Ex. 85 at ¶ 2/Doc. 168-30 at 1, ¶ 2). Greek Law 89 records, of which the Court lacks an English translation, show Primera managed as many as five vessels during the year 2008. (Plf.'s Ex. 8 at 192/Doc. 168-2 at 1). Of the five vessel-owning companies, one was Forza Maritime Ltd., based in the Marshall Islands. According to this document, Primera managed Forza's vessel, the ECLIPSE, from January 1, 2008 to January 16, 2008.  No evidence was presented that the Coronis family controlled or owned this company.

(59)   Of the remaining four companies that owned a vessel Primera managed, the Coronis family owned about 69% of each company. (Def.'s Ex. 58/ Doc. 169-40 at 2 (Paul Coronis May 10, 2016 Testimony at 173)).

(60)   In mid-2008, Primera managed four ships, all primarily owned by the Coronis family: the AQUADANCE, the ADALIA, the MOONDANCE II, the SUNRAY, and the SEA GLASS II. (Id.).

(61)   By June of 2008 and at the time Primera executed the FFA with Primera, Greek Law 89 documents show Primera managed three vessels. (Plf.'s Ex. 8 at 192/Doc. 168-2 at 1). The Coronis family owned 69% of each company. (Def.'s Ex. 58/Doc. 169-40 at 2 (Paul Coronis May 10, 2016 Testimony at 174)).

(62)   Primera managed three vessels during 2009: the MOONDANCE II, SUNRAY, and SEA GLASS II. (Plf.'s Ex. 8 at 199A/Doc. 168-2 at 5).

(63)   Primera also entered into FFAs with corporations other than d'Amico Dry d.a.c., the plaintiff in this case. (Plf's Ex. 29-31/Doc. 168-15, 168-16 & 168-17).

(64)   Nikka entered into at least two time charters with companies. (Def.'s Ex. 9 & 33/Docs. 169-4 & 169-25). One time charter is dated June 24, 2008. (Def.'s Ex. 9/Doc. 169-4). The other time charter is dated August 1, 2009. (Def.'s Ex. 33/Doc. 169-25). The time charters do not depict Primera as a party.

(65)   The Court **FINDS** both Primera and Nikka received business outside the business Primera generated by managing the SEA GLASS II.

### b.  Discussion

Primera engaged in two types of business activities around the same time it executed the FFA with Primera: it managed vessels and it traded FFAs. Managing the SEA GLASS II constituted a part of Primera's business, but it was not a majority. At the time Primera and d'Amico executed the FFA, Primera managed two other vessels.

Nikka's revenue did not originate from Primera; instead, Primera acted as an agent to secure paying time charters. Although d'Amico observes that Primera's ship-managing activity largely—if not exclusively in 2008—revolved around Coronis-owned vessels, those vessels and the companies that own them are not the object of this litigation and therefore are not considered in whether Nikka constituted all of Primera's business and vice versa. On balance, this factor does not support an alter ego finding.

### 10. One uses the other's property as its own

### a.  Findings of Fact

(66)   Paul Coronis, while serving as a director of Primera, vetted and negotiated the purchase of the SEA GLASS II. (Paul Coronis Depo. Oct. 24, 2018 at 275:1-9).

(67)   Paul Coronis sought the advice of Primera's chartering manager and technical manager regarding the SEA GLASS II and its chartering ability, including "the specification, the

maker's list, [and] the yard where it was being built . . . ." (Id. at 275:10-17). There is no documentary evidence Nikka reimbursed Primera for this consulting.

(68)  Paul Coronis testified in his deposition that Primera employees assisted him in paying Nikka's invoices and that confirmation of wire transfers were sent to Primera's fax machines. (Id. at 51:3-54:3).

(69)  Paul Coronis testified in his deposition that when Nikka received SWIFT payment confirmation through Primera's fax machines, his secretary filed them in the desks of Primera and Primebulk. (Id. at 54:4-15).

(70)  The Court **FINDS** Primera's property (specifically its Athens office) was commonly used by Paul Coronis to conduct business on Nikka's behalf.

### b. Discussion

Nikka maintained no office of its own, aside from what Paul Coronis termed a floating office on the vessel.  Instead, Nikka used Primera's assets to conduct its business.  This use predated Nikka's incorporation and continued, even when no Management Agreement was in effect, until Primera dissolved.  Primera provided property, office space, and other support for Nikka without regard to corporate separateness and, as previously discussed, without reimbursement. This factor supports an alter ego finding.

### 11. Daily operations of the two corporations are not kept separate

### a.  Findings of Fact

(71)  Pursuant to the May 21, 2008 Facility Agreement, the daily operations of Nikka were managed by Primera. (Plf.'s Ex. 1/Doc. 168-1).

(72)  Nikka maintained its own bank account. (Def.'s Ex. 38/Doc. 169-28).

(73)  During the relevant time period, Paul Coronis was either the formal director of both entities or continued to be intricately involved in each entities' daily operations.

(74)  The Court **FINDS** Primera and Nikka's daily operations were not kept separate.

### b.  Discussion

As discussed above, the Management Agreement obligated Primera to perform services consistent with the normal operation of a vessel. On the other hand, evidence also exists that when Nikka did conduct operations outside the Management Agreement, it did so either through Primera's office or utilized Primera's established departments to conduct the business. This factor supports a finding of alter ego.

### 12. The companies observe basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings

#### a. Findings of Fact

(75)   There is no documentary evidence of Nikka bylaws or shareholder/board minutes during the period preceding Bulknav's existence.

(76)   Nikka compiled separate financial statements, titled "Annual Report & Accounts," for the following years:

      a)  2008 (Def.'s Ex. 10/Doc. 169-5).
      b)  2009 (Def.'s Ex. 21/Doc. 169-16).
      c)  2010 (Def.'s Ex. 20/Doc. 169-15).
      d)  2011 (Def.'s Ex. 19/Doc. 169-14).

(77)   A resolution of Nikka's Board of Directors adopted on October 15, 2009 indicates Nikka appointed individuals as President and Secretary-Treasurer. (Def.'s Ex. 14/Doc. 169-9 at 1).

(78)   A second resolution dated October 15, 2009 indicates the election of two other individuals as directors: Niccolo Benvenuti and George Papadopoulos. (Def.'s Ex. 15/Doc. 169-10).

(79)   These Nikka resolutions are dated *after* Paul Coronis realized the FFA market was imploding. See Finding of Fact ¶ 13.

(80)   Nikka rarely held Board of Directors minutes. And it did so only after Paul Coronis knew the FFA market was collapsing and that Primera would be unable to fulfill its debts. No shareholder minutes were produced. Therefore, between incorporating on September 5, 2007 and Bulknav becoming Nikka's holding company, there is scant evidence of Nikka observing corporate formalities.

(81)   Primera complied with Law 89 by submitting documents such as annual reports, a list of employees, and the vessels Primera managed during a period. (Def.'s Ex. 59 001-022/Doc. 169-37 at 1-22).

(82) The Court **FINDS** Nikka rarely observed corporate formalities, such as conducting shareholder and board meetings.

### b. Discussion

When addressing whether a corporation observes corporate formalities, the critical analysis centers on substance and not form. E.g., Bridas, 447 F.3d at 418 (stating the court's error in not finding alter ego derived from emphasizing "form over the substance"); Jon-T Chemicals, Inc., 768 F.2d at 693 (faulting appellant for "put[ing] form ahead of substance"). Nikka argues the February 23, 2009 Bulknav Board of Directors minutes constitutes evidence that Nikka observed corporate formalities for the year 2008. (November 28, 2018 Trial Transcript at 335). But it does nothing of the sort. The approval was a blanket approval for all the companies Bulknav held. It was not Nikka who observed corporate formalities but instead Bulknav. In sum, this factor favors an alter ego finding because Nikka failed to observe corporate formalities.

## VII. CONCLUSION

Although not all of the 12 abovementioned factors favor a finding of alter ego, not all of the factors must be present in order to establish an alter ego relationship. See Eitzen Chem., 749 F. App'x at 771 ("It is not necessary that the party seeking to pierce the corporate veil prove all of the factors, but enough of the factors must exist to indicate the necessary degree of control by one company over the other to constitute an alter ego relationship."); Williamson, 542 F.3d at 53 ("There is no set rule as to how many of these factors must be present to warrant piercing the corporate veil and courts have considered additional factors as well."); Jon-T Chemicals, Inc., 768 F.2d at 694 ("[T]here is no litmus test for determining whether a subsidiary is the alter ego of its parent.").

D'Amico has proven by a preponderance of the evidence that, at all material times, Nikka and Primera were alter egos. The identity of these two entities was blurred such that both were

treated as one. Nikka and Primera largely ignored their respective independent business structures. The lack of independence is demonstrated by the significant overlap of ownership (69%) between Primera and Nikka, Paul Coronis' simultaneous service as Nikka's sole director while serving as one of two of Primera's directors, Nikka's use of Primera's established business departments, Nikka's failure to compensate Primera for its ship managing services, Nikka's failure to fully reimburse Primera for the SEA GLASS II's crewmen's salary, Nikka's use of Primera's property for its own purposes, and Nikka's failure to properly observe corporate formalities. In sum, the court finds that Nikka and Primera were alter egos. Nikka is therefore liable for the 2009 English judgment.

**DONE** the 1st day of March 2019.


/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**